1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SOUTH FERRY LP #2, individually and on
behalf of all others similarly situated,

                    Plaintiffs,                          CASE NO. C04-1599C

          v.                                            ORDER

KERRY K. KILLINGER, THOMAS W.
CASEY, DEANNA W. OPPENHEIMER,
WILLIAM W. LONGBRAKE, CRAIG J.
CHAPMAN, JAMES G. VANASEK, and
WASHINGTON MUTUAL, INC.,

                    Defendants.

ORDER – 1

# TABLE OF CONTENTS

I.      INTRODUCTION      .      .      .      .      .      .      .      .      .      3

II.     BACKGROUND      .      .      .      .      .      .      .      .      .      3

III.    APPLICABLE STANDARD UNDER FED. R. CIV. P. 12(b)(6)      .      .      .      5

IV.     SECTION 10(b) CLAIMS      .      .      .      .      .      .      .      .      5

        A.      Materially false and misleading statements      .      .      .      .      6

                1.      Identification of statements      .      .      .      .      .      6

                2.      Threshold actionability of accused statements      .      .      .      8

                3.      Materiality of misrepresentations or omissions      .      .      .      20

        B.      Scienter      .      .      .      .      .      .      .      .      .      23

                1.      Knowledge      .      .      .      .      .      .      .      .      24

                2.      Stock sales      .      .      .      .      .      .      .      .      30

                        a.      Defendant Killinger      .      .      .      .      .      .      33

                        b.      Defendant Casey      .      .      .      .      .      .      34

                        c.      Defendant Oppenheimer      .      .      .      .      .      35

                        d.      Defendant Longbrake      .      .      .      .      .      35

                        e.      Defendant Chapman      .      .      .      .      .      .      35

                        f.      Defendant Vanasek      .      .      .      .      .      .      36

                3.      GAAP violations      .      .      .      .      .      .      .      37

        C.      Causation      .      .      .      .      .      .      .      .      .      38

        D.      Reliance and damages      .      .      .      .      .      .      .      38

V.      SECTION 20(a) CLAIMS      .      .      .      .      .      .      .      .      39

VI.     LEAD PLAINTIFFS' STANDING      .      .      .      .      .      .      .      39

VII.    CONCLUSION      .      .      .      .      .      .      .      .      .      40

I.      INTRODUCTION

        This matter has come before the Court on Defendants' motion to dismiss Plaintiffs' Consolidated Amended Complaint.  (Dkt. No. 65.)  Having carefully considered the papers filed by the parties in support of and in opposition to the motion, the Court has determined that no oral argument shall be necessary.  For the reasons that follow, Defendants' motion is GRANTED in part and DENIED in part.

II.     BACKGROUND

        Plaintiffs' complaint[1] alleges that Defendants, Washington Mutual, Inc. ("WAMU") and certain of its senior executive officers, violated federal securities laws by issuing a series of materially false and misleading statements between April 15, 2003, and June 28, 2004 (the "Class Period").  (Opp'n 1.)  More specifically, Plaintiffs claim that Defendants made materially false and misleading statements representing that WAMU had successfully integrated its acquisitions and that it was well positioned to withstand changes in interest rates.  According to Plaintiffs, these statements were materially false and misleading because WAMU had, in fact, *not* integrated its acquisitions, and in particular, had not integrated the different information technology systems used by each, and because the lack of an integrated information technology system made it impossible for WAMU to be well positioned to deal with changes in the interest rate environment.

        In order to understand the significance of the accused statements made by Defendants, it is necessary to understand the context in which they were made.  During 2001 and the early part of 2002, WAMU acquired almost $25 billion in assets through five acquisitions.  (Am. Compl. ¶ 30.)  By April 2003, WAMU was the nation's second largest mortgage loan originator.[2]  (*Id*.)  WAMU's mortgage

---

[1]The lead plaintiffs, South Ferry LP # 2, Metzler Investment GmbH, and the Walden Management Company Pension Plan, seek to represent a class of investors who purchased and sold WAMU securities or sold WAMU put options during the Class Period.  (Opp'n  1.)

[2]Although WAMU is engaged in retail banking and financial services as well as mortgage banking, Plaintiffs' complaint involves only WAMU's mortgage banking business.

ORDER – 3

banking business originates and services home mortgage loans, buys and sells home mortgage loans in the secondary market, and provides mortgage-related insurance products.  (*Id.* ¶ 31.)  The mortgage banking business was exposed to two major sources of interest rate-related risk: (1) "pipeline" risk associated with new loans in the origination pipeline that are not yet closed and funded, and (2) loan servicing risk (mortgage servicing rights, or "MSR" risk).  Pipeline risk is attributable to the practice of allowing borrowers to lock in rates until their mortgages close.  If rates rise before the loans are funded, the bank takes a loss.  MSR risk derives from the fact that MSR value "is an estimate of the present value of the income (net of expense) a servicer expects to receive over the life of the serviced obligation."  (Defs.' Mot. 5.)  MSR value "depends largely on the number of years of servicing income that the servicer can expect, which in turn depends on the anticipated number of years each borrower will keep the loan before refinancing or selling their home."  (*Id.*)  Falling interest rates cause borrowers to pre-pay and re-finance their loans in order to take advantage of the lower rates.

To a certain extent, WAMU's loan origination business and its mortgage servicing business balanced or were expected to balance each other out as interest rates changed.  As WAMU Chief Executive Officer Kerry Killinger, a defendant in this action, explained in an interview,

> [W]e have a very balanced business model[,] one in which when housing's doing [*sic*] strong, we get high levels of loan originations and gains on sale of those loans and so forth.  When interest rates go up and we start to get a slowdown in housing, then we will have a real benefit of the servicing portfolio that we have of loans that we service for others, and that income should really kick in.

(Am. Compl. ¶ 59.)

In addition to the somewhat complementary relationship between the loan origination and the mortgage servicing businesses, each of these two businesses was "internally" hedged against decreases in value.  As Defendants explain in their brief, pipeline risk is hedged "by executing forward sales commitments, interest rate contracts, mortgage option contracts and interest rate futures."  (Defs.' Mot. 7.)  MSR risk is hedged by purchasing financial instruments which tend to increase in value when long term interest rates decline.  (*Id.*)

ORDER – 4

1     The central theme of Plaintiffs' complaint is that "throughout the Class Period, [WAMU] was

2    saddled with outdated and incompatible computer systems which could not share information necessary

3    to allow for effective hedging and satisfactory performance in the face of increasing interest rates."

4     Defendants have now moved to dismiss the complaint because it does not meet the heightened

5    pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  15 U.S.C. §

6    78u-4.

7    **III.    APPLICABLE STANDARD UNDER FED. R. CIV. P. 12(b)(6)**

8     Fed. R. Civ. P. 12(b)(6) provides that an action will be dismissed for failure to state a claim upon

9    which relief may be granted.  A court will grant dismissal only if "it appears beyond doubt that the

10   plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v.*

11   *Gibson*, 355 U.S. 41, 45–46 (1957).  While a court must accept all material allegations in the complaint

12   as true and construe them in the light most favorable to the nonmoving party, conclusory allegations of

13   law or unwarranted inferences of fact urged by the nonmoving party are insufficient to defeat a motion to

14   dismiss.  *Ove v. Gwinn*, 264 F.3d 817, 821 (9th Cir. 2001).  In addition, a court's obligation to construe

15   allegations in the light most favorable to the nonmoving party does not mean that those allegations must

16   be construed in a light favorable to the nonmoving party, if such a construction cannot reasonably be

17   made.

18   **IV.    SECTION 10(b) CLAIMS**

19    Here, Plaintiffs' claims are brought pursuant to Sections 10(b) and 20 of the Securities Exchange

20   Act of 1934 ("Exchange Act").  Section 10(b) makes it unlawful "for any person, directly or indirectly .

21   . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or

22   deceptive device or contrivance in contravention of such rules and regulations as the Commission may

23   prescribe."  15 U.S.C. §§ 78j, 78j(b).  Rule 10b-5, promulgated by the Securities and Exchange

24   Commission ("SEC") pursuant to Section 10(b), provides that "[i]t shall be unlawful for any person . . .

25   [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to

26   ORDER – 5

1  make the statements made, in the light of the circumstances under which they were made, not

2  misleading." 17 C.F.R. § 240.10b-5(b).  Accordingly, the Ninth Circuit has held that the elements of a

3  10b-5 claim are: (1) a misrepresentation or omission of a material fact; (2) scienter; (3) causation; (4)

4  reliance; and (5) damages.  *In re Daou Sys.*, *Inc. Sec. Litig.*, 397 F.3d 704, 710 (9th Cir. 2005).

5        The complaint in this matter is also subject to the pleading requirements of the Private Securities

6  Litigation Reform Act of 1995.  15 U.S.C. § 78u-4.  The PSLRA requires that a complaint must "specify

7  each statement alleged to have been misleading, the reason or reasons why the statement is misleading,

8  and, if an allegation regarding the statement or omission is made on information and belief, the complaint

9  shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1).  In

10 addition, the complaint must "state with particularity facts giving rise to a strong inference that the

11 defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2).  In the Ninth Circuit, the

12 required state of mind is one of "deliberate or conscious recklessness." *In re Silicon Graphics Sec.*

13 *Litig.*, 183 F.3d 970, 979 (9th Cir. 1999).  In the context of a Fed. R. Civ. P. 12(b)(6) motion, the Court

14 must determine whether "particular facts in the complaint, taken as a whole, raise a strong inference that

15 defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to

16 investors." *Id.* (citation omitted).

17       A.    *Materially false and misleading statements*

18       In order to simplify the analysis of Defendants' arguments with respect to the identification,

19 actionability, and materiality of the statements accused by Plaintiffs, the Court has prepared a non-

20 exhaustive summary table, attached as Appendix A.  Where suitable, the Court may refer to a specific

21 statement by the number assigned to it in the table.

22       1.    *Identification of statements*

23       Defendants argue that Plaintiffs' complaint should be dismissed because the complaint fails to

24 adequately identify the statements claimed to be false and misleading.  In addition, Defendants claim that

25 Plaintiffs do not articulate how or why any particular statement is false or misleading.  In support of their

26 ORDER – 6

1   argument, Defendants cite to various district courts who have expressed dissatisfaction with what is

2   ultimately an issue of style rather than of substance.  *See, e.g.*, *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d

3   1231, 1243– 44 (N.D. Cal. 1998) (complaining that analyzing the complaint "requires a laborious

4   deconstruction and reconstruction of a great web of scattered, vague, redundant, and often irrelevant

5   allegations"); *In re Capstead Mortgage Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 557 n.8 (N.D. Tex. 2003)

6   (complaining that "Plaintiffs' fifty-page complaint is . . . a document replete with circular statements.

7   Indeed, the simplest and easiest thing for the court to have done would have been to deny the motions to

8   dismiss with no explanation, rather than expend considerable hours of time on their resolution.  Such an

9   approach, however, although employed by some courts, is inconsistent with the court's duty to fully and

10  fairly discharge its obligations to the litigants.").

11          Having reviewed the amended complaint in fairly exhaustive detail, the Court finds that Plaintiffs

12  have clearly identified the particular statements alleged to be false or misleading by emphasizing the

13  relevant phrases, where necessary, and have adequately and clearly stated the reasons why the accused

14  statements are alleged to be false and misleading.  The Court also notes that Plaintiffs' complaint supplies

15  the requisite information about who made the statement and when it was made.  In particular, the Court

16  does not find that the complaint is organizationally defective.  *C.f. Wenger*, 2 F. Supp. 2d at 1243

17  (deploring the fact that the complaint had lumped *all* of the accused statements together in one section

18  and *all* of the reasons why the statements were alleged to be false and misleading in another section, with

19  no matching between the two, *i.e.*, which statements corresponded to which reasons).  Here, Plaintiffs

20  grouped certain statements together simply because they were made during the course of the same

21  conference call, or in the same document.  The Court finds that following this structure did not

22  excessively tax its judicial resources.

23          Further, the Court finds that Plaintiffs' attempt to comply with the heightened pleading standard

24  applicable in this case has not led Plaintiffs to "disregard the requirement of simplicity, directness and

25  clarity of Fed. R. Civ. P. 8."  2 F. Supp. 2d at 1239.  The Court therefore declines to dismiss the

26  ORDER – 7

1    complaint on the basis of Plaintiffs' pleading structure.

2                    2.       *Threshold actionability of accused statements*

3            Defendants argue that Plaintiffs have not identified any actionably false statements because the

4    statements identified in the complaint are (1) statements of historical fact, the falsity of which are not

5    alleged; (2) non-actionable puffery; or (3) forward-looking statements for which the PSLRA provides a

6    safe harbor.  (Defs.' Reply  13.)

7            In general, accurately reported historical data cannot provide the basis for a securities fraud claim.

8    *See, e.g.*, *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th

9    Cir. 1993).  Plaintiffs' amended complaint refers to and incorporates many sentences that contain only

10   historical financial information.  However, taking the pleading as a whole, it is clear that these sentences

11   are provided for their contextual value, rather than as examples of Defendants' alleged misleading and

12   false statements.  Indeed, the sentences containing factual financial data are interwoven with sentences

13   containing the allegedly false and misleading statements in such a way that (1) excising them would have

14   made the complaint very difficult to read and understand, and (2) in some cases, bolstered the allegedly

15   false and misleading nature of the accused statements.  (*See, e.g.*, Statement 4, relying on financial data

16   reflecting growth in the first quarter of 2003 and attributing the growth to WAMU's balanced business

17   model; Statement 6, relying on financial data reflecting growth in the second quarter of 2003 and

18   attributing the growth to WAMU's balanced business model; Am. Compl. ¶ 97, referring to growth in

19   WAMU's home loan mortgage banking income and attributing it to the "natural balance in our mortgage

20   banking model.")  The Court is particularly mindful of the Ninth Circuit's admonition that statements

21   cannot be considered in isolation, but must be considered in the context of the total presentation.  *Hughes*

22   *v. Dempsey-Tegeler & Co.*, 534 F.2d 156, 176 (9th Cir. 1976).  Here, the factual information provides—

23   and was provided for— context.  For these reasons, although Plaintiffs' amended complaint refers to

24   numerous statements involving accurately reported historical information, the Court does not find that

25   this feature renders the complaint's securities fraud claims any less cognizable.

26   ORDER – 8

Generally speaking, "projections and general statements of optimism may trigger liability under federal securities laws." *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1096 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996). However, statements that are "so vague or amorphous that no reasonable investor could rely on them"are considered non-actionable puffery. *Id.* The Third Circuit clarified "puffery" as follows:

> Strictly speaking, the securities laws recognize no distinct "puffing" exception. To say that a statement is mere "puffing" is, in essence, to say that it is immaterial, either because it is so exaggerated ("You cannot lose.") or so vague ("This bond is marvelous.") that a reasonable investor would not rely on it in considering the "'total mix' of available information."

*Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200–01 (3d Cir. 1990) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Thus, statements on the extreme edge of generality and vagueness may be insufficient as a basis for a securities fraud claim. However, as *Hoxworth*'s discussion of puffery demonstrates, the exception for puffery is narrowly drawn. In addition, the Ninth Circuit has held that "[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989).

Although Defendants' brief specifically identifies only two statements, Defendants point to paragraphs in the amended complaint that they argue contain puffery. (Defs.' Mot. 27.) The statements pointed to are certainly optimistic. However, given that they are either immediately preceded or followed by very specific statements of fact that supposedly justify or supply a foundation for the optimism, the Court cannot conclude that Plaintiffs' claims are founded on mere puffing by Defendants.

For example, in paragraph 89, Plaintiffs cite to statements made by Defendant Oppenheimer at a conference on December 9, 2003:

> As highlighted earlier, we have not been in a position to fully integrate the system to the mortgage companies that we acquired in 2000 and 2001. The end of the refinance wave now affords us that opportunity, and this slide shows you that our point-of-sale origination system, Optus.1, is now rolled out to the vast majority of our systems.

ORDER – 9

We anticipate that we'll be on a common operational and technology platform for loans servicing in the third quarter of 2004.  We have chosen to partner with Fidelity Financial as our loan servicing provider for two reasons.  First, the lower risk to convert the smaller home side portfolio onto the larger Washington Mutual portfolio as opposed to the other way.  The second reason is cost.  Our renegotiated agreement with Fidelity enables us to achieve the efficiencies that we originally projected in the acquisitions of home side ALLS platforms.

In the fulfillment area we have our work cut out for us.  Our past systems integration experience in acquisitions will be put to good use as we tackle the complexities of this challenge.  We currently have nine different loan origination systems in our mainstream home lending channel.

(Am. Compl. ¶ 89.)  Defendants argue that the penultimate sentence of the statement above is mere puffery.  The Court disagrees.  This sentence, standing alone or in a different context, *could* constitute puffery.  However, in this specific textual (Defendant Oppenheimer's whole statement containing several very specific representations of fact) and factual (historical) context, both of which highlighted the importance of WAMU's ability to integrate its acquisitions and to hedge its operations, a reasonable investor would assign some importance to Defendant Oppenheimer's reference to WAMU's past systems integration experience.  For example, a reasonable investor might rely on this sentence to conclude that despite the obvious challenge of integrating nine different loan originations systems, WAMU's seasoned systems integration people would be able to pull the company through.  For these reasons, the Court does not find that the sentence singled out by Defendants constitutes non-actionable puffery.

The analysis is virtually identical for the other paragraphs listed by Defendants.  Therefore, the Court finds that Plaintiffs' amended complaint is not founded on non-actionable puffery.

Finally, Defendants argue that the bulk of the accused statements are forward-looking statements for which the PSLRA provides a safe harbor.  The safe harbor provisions of the Exchange Act provide that a person shall not be liable for any (1) "forward-looking statement," (2) that is identified as such, and (3) is accompanied "by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  *Id.* § 78u-5(c)(1)(A)(I).  However, a forward-looking statement may be actionable if it was made with actual knowledge that the

ORDER – 10

statement was false or misleading.  *Id.* § 78u-5(c)(1)(B).

The threshold requirement for the PSLRA's safe harbor is that a statement be forward looking. The statute defines "forward-looking statement," in pertinent part, as:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; [or]
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission.

*Id.* § 78u-5(i)(1)(A)–(C).  At first glance, these provisions appear to cover a very wide range of statements.  However, the effect of these provisions is limited in several material ways.

First, all three of these definitions delimit certain categories of statements about future expectations that are non-actionable under the PSLRA *if accompanied by an adequate cautionary statement.*  Second, these three sections describe statements with very specific subject matters.  In other words, the PSLRA does not exempt *all* statements whose subject happens to involve the future.

Third, there are statements couched in the future tense, but whose effect is to convey information about the present.[3]  The Ninth Circuit has recognized this principle and has refused to extend safe harbor protection to statements that are grammatically about the future but whose subject matter is firmly lodged in the present.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936–37 (9th Cir. 2003).  In *America West*, the court considered the following two

---

[3]The flip side of this postulate is that a present tense statement may qualify as a forward-looking statement for safe harbor purposes if its truth or falsity cannot be discerned until some point in time after the statement is made.  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1067–68 (N.D. Cal. 2001).  However, it is important to note that this "rule" is couched in permissive, rather than mandatory, language.

ORDER – 11

statements: (1) a press release stating that "the settlement agreement's provisions will not have a material adverse affect [*sic*] on the Company's operations or financial results," *id*. at 936; and (2) a conference call during which the defendant said "[w]e are not anticipating any major increase in maintenance costs or the cost of oversights going forward as a result of [the settlement agreement]," *id*. The court found that these two statements were not "forward looking" because "[e]ach is a disclosure of the fine imposed by the settlement agreement for past violations of FAA regulations and a description of the present effects of their imposition on the company." *Id*. at 937.

    *America West*'s discussion of these two statements also illustrates a fourth, and possibly the most important, way in which the safe harbor is curtailed. *America West* recognized that even though the forward-looking aspect of a particular statement may not be actionable, that very same statement may be actionable because of other misleading content. In this way, the PSLRA safe harbor operates in a way similar to hearsay rules, which forbid the admission of certain statements for the truth of the matter asserted, but allow those statements to be admitted for their corollary value. Thus, *America West* is an example of how a single statement may communicate many different meanings, some of which may render the statement actionable.

    Finally, as in the "puffery" analysis, when evaluating a statement's eligibility for the safe harbor, the Court must consider the statement's context, both textual and factual. The statute itself, by mandating the consideration of cautionary statements and by condemning "forward-looking" statements made with actual knowledge of their falsity, contemplates that statements will be considered within their surrounding contexts. Thus, a statement, standing alone, whose primary import may be "forward looking" within the meaning of the statute, may in context convey information not covered by the safe harbor.

    In light of these material ways in which the definition of "forward looking" is limited, the Court

ORDER – 12

finds that none of the twenty-two statements catalogued in the table in Appendix A are "forward looking" within the meaning of the statute.  In making this finding, the Court is mindful of the following relevant factual context, in addition to the facts set forth *supra* in Part II.

> In 2002, Washington Mutual was the largest servicer and the second largest originator of mortgage loans in the nation.  The Group's strategy is to remain a leading originator and servicer of home loans and to increase its market share in both loan origination and loan servicing.
>
> . . . .
>
> The Group is migrating to single platforms for originating and servicing home loans.  The process of reducing the number of origination systems from seven to a single platform will occur in stages throughout 2003 and should be completed in 2004.  In the fourth quarter of 2003, we expect to begin the multi-year process of converting from an outsourced loan servicing system to a proprietary system acquired as part of the HomeSide Lending transaction.  During 2003, we will also be consolidating our nationwide loan fulfillment operations from approximately 500 locations to approximately 60 locations.  We anticipate that these initiatives will improve operational efficiencies and productivity.
>
> . . . .
>
> Forward-looking statements provide our expectations or predictions of future conditions, events or results.  They are not guarantees of future performance.

(Rummage Decl. Ex. B, WAMU 2002 Annual Report (Form 10-K), at 3-5 *passim* (Mar. 17, 2003).)

The preceding excerpt is typical of the language used in WAMU's SEC filings, and is notable in three significant ways.  First, it establishes WAMU as a leading presence in the home lending market. Second, it communicates management's expectations of how WAMU's integration of its recent acquisitions would proceed over the following two years.  Finally, it recognizes that while the predictions and expectations themselves might not come to fruition, the statements *do* reflect actually-held expectations and predictions.  (*Id*. at 5, stating "[f]orward-looking statements provide our expectations.")

With context-laying statements like the one cited above in mind, the Court concludes that although some of the statements contained in the table in Appendix A have some elements that qualify as

ORDER – 13

"forward looking" within the meaning of the PSLRA, none of the statements are fully protected by the safe harbor.  Generally speaking, the statements in the table fall into three discernible categories (with some statements belonging to more than one category): (1) statements of present or historical fact; (2) statements of fact attributing results to specific actions or factors; and (3) statements about the future that also function as communications of current expectations and are actionable as such.

The first two categories do not constitute forward-looking statements within the meaning of the statute.  The statements falling into the first category include, but are not limited to Statements 2:1,[4] 2:3, 4, 5, 8, 9, 10, 11, 12, 14, 15, 17, 18, 19:2, 20:2, 21:1, 21:2, and 22.  These statements are not forward looking because they are about present or historical facts.  For example, Statement 5 is as follows:

> Our goal is to ensure that our senior management has timely access to all material financial and non-financial information concerning our business.  While we believe the present design of our disclosure controls and procedures is effective to achieve our goal, future events affecting our business may cause us to modify our disclosure controls and procedures.

(Am. Compl. ¶ 61, citing WAMU Quarterly Report for the Quarter Ended Mar. 31, 2003 (Form 10-Q) (May 15, 2003).)  A reasonable investor reading this statement would conclude that at the time the statement was made, WAMU's disclosure controls and procedures were providing senior management with timely access to all material information about the business.  Thus, although this statement invokes the future, it does not do so in a way that alters the present character of the statement.  Therefore, the Court concludes that this statement is not a forward-looking statement within the meaning of the PSLRA.  Consequently, the statement is not eligible for the safe harbor.

Another example of a statement in this category is Statement 12, which states "We have identified the issues that led to these challenges [*i.e.*, net loss from mortgage loans] and have implemented measures

---

[4]The notation "2:2" designates the second substatement in the statement designated as #2.

ORDER – 14

to address them." (Rummage Decl. Ex. N., Press Release, WAMU, Washington Mutual Announces Third Consecutive $1 Billion Quarter (Oct. 21, 2003).)  A reasonable investor would read this statement to mean that WAMU had recognized the problems and was well on its way to resolving them.  Unlike Statement 5, Statement 12 does not even invoke the future.  For these reasons, the Court concludes that this statement is not a forward-looking statement and is therefore ineligible for the PSLRA safe harbor.

The statements falling in the second category, those attributing results to certain actions or factors, include, but are not limited to Statements 3:2, 4, 6, 7, 8, 11, 13, 16, and 19.  Like the statements in the first category, these statements are representations of a presently existing or historical fact, and thus are not eligible for the PSLRA safe harbor.  One example from this category is Statement 4, which states,

> Part of our business does better when interest rates are going up, part of it does better when interest rates are going down.  And those really do a nice job of offsetting each other.  And that's given us this very, very strong secular growth rate over the last many years and relatively little volatility.

(Am. Compl. ¶ 59, citing CNBC interview with Def. Killinger on Apr. 16, 2003.)  A reasonable investor would construe this statement to mean that WAMU's excellent first quarter results were, in part, attributable to the specific and unique way WAMU structured its business.  If the excellent first quarter results had in fact been due to a market-related windfall, this statement would be a false and misleading statement of present or historical fact.  In a similar vein, Statement 7 said, "With interest rates remaining at near historic lows, high prepayment rates have reduced the value of the mortgage servicing asset; however, as in prior periods, the company's risk management activities effectively mitigated the change in the MSR valuation."  (Rummage Decl. Ex. M, Press Release, WAMU, Washington Mutual Announces Record Earnings; Company Delivers Second Consecutive $1 Billion Quarter (July 15, 2003).)  A reasonable investor would read this statement to mean that WAMU's then-present risk management

ORDER – 15

activities were functioning as intended.  For these reasons, the Court finds that statements attributing results to specific aspects of the way WAMU conducted its business are not forward-looking and thus are not eligible for the PSLRA safe harbor.

The final category of statements consists of statements about the future that also function as communications of current expectations and are actionable as such.  Statements in this category include, but are not limited to Statements 1, 2:2, 2:3, 3:1, 3:2, 8, 9, 11, 16, 19, 20, and 22.  For example, Statement 1, made by Defendant Killinger during a conference call discussing WAMU's results from the first quarter of 2003, stated that WAMU would be in a "stronger position when the current interest rate environment changes."  This statement is not forward looking insofar as it purports to accurately reflect his or WAMU's actual expectations.  Read in this way, the statement is a present-tense communication of present facts, and as such, is not included in the safe harbor.  Therefore, to the extent that Plaintiffs can prove that the statement did not actually reflect WAMU and Defendant Killinger's actual expectations, the statement may be false and misleading.  Other statements that fall into this category of statements actionable as representations of current expectations include, but are not limited to Statements 2:2, 2:3, 3:1, 3:2, 8, 9, 11, 16, 19, 20, and 22.[5]

The question of whether statements actionable as representations of current expectations are also actionable in their capacity as forward-looking statements must be answered through a full safe harbor analysis.  With respect to Statement 1, for example, the question is whether this statement is actionable

[5]"[O]ur balanced business model will provide the leverage to continue to grow market share in a changing environment."  (Statement 2.)  This statement suggests that (1) the business model is balanced, (2) the balance is expected to enable growth, and (3) this expectation is actually held.  "We're very confident that our risk management is working here."  (Statement 3:2.)  This statement communicates that management is satisfied with WAMU's risk management programs and that the risk management programs are working correctly.  The remaining statements can be parsed nearly identically as the preceding two.

ORDER – 16

on the basis that WAMU was not actually in a stronger position when the interest rate environment changed First, because the statement refers to future economic performance, the Court finds that the statement is "forward looking" within the meaning of the statute. *See* 15 U.S.C. § 78u-5(i)(1)(C). Once a statement has been determined to be forward looking, the Court must determine whether the statement is *identified* as a forward-looking statement and whether it is accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1). Finally, the Court must determine whether Plaintiffs have sufficiently alleged that the statement was made with "actual knowledge" that it is false or misleading. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005).

When determining whether cautionary language is sufficient under the statute, courts refer back to the judicial "bespeaks caution" doctrine. *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) (accepting that the PSLRA's safe harbor provision is the statutory enactment of the judicial "bespeaks caution" doctrine). *See also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (invoking the "bespeaks caution" doctrine). Courts require that "the cautionary language mention important factors that could cause actual results to differ materially from those in the forward-looking statement." *Clorox*, 353 F.3d at 1133 (citing 15 U.S.C. § 77z-2(c)(1)(A)(i)). "Dismissal on the pleadings under the bespeaks caution doctrine . . . requires a stringent showing: There must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading." *Livid*, 416 F.3d at 947 (9th Cir. 2005) (citation omitted).

Where an accused statement is oral, the Ninth Circuit has found that the safe harbor "extends to an oral statement that 'additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document.'" *Clorox*, 353 F.3d at 1133 (citing 15 U.S.C. § 78u-5(c)(2)(B)(I)). However, the sufficiency

ORDER – 17

of the oral cautionary language depends on the sufficiency of the underlying written cautionary language

referred to.

Here, Statements 1, 2, and 3 were oral statements made during the April 16, 2003 conference call

and were prefaced by the following oral statement:

> Statements contained in our commentary today which are not historical facts and which
> pertain to future operating results of Washington Mutual and its subsidiaries, constitute
> forward-looking statements within the meaning of the [PSLRA] . . . . Actual results may
> differ materially from the results discussed in these forward-looking statements for the
> reasons among others, stated in our annual report on form 10-K and the section entitled
> "Factors that may affect future results."

> In addition, these forward-looking statements are subject to assumptions with respect to
> future business strategies and decisions that are subject to change.

(Rummage Decl. Ex. T, Transcript of WAMU 1Q03 Conference Call, at 1.)  The Court finds that this

statement is enough to invoke and incorporate the language in WAMU's annual report.  Thus we proceed

to assess the sufficiency of the written cautionary language contained therein.  This language is as

follows:

> From time to time, we have made and will make forward-looking statements.  Our Form
> 10-K and other documents that we file with the [SEC] have forward-looking statements.
> In addition, our senior management may make forward-looking statement orally to
> analysts, investors, the media and others.  Forward-looking statements can be identified by
> the fact that they do not relate strictly to historical or current facts. . . .

> Forward-looking statements provide our expectations or predictions of future conditions,
> events or results.  They are not guarantees of future performance.  By their nature,
> forward-looking statements are subject to risks and uncertainties.  These statements speak
> only as of the date they are made.  We do not undertake to update forward-looking
> statements to reflect the impact of circumstances or events that arise after the date the
> forward-looking statements were made.  There are a number of factors, many of which are
> beyond our control, that could cause actual conditions, events, or results to differ
> significantly from those described in the forward-looking statements.

(WAMU 2002 Annual Report at 5.)  The annual report goes on to disclose risks associated with the

following five factors: (1) general business and economic conditions, including interest rates; (2) potential

ORDER – 18

volatility of the mortgage banking business; (3) ability to implement business operations technology solutions; (4) competition in the financial services industry; and (5) regulatory changes. (*Id*. at 5–7.)

In the context of this lawsuit, the disclaimers regarding volatility in the mortgage banking business and WAMU's ability to implement its operations technology solutions are particularly important and require further scrutiny. WAMU warned that "[c]hanges in interest rates significantly affect the mortgage banking business" and that "[o]ne of the principal risks . . . is prepayments and their effects on MSR." (*Id*. at 6.) WAMU acknowledged that the success of its hedging efforts in the MSR arena was "dependent on management's judgments regarding the amount, type and mix of MSR risk management instruments that we believe are appropriate to managed the changes in fair value of our MSR asset." (*Id*.) With respect to implementation of the operations technology, WAMU stated:

> During 2001 and early 2002, we consummated five acquisitions. . . .On the mortgage banking side, we are currently integrating the technology platforms of the acquired companies into our business. We are developing single operating platforms for the origination and servicing of home loans and are migrating from a decentralized mortgage operations model to a regional processing configuration. We anticipate that these initiatives will result in economies of scale and operating efficiencies. . . .
>
> If we experience difficulties in the integration of the technology platforms or the upgrading of software or any prolonged interruption of our service, we could experience higher than anticipated administrative costs and the loss of customers, among other things. These events could cause our earnings to be lower than anticipated and could adversely affect our operations and financial condition.

(*Id*.)

Plaintiffs argue that these statements do not "immunize [D]efendants' failure to reveal that the Company was *not* prepared for rising interest rates as [D]efendants had repeatedly stated and had *not* 'fully integrated' its interest rate hedging activities for 'more effective' hedging as [D]efendants had claimed." (Opp'n 17.) The Court must agree. Defendants' cautionary statements with respect to the MSR hedging refer only to the possibility that management's judgment could be flawed, not that WAMU

ORDER – 19

was technologically unable to produce the necessary information so that it could properly hedge the MSR risk, as Plaintiffs allege. To the extent that WAMU acknowledged the risk inherent in its technology upgrade, it disclosed only risks pertaining to administrative costs and loss of customers, not risks pertaining to its ability to hedge its mortgage business. These cautionary statements do nothing to put the investor on notice that WAMU's hedging depended, as Plaintiffs allege, on its ability to access information in a certain way. For these reasons, the Court finds that this cautionary language is neither meaningful nor adequate with respect to the statements listed in the table in Appendix A.

Defendants' argument that it had fully and fairly disclosed to investors the risks inherent in a business so dependent on interest rate fluctuations rather misses the mark. Plaintiffs' arguments are much more finely drawn and more focused on the technological aspects of WAMU's woes. According to Plaintiffs, while Defendants warned investors that interest rates posed a potential problem, Defendants also, in no uncertain terms, reassured investors that WAMU was prepared both strategically and technologically to confront and surmount the challenge. Thus, to the extent that Defendants' cautionary statements generically warned investors that WAMU's success depended on interest rates, the Court agrees with Plaintiffs that these warnings did not speak to the particular issue on which Plaintiffs have focused. For this reason, the Court does not find that Defendants' forward-looking statements were accompanied by meaningful cautionary language such that the statements are protected by the PSLRA safe harbor.

3.      *Materiality of misrepresentations or omissions*

Having found that the accused statements do not qualify for the safe harbor, the Court proceeds to determine whether the statements were material. In the context of a Rule 10b-5 claim, "a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed."

ORDER – 20

*Livid*, 416 F.3d at 947.  "[T]o fulfill the materiality requirement[,] there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).  *Basic* emphasized that the inquiry to be undertaken is a fact-specific one.  *Id*. at 240.

Here, Plaintiffs' complaint is that WAMU did not disclose to investors the range and depth of its technological woes and that these problems had a significant negative impact on WAMU's ability to steer its mortgage business through a sea of changing interest rates.  Plaintiffs allege that WAMU "was plagued with company-specific problems which undermined the veracity of their public representations as the Company could not properly hedge its interest rate exposure."  (Am. Compl. ¶ 38.)  Plaintiffs add:

> In order to properly hedge Washington Mutual's interest rate exposure, [D]efendants needed to have complete and precise information concerning the Company's aggregate mortgage loan portfolio and MSR positions at all times.  Absent such information, it would have been impossible to configure proper hedges due to interest rate fluctuations. In other words, because interest rates are constantly changing, [D]efendants needed to know, at all relevant times, the details of each loan in the Company's pipeline so that they could hedge the interest rate exposure associated with those loans.  Complete and precise information, however, would have required effective communication between and among Washington Mutual's many computer systems.  In reality, the Company's systems could not (and did not) function properly.

> Because of its outdated and problematic computer systems throughout the Class Period, [WAMU] did not have a clear understanding of its loan pipeline and the corresponding interest rate risk associated with those loans in the face of fluctuating interest rates. Assumptions underlying hedging in the face of interest rate changes include critical information regarding the loan pipeline, complete and precise knowledge of all loans in the system, the interest rates being locked, the existence of loan processing delays, and whether the computer systems and personnel can process the volume and capacity of loans in the pipeline.

(Am. Compl. ¶¶ 46–47.)

Having reviewed this and other similar sections containing specific allegations of how WAMU's technological abilities impact its ability to conduct its business, the Court concludes that there is a substantial likelihood that a reasonable investor would have acted differently if WAMU had fully and

ORDER – 21

fairly disclosed its progress or lack thereof in developing and/or integrating its technology platforms.  In

particular, the Court takes notes of a series of events during the fall of 2003.  On September 9, 2003,

Defendant Killinger disclosed that "several mortgage banking process system challenges . . . came to

light[,] . . . some imprecision in the matching of our loan commitments and pipeline hedging activities."

(Am. Compl. ¶ 74.)  These problems resulted in a $0.27 per share charge for the third quarter of 2003.

(Am. Compl. ¶ 81, citing Jefferies Securities Report (Oct. 23, 2003).)  However, Defendant Killinger

reassured investors that "we took immediate steps to address any of the operating challenges and are

back on track."  (Am. Compl. ¶ 74.)  He also stated that WAMU had taken affirmative steps to position

itself for a rising interest rate environment and that WAMU's business model was performing as planned.

(*Id.*)

Despite the negative impact of the "system challenges," to the tune of $400 million, analysts were

sufficiently convinced by Defendant Killinger's remarks to maintain their positive outlook on WAMU's

future performance.  (*See* Am. Compl. ¶ 81, citing financial analyst reports.)  In addition, the market in

general dismissed the significance of the "system challenges," as evidenced by the 3.21% increase in

WAMU stock on October 22, 2003, after WAMU's third quarter conference call.

This pattern continued through the spring of 2004: slight and unexpected financial

disappointments, excused and explained by management, followed by analyst reports justifying their

positive outlooks by citing to WAMU's historical ability to navigate the market and its representations

that it was streamlining its operations and boosting its ability to hedge its mortgage business.  Because

the analysts covering WAMU repeatedly and expressly relied on WAMU's reassurances to justify their

continued positive outlook, the Court finds that WAMU's statements, or lack thereof, regarding its

technology problems were material within the meaning of Rule 10b-5.

In addition to WAMU's alleged failure to disclose its technological problems, Plaintiffs' complaint

ORDER – 22

also challenges statements that more generally attribute WAMU's historical success to its ability to balance its loan origination and servicing businesses, as well as to its hedging ability. To the extent that these statements fail to disclose WAMU's technology problems, that failure is material for the same reasons as discussed in the immediate preceding paragraphs. However, these statements are also material to the extent that they might have falsely attributed WAMU's historical successes. As in the case of the technological issues, analysts repeatedly relied on the fact that WAMU had attributed its success to its balanced business model and concluded that what had worked so well in the past was likely to work well in the future. If, however, WAMU's strategy had *not* worked well in the past, there is a substantial likelihood that analysts and reasonable investors would have made different decisions as to their willingness to bet that WAMU's strategy would work well in the future. For this reason, the Court finds that statements attributing WAMU's successes to its business and hedging strategy are material within the meaning of Rule 10b-5.

      In sum, the Court finds that all the statements challenged by Plaintiffs meet the PSLRA test.

      *B.*    *Scienter*

      Scienter is the second necessary element of a Rule 10b-5 claim. The PSLRA requires plaintiffs to "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. "[T]o show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity [to commit fraud]." *Id*. When determining whether scienter has been sufficiently pled, a court may go beyond each individual allegation to consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *America West*, 320 F.3d at 938. In performing this analysis, the Court must consider all inferences in the light most favorable to Plaintiffs, keeping in mind

ORDER – 23

that this deliberate bias may still result in inferences unfavorable to Plaintiffs. *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

       *1.*    *Knowledge*

      One avenue by which to establish scienter is to show, through direct or circumstantial evidence, that the defendants knew or should have known that their statements were false or misleading. Because the Court found that none of Defendants' statements were forward looking within the meaning of the statute, Plaintiffs' complaint need not allege actual knowledge.

      "The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). However, where allegations of actual knowledge are not necessary, "it may be inferred that facts critical to a business's core operations or an important transaction are known to a company's key officers." *In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001). Either way, Plaintiffs must show through sufficiently specific factual allegations that Defendants had knowledge, constructive or actual, of the data alleged to be contradictory to their statements. Thus, the showing is two-fold: (1) that there was information contradictory to the challenged statements, and (2) that Defendants knew or should have known this information by virtue of their roles at the company.

      Here, Plaintiffs make the showing through both direct and circumstantial evidence. Plaintiffs' main source of direct evidence is a group of twelve confidential witnesses ("CW"). "[P]ersonal sources of information relied upon in a complaint should be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Nursing Home*, 380 F.3d at 1233. In general, plaintiffs must show how

ORDER – 24

confidential witnesses "came to learn of the information they provide." *Northpoint*, 184 F. Supp. 2d at 1000. However, the fact-specific nature of the analysis means that "[t]he precise amount of detail required in describing confidential witnesses varies based on the circumstances of the case." *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 988 (N.D. Cal. 2001).

Here, Plaintiffs' descriptions of their confidential witnesses included (1) job title, (2) time period during which he or she was employed by WAMU, (3) location where he or she worked, and (4) brief job description. (*See* Am. Compl. ¶¶ 48–54.) For ease of reference, the Court has created a summary table reflecting most of the information provided by and about the confidential witnesses. *See* Appendix B.

Having reviewed the section of the complaint involving the confidential witnesses, the Court finds that for the most part, Plaintiffs have sufficiently established that each of their confidential witnesses were in a position to have personal knowledge of the information about which they spoke. In addition, the Court finds that the consistent and interlocking nature of the evidence provided by each witness bolsters the evidence's reliability and credibility.[6] For these reasons, the Court finds that Plaintiffs have pled with sufficient particularity that (1) WAMU suffered technology problems affecting its ability to timely process and monitor loans after customers had locked in rates, (2) Optis was a failure and was never completely rolled out, and (3) WAMU's failure to integrate its different technology platforms created significant problems, including insufficient and inaccurate reporting of data critical to its hedging operations.

However, certain statements made by Plaintiffs' confidential witnesses are not obviously within the range of the personal and firsthand knowledge of the confidential witness who made it. These

---

[6]The Court has considered Defendants' citation to *In re Metawave Communications Corp. Securities Litigation*, 298 F. Supp. 2d 1056 (W.D. Wash. 2003), in support of the argument that agreement and corroboration between confidential witnesses do not necessarily constitute stronger indicia of reliability. However, the Court finds that the statements in this case go beyond mere "shared opinion" as in *Metawave*, 298 F. Supp. 2d at 1070, and actually constitute multiple observations of the same phenomenon.

ORDER – 25

statements include Allegations 4, 6:2,[7] 7:3, 8, 9:2, 10, and 11:3.  The Court will address each statement in turn.

With respect to Allegation 4, Plaintiffs have not sufficiently explained what CW4 did in IT and how his or her job responsibilities included exposure to and experience with Optis.  With respect to Allegation 6:2, Plaintiffs provide no background information regarding how CW6 knew that it was "widely known" at WAMU that Optis was a failing technology.  As to Allegation 7:3 — that WAMU's directive not to deter customers from locking in rates exacerbated delays — the Court finds that this allegation is more in the nature of personal speculation than a factual allegation, and as such, is not appropriately considered at this time.  CW8's allegation that "many of [WAMU]'s loans needed extensions" and that this was "exacerbated by [WAMU]'s archaic computer systems requiring separate processing and underwriting systems" suffers from the same problem as Allegation 7:3.  (Am. Compl.  ¶ 51.)  However, this shortcoming could be cured by information showing that CW8 was in a position to know firsthand that the separate processing and underwriting systems caused many loans to need extensions.

With respect to Allegation 9:2, the information provided about CW9 does not establish how or why he or she would know when Optis was designed or how the fact that Optis had been designed during a period of falling interest rates would affect its operation.  As to Allegation 10, there is no information about CW10 that suggests why or how CW10 would know what "WAMU" knew or didn't know.  If CW10 himself or herself did not know, that is one matter; to allege that "WAMU" as an institution knew or didn't know is a different matter altogether, requiring a different foundation or basis of knowledge.  Finally, CW11 alleges that WAMU's "multiple systems and the failure to properly integrate product

---

[7]"Allegation 6:2" refers to the second allegation made by CW6, as represented in the table in Appendix B.

offerings from its multiple acquisitions were major problems." However, it is not clear how an individual hired to be an Optis release manager and who worked on unnamed "strategic projects" would come into this knowledge.

Because the Court finds, as to these particular statements, that Plaintiffs' confidential witnesses have not been described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," the Court must disregard the enumerated statements. As Plaintiffs do not allege any other direct evidence of knowing or reckless behavior, the Court must now assess the sufficiency of the circumstantial evidence of Defendants' knowledge, actual or constructive.

As the Court noted *infra*, the remaining confidential witness statements are sufficient to allege that (1) WAMU suffered technology problems affecting its ability to timely process and monitor loans after customers had locked in rates, (2) Optis was a failure and was never completely rolled out, and (3) WAMU's failure to integrate its different technology platforms created significant problems, including insufficient and inaccurate reporting of data critical to its hedging operations. Plaintiffs allege that Defendants' knowledge of this information can be inferred because of the nature of the statements they were making and the nature of these specific alleged operational problems. *See Northpoint*, 184 F. Supp. 2d at 998 ("[I]t may be inferred that facts critical to a business's core operations or important transaction are known to a company's key officers."). The Court agrees. In addition, as discussed below, because of the specific nature of the challenged statements, the Court finds that the complaint alleges with sufficient particularity that making the challenged statements without knowing whether they were accurate was actionably reckless.

The facts alleged in the complaint show that WAMU needed to reassure the market that it could successfully integrate its many acquisitions and that it was well positioned to perform well in a potentially

ORDER – 27

unstable interest rate environment.  According to Plaintiffs, in order to do both of these, WAMU needed to have certain technological capabilities.  Thus, WAMU's assurances on both counts also amounted to an acknowledgment that its technology systems were adequate.  Because of this, the Court finds that Plaintiffs have made sufficient allegations that technological capabilities were critical to WAMU's core operations.

In addition to the inferred statements about WAMU's technological capabilities, Defendants made several statements expressly addressing WAMU's technological capabilities.  (*See, e.g.*, Appendix A, Statements 11, 12, 14, 15.)  For this reason, the Court finds that WAMU's technological systems and the actions it was taking with respect to the systems amounted to an "important transaction" that would have been known to the officers making statements about them.

Thus, the Court finds that Plaintiffs' complaint sufficiently alleges that knowledge of WAMU's various technology problems may be inferred to those Defendants making statements about them.

To the extent that such knowledge cannot be inferred, the nature of Defendants' statements is such that to make them without the requisite knowledge would be actionably reckless.  Defendants Killinger and Casey stated emphatically that the problems plaguing the loan originations business had been resolved.  (*See, e.g.*, *id.*, Statements 11, 12, 14, 15, 17.)  In addition, Defendant Killinger assured the market that WAMU had sufficient technology for the future.  (*See, e.g.*, Statement 16, 19, 20, 21.)  Defendant Oppenheimer's statement, during or shortly after a time period when WAMU was rushing to assure investors that its loan originations problems had been contained, that WAMU was balancing its businesses in a very sophisticated fashion, was an express endorsement of the assurances Defendants Killinger and Casey had been making.

For all the above reasons, the Court finds that Plaintiffs' complaint shows with sufficient particularity that knowledge of WAMU's technological problems may be attributed to Defendants

ORDER – 28

Killinger, Casey, and Oppenheimer.  In addition, because WAMU's technological capabilities were apparently so crucial to its ability to perform as promised, the Court finds that Plaintiffs' complaint sufficiently alleges that these defendants' reckless misinformation, or failure, if any, to acquire the relevant knowledge before making the accused statements was deliberate or conscious recklessness. Finally, and again because of the importance of the subject matter, the Court finds that Plaintiffs' circumstantial evidence regarding this factor alone is sufficient to establish scienter in the context of a motion to dismiss.

Defendants Chapman, Longbrake, and Vanasek are in a slightly different situation.  Of these three Defendants, only Defendant Chapman is alleged to have made a statement of any substance.  (*See* Am. Compl. ¶ 98.)  However, Defendant Chapman's statement does not suggest that he possessed any particular information about the technological problems Plaintiffs allege.  Instead, the statement is broadly optimistic about WAMU's $1 billion cost reduction program.  (*Id.*)  Defendant Chapman mentioned in passing that about 50% of the anticipated cost savings would come from "increased efficiencies" in the home lending business and that some progress had already been made in the form of reductions in the number of mortgage loan fulfillment centers.  (*Id.*)  The Court does not find that the speaker of this statement necessarily knew or should have known of the alleged technological systems problems.

Because Defendants Chapman, Longbrake, and Vanasek did not make statements from which knowledge, actual or constructive, could be imputed, Plaintiffs attempt to impute the requisite knowledge on the basis of the defendants' job titles and responsibilities.  Defendant Chapman is alleged to have been President of WAMU's Commercial Group and its Chief Administrative Officer.  In these capacities, he is alleged to have been responsible for overseeing various lending businesses and acquisition integration. While Defendant Chapman's job titles and responsibilities would support an inference of knowledge if there were other circumstantial evidence regarding his possession of the knowledge, it cannot, without

ORDER – 29

more, create a strong inference of scienter.  The same is true to an even greater extent with Defendants

Longbrake and Vanasek.  Neither of these defendants possess job titles or alleged job responsibilities that

would obviously give them responsibility over — and therefore knowledge of — technological problems

in WAMU's home mortgage business.[8]

Therefore, for all the reasons stated above, the Court finds that the allegations regarding

Defendants' knowledge and responsibilities is only sufficient to create a strong inference that Defendants

Killinger, Oppenheimer, and Casey acted with deliberate or conscious recklessness.  The allegations as to

Defendant Chapman's position and responsibilities, on its own, does not create a strong inference of

scienter, but could support such an inference if drawn from other evidence.  Finally, the allegations as to

Defendants Longbrake and Vanasek are neutral, and do not create or support an inference of scienter.

2.    *Stock sales*

In addition to Plaintiffs' circumstantial evidence regarding Defendants' knowledge of WAMU's

IT problems, Plaintiffs allege that Defendants' stock sales also constitute circumstantial evidence of

---

[8]The parties raise the issue of whether the group pleading doctrine survived the PSLRA's enactment.  The group pleading doctrine allowed a securities litigation plaintiff to satisfy the requirements of Fed. R. Civ. P. 9(b) by relying on "a presumption that the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors."  *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995).  This principle, applied in a case such as this one, would permit Plaintiffs to satisfy the particularity requirement by alleging that false and misleading information had appeared in prospectuses, annual or quarterly reports, press releases, or any other "group published" material.  However, since the enactment of the PSLRA, the continued applicability of the group pleading doctrine has been thrown into question.  In light of the very stringent pleading requirements imposed by the PSLRA, and the Ninth Circuit's application and interpretation of the PSLRA to require a plaintiff to plead in great detail facts demonstrating the required degree of intent, this Court must conclude that the group pleading doctrine is no longer viable.  This finding has no impact on the Court's findings with respect to Individual Defendants Killinger, Casey, and Oppenheimer because Plaintiffs' complaint attributed statements to each of those individual defendants.  However, although Plaintiffs allege that Defendants Chapman, Longbrake, and Vanasek were present when the accused statements were made, in the absence of the presumption allowed by the group pleading doctrine, this is not enough to satisfy Plaintiffs' burden.

ORDER – 30

scienter. *See, e.g.*, *Silicon Graphics*, 183 F.3d at 986 ("[Unusual] or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter.") (internal quotes omitted).  The Ninth Circuit has explained that in order to constitute "unusual" or "suspicious" sales, the transactions must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989)).  "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*  The insider's ability to trade may also be considered. *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001).

Courts considering stock sales as circumstantial evidence of scienter have considered whether there is evidence of other behavior corroborating the allegedly suspicious nature of the sales.  For example, in *Silicon Graphics*, the Ninth Circuit found that even though two of the defendants' stock sales patterns could have been interpreted as suspicious, the other facts and circumstances surrounding the defendants and their stock sales either contradicted the potential inference of scienter or supplied an innocent explanation for the sales.  183 F.3d at 987–88 (noting that one defendant had only been employed by the defendant corporation for one year and thus had not established a significant trading history against which to compare the accused sales, and that the other defendant had no day-to-day contact with the corporation's officers and no involvement in its operations).

Here, Plaintiffs include in their stock "sales" figures shares withheld or liquidated in order to pay tax liabilities on stock awards as well as deferrals of the value of the stock into WAMU's deferred compensation plan.  Plaintiffs argue that any dispositions of stock that "materially benefit" the shareholder should be considered in the context of assessing the presence of scienter.  As a matter of principle, Plaintiffs' argument is not wholly without merit.  The context-sensitive analysis applicable to

ORDER – 31

insider stock trading allows for such an interpretation.  However, given the high bar imposed by the PSLRA, it stands to reason that such an argument must be supported by very granular factual details and reasoning.  For example, it is conceivable that a deferred compensation plan could be structured in such a way that contributions or transfers of stock to the plan "freeze" the value of the stock such that changes in the value of the stock do not alter the value of the contribution.  However, without evidence that a plan is structured in this way, the Court cannot presume that contribution of shares to a given deferred compensation plan have this or any other effect that would justify considering such contributions "sales" in the context of an insider trading analysis.  On the other hand, the fact that shares were retained after their transfer to the deferred compensation plan, without more information about how the plan worked, is similarly neutral with respect to the scienter analysis.

In a similar manner, evidence of shares yielded up to the company to pay a payroll tax liability on an option exercise or award of shares, without more, neither enhances nor weakens the inference of scienter.  Indeed, generally, the shares used for such a purpose are automatically withheld each time an employee is awarded stock.  Where an employer awards stock to its employees on a particular day, the fact that a number of shares were sold on that day for tax purposes would not tend to create an inference of scienter.  This appears to be the case here where four of the accused transactions, one for each of the defendants who sold stock, took place on April 19, 2004, the same day shares were awarded under the Performance Share Program.  Thus, the Court finds that these tax-related withholdings neither give rise to nor support an inference of scienter.

In light of the considerations for purposes of the PSLRA analysis discussed above, and for the reasons that follow, the Court finds that Plaintiffs have not pled contextual facts that allow the Court to draw a strong inference of scienter from Defendants' insider trading.

The Court analyzes each individual defendant's insider trading history in turn.

ORDER – 32

a.      *Defendant Killinger*

Plaintiffs' complaint alleges that Defendant Killinger "sold" 231,587 shares during a period from January 28, 2004, to April 19, 2004.  (Am. Compl. ¶ 155.)  The complaint compares this to the 79,102 shares "sold" during the three years preceding the Class Period.  (*Id.* ¶ 156.)  Defendants point out that of the 231,587 shares "sold," 109,637.28 shares were transferred to a deferred compensation plan and 30,588.02 shares were withheld for payroll tax obligations on a stock award.

This leaves only 91,361 shares, or approximately 10% of Defendant Killinger's holdings, that were sold on the open market.  This transaction took place on January 28, 2004.  On first impression, this transaction does seem quite a bit larger than Defendant Killinger's prior transactions.  However, other data provided by Plaintiffs tends to weaken the inference of scienter to be drawn from this transaction.  First, Defendant Killinger sold relatively large numbers of shares in January of 2002 (50,000 shares at $34.44) and 2003 (13,666 shares at $36.18).  This suggests that he had some sort of routine trading plan.  Second, although the January 2004 sale involved almost twice the number of shares as the next largest transaction, the share price he obtained in the 2004 sale was $44.00, significantly higher than in his previous two sales, and a high point relative to the $39 trading range in December 2003.  Given this information, any reasonable investor with a trading plan to sell a swath of shares in January might have made a similar transaction.

Finally, the timing of Defendant's trade neither strengthens nor weakens the inference of scienter.  The trade took place weeks after WAMU's flurry of investor communications in October and December of 2003 reassuring investors that the operational problems in the home loans business had been addressed.  If Defendant Killinger had been intent on exploiting his insider information, he could have sold shares in November or early December of 2003, when WAMU traded above $46.00.  Instead, he waited until January, when WAMU was trading in a lower range.  Although this delay was not a "missing

of the boat" such that it negates any inference of scienter, it does make the Court hesitant to draw such an inference.  In addition, the Court notes that Defendant's Form 4, filed January 30, 2004, indicates that the shares sold were acquired through the exercise of options that were shortly to expire, on February 15, 2004.  Kerry K. Killinger, Statement of Changes in Beneficial Ownership (Form 4) (Jan. 30, 2004).  This evidence suggests that the timing of Defendant Killinger's sale could have been dictated, in part, by the imminent expiration of his options.[9]

Because the PSLRA places the burden on Plaintiffs to show that their circumstantial evidence creates a strong inference of scienter, and given the equivocal nature of the stock trading evidence above, the Court does not find that Defendant Killinger's stock trades are suspicious.  However, the Court does not find that Defendants have brought forth such evidence as to negate any inference of scienter.  The Court merely concludes that the record now before the Court does not permit an inference in either direction.

### b.   Defendant Casey

Defendant Casey is alleged to have "sold" 752 shares during the Class Period.  However, Defendants contend, and Plaintiffs do not dispute, that this sale was to pay a tax liability on vested shares. Plaintiffs provide no trading history for Defendant Casey, nor does the complaint allege that this sale is somehow suspicious.  In the absence of such allegations, the Court does not find Defendant Casey's transaction suspicious.

---

[9]The Court is well aware that an individual who exercises options may choose to hold the shares thus acquired, rather than to sell them immediately.  However, individuals who may be stock-rich and cash-poor may have little choice but to cash out of their shares immediately.  The record now before the Court does not permit the Court to identify Defendant Killinger as of the latter group, but the fact that this very real possibility exists renders the Court hesitant to draw an inference from the timing of Defendant's sales of these particular shares.

ORDER – 34

c.      *Defendant Oppenheimer*

Plaintiffs' complaint alleges that Defendant Oppenheimer "sold" 139,179.37 shares during a period from January 28, 2004, to April 19, 2004.  (Am. Compl. ¶ 157.)  The complaint compares this to the 22,478 shares "sold" during the three years preceding the Class Period.  (*Id.* ¶ 158.)  Defendants point out that of the 139,179.37 shares "sold," 15,320.37 shares were withheld for payroll tax obligations on a stock award.  However, this leaves 123,859 shares, representing over 50% of Defendant Oppenheimer's holdings, evidently sold on the open market.

Unlike Defendant Killinger, Defendant Oppenheimer does not appear to have any trading routine. In addition, the relative magnitude of Defendant Oppenheimer's January transactions compared to her trading history present a far greater contrast than Defendant Killinger's trades.  Thus, the Court finds that the amount of Defendant Oppenheimer's January trades gives rise to some suspicion.  However, as in Defendant Killinger's case, the Court finds that the timing of Defendant Oppenheimer's January 28 trades was somewhat less than optimal.  As such, the timing of the sales does not tend to strengthen the inference of scienter.

Given the above, the Court does not find that Plaintiffs' allegations regarding Defendant Oppenheimer's stock sales give rise to a strong inference of scienter.  However, while the transactions themselves do not give rise to the necessary inference, given the unusual amount, they could support an inference drawn from other circumstantial evidence.

d.      *Defendant Longbrake*

Plaintiffs' complaint concedes that Defendant Longbrake did not sell any shares of stock during the Class Period.

e.      *Defendant Chapman*

Plaintiffs allege that Defendant Chapman "sold" 81,765.18 shares during the Class Period,

ORDER – 35

compared to 17,000 shares sold on April 26, 2002, the single transaction executed in the prior three years.  (Am. Compl. ¶¶ 159, 160.)  Of these, 7,660.18 were shares withheld for payroll tax obligations. The remaining 74,105 shares sold represented over 50% of Defendant Chapman's holdings and were more than four times the amount he sold in 2002.  While the amount of Defendant Chapman's trade, taken alone, is certainly remarkable, there is very little to compare it to.  The April 26, 2002 sale is a single transaction, and as such, does not provide a very useful comparison point.  It could be that if one were to look at a ten-year trading history, the April 26 transaction would seem unusually small.  For this reason, the Court finds that the limited and sparse nature of Defendant Chapman's trading history does not permit it to draw an inference from the amount traded.

For reasons similar to the Court's analysis of Defendants Killinger and Oppenheimer's trades, the Court does not find the timing of Defendant Chapman's trade to be particularly suspicious.

For all these reasons, the Court finds that Plaintiffs' allegations regarding Defendant Chapman's insider trading history do not themselves give rise to a strong inference of scienter.  However, in the presence of other strong circumstantial evidence, they could support such an inference.

### f.    Defendant Vanasek

Plaintiffs allege that Defendant Vanasek "sold" 50,249.46 shares during the Class Period (Am. Compl. ¶ 160), compared to 25,000 shares sold in the previous three years (*id*. ¶ 161).  Of these, 4,924.46 shares were withheld for payroll taxes associated with shares awarded under the Performance Share Program.  The remaining 45,325 shares, sold in a single transaction on May 30, 2003, represented over 80% of Defendant Vanasek's holdings.  While this number is significantly more than the 25,000 shares he sold on May 24, 2002, in the sole transaction executed during the previous three-year period, the 2002 transaction represented 63.49% of his holdings at that time.  The Court also notes that both transactions took place at the end of May.  For these reasons, the Court finds the two transactions more

ORDER – 36

alike than different in both timing and relative amount, and therefore that the Class Period transaction does not give rise to a strong inference of scienter. Furthermore, because of the similarities between the two transactions, the Court does not find that Defendant Vanasek's 2003 transaction particularly supports an inference of scienter drawn from other circumstantial evidence.

### 3. GAAP violations

Plaintiffs' amended complaint alludes to violations of Generally Accepted Accounting Principles ("GAAP"). (*See* Am. Compl. ¶¶ 128-149.) The alleged GAAP violations perform multiple roles in the complaint, from providing a presumption of inaccuracy (*id*. ¶ 130 "financial statements . . . not prepared in compliance with GAAP are presumed to be misleading and inaccurate") to substantive evidence of the requisite scienter.

"GAAP violations must be pled with particularity." *In re ICN Pharm. Sec. Litig.*, 299 F. Supp. 2d 1055, 1067 (C.D. Cal. 2004) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996)). The Court does not find that Plaintiffs have pled the alleged GAAP violations with the requisite level of particularity. Although Plaintiffs cite numerous principles and make some attempt to connect those principles with corresponding violations, the complaint fails to state the who, what, when, where, and how of the violations. Rather than identifying a particular statement and explaining why it violates a particular GAAP rule, Plaintiffs merely re-present their litany of Defendants' alleged misrepresentations (*see, e.g.*, Am. Compl. ¶ 147, discussing WAMU's failure to maintain an adequate system of internal control). This type of allegation is insufficient to plead GAAP violations.

For these reasons, the Court must disregard Plaintiffs' allegations regarding GAAP violations in determining whether Defendants' scienter has been sufficiently alleged.

In sum, the Court finds that the amended complaint is sufficient to create a strong inference that Defendants Killinger, Oppenheimer, and Casey acted with deliberate or conscious recklessness. The

ORDER – 37

Court is cognizant that it may go beyond each individual allegation to consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *America West*, 320 F.3d at 938.  The Court nonetheless finds that Plaintiffs have not made the requisite showing with respect to Defendants Chapman, Longbrake, and Vanasek.

>    C.    *Causation*

"The causation requirement for Rule 10b-5 actions includes 'both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentation or omissions caused the harm.'" *Livid*, 416 F.3d at 949 (quoting *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999)).  Here, Plaintiffs allege both (1) that but for the alleged misrepresentations and omissions, Plaintiffs would not have purchased or otherwise acquired WAMU securities (Am. Compl. ¶ 177) and (2) that the alleged misrepresentations and omissions caused the harm (*id*. ¶ 178).  More importantly, in light of *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1633–34 (2005), Plaintiffs allege that the share price fell significantly after the truth became known. Accordingly, the Court finds that Plaintiffs have pled causation sufficient to survive Defendants' motion to dismiss.

>    D.    *Reliance and damages*

As to these last two elements of the Rule 10b-5 claim, Defendants did not raise the issue of these two elements in their motion to dismiss.  The Court finds that they have been adequately pled.  (*See* Am. Compl. ¶ 176.)

*   *   *   *   *

Accordingly, the Court finds that Plaintiffs' amended complaint sufficiently pleads a 10b-5 claim against Washington Mutual and Individual Defendants Killinger, Casey, and Oppenheimer, but fails to do

ORDER – 38

so with respect to Individual Defendants Chapman, Longbrake, and Vanasek.  Plaintiffs' Rule 10b-5

claims against Individual Defendants Chapman, Longbrake, and Vanasek are therefore dismissed.

V.    SECTION 20(a) CLAIMS

Section 20(a) of the Exchange Act imposes joint and several liability upon controlling persons.  15

U.S.C. § 78t(a).  Here, because the Court has found that Plaintiffs have failed to plead a primary violation

against Defendants Chapman, Longbrake, and Vanasek, Plaintiffs' Section 20(a) claim against these three

Individual Defendants shall be dismissed.  However, as the Court found that Plaintiffs' 10b-5 claims

against Defendants Killinger, Casey, and Oppenheimer were sufficient to withstand Defendants' motion

to dismiss, and as Defendants do not dispute that these three individual defendants were "controlling

persons," Plaintiffs' Section 20(a) claim against Defendants Killinger, Casey and Oppenheimer may

proceed.

VI.    LEAD PLAINTIFFS' STANDING

Plaintiffs purport to "bring this action as a class action . . . on behalf of a Class consisting of all

those who purchased or otherwise acquired the securities and/or sold put options of Washington Mutual

between April 15, 2003 and June 28, 2004, inclusive . . . and who were damaged thereby."  (Am. Compl.

¶ 24.)  Defendants contend that despite this broad class definition, the complaint has not sufficiently pled

the purchase of any WAMU security other than common stock and put options, and more importantly,

that Plaintiffs have failed to sufficiently allege loss causation with respect to sales of puts.

Defendants' two arguments are quite different.  The first, as an argument about whether the

named plaintiffs may adequately represent the entire class of plaintiffs, strikes the Court as an issue more

properly suited to a motion regarding Plaintiffs' class certification.  For this reason, the Court declines to

take up this argument at this time.

The immediate impact of Defendants' second argument is more serious.  Unlike the first, this

ORDER – 39

argument invokes the sufficiency of Plaintiffs' allegations with respect to purchasers of different types of securities. While the Court is satisfied that all of Plaintiffs' allegations about Defendants' misrepresentations and omissions are equally applicable to purchasers of all types of securities, that part of the complaint about causation and damages must focus on Plaintiffs', rather than Defendants' behavior.

The *Dura* Court quite clearly stated that loss causation is an essential part of a 10b-5 claim. 125 S. Ct. at 1633–34. Plaintiffs have failed to allege how individuals who bought or sold securities other than common stock may have suffered losses as a result of Defendants' alleged conduct. For this reason, the Court finds that Plaintiffs have failed to state a 10b-5 claim on behalf of those who sold put options. Therefore, Plaintiffs' claims on behalf of those who sold put options during the Class Period shall be dismissed.

VII.   CONCLUSION

In accordance with the foregoing, the Court hereby GRANTS in part and DENIES in part Defendants' motion to dismiss. Plaintiffs' claims against Individual Defendants Chapman, Longbrake, and Vanasek are hereby DISMISSED. Plaintiffs' claims on behalf of individuals who sold put options during the Class Period shall also be DISMISSED.

Defendants are hereby ORDERED to SHOW CAUSE why Plaintiffs should not be allowed to amend their complaint to rectify the deficiencies and reinstate their dismissed claims. Defendants' response to this order is due December 8, 2005. Plaintiffs' response to Defendants shall be due December 22, 2005. Defendants's reply, if any, shall be due December 30, 2005.

//

//

//

ORDER – 40

The matter shall be noted for consideration on December 30, 2005.

SO ORDERED this <u>17th</u> day of November, 2005.


UNITED STATES DISTRICT JUDGE

ORDER – 41

# APPENDIX A[10]

| # Source | Who, how, when, where | Statement |
|---|---|---|
| 1 ¶ 56 | Def. Killinger, during WAMU's 1Q:03 conference call, on April 16, 2003. | WAMU will be in a "stronger position when the current interest rate environment changes." |
| 2 ¶ 56 | Def. Casey, during WAMU's 1Q:03 conference call, on April 16, 2003. | WAMU was taking necessary and proper steps so as to account for "eventual changes in [the] interest rate environment." "At this time, we are focused on balancing the demands of today while positioning the company for the eventual change in interest rate environment. And our balanced business model will provide the leverage to continue to grow market share in a changing environment." "As part of the company's ongoing interest rate risk management program and positioning of the balance sheet for future rising rates, we repositioned certain acts and liability hedging during the quarter. . . .We believe this was a prudent step that will help us position for the future rise in interest rates." |
| 3 ¶ 57-58 | Def. Casey, during the Q&A session of WAMU's 1Q:03 conference call, on April 16, 2003. | "We feel very good about our hedging activities for mortgage servicing rights." "We're very confident that our risk management is working here, and when you see the offset here, I think we're feeling very good about where we are." |

---

[10]Unless otherwise noted, all "source" information refers to paragraphs from Plaintiffs' Amended Complaint.

ORDER – 42

| # Source | Who, how, when, where | Statement |
|---|---|---|
| 4<br>¶ 59 | Def. Killinger, CNBC interview, on April 16, 2003. | "[W]e carefully manage all of the various portfolios we're in and we watch the national housing market very carefully. . . .[W]e have a very balanced business model one in which when housing's doing strong [*sic*], we get high levels of loan originations and gains on sale of those loans and so forth.  When interest rates go up and we start to get a slowdown in housing, then we will have a real benefit of the servicing portfolio that we have of loans that we service for others, and that income should really kick in. . . .<br>Part of our business does better when interest rates are going up, part of it does better when interest rates are going down.  And those really do a nice job of offsetting each other.  And that's given us this very, very strong secular growth rate over the last many years and relatively little volatility.  Now, in addition to the natural business hedge, we do a certain amount of financial hedging just to be sure that we kind of smooth out those peaks and troughs a little bit more.  But the kind of financial hedging we do are straight over tackle.  We normally use [] either securities or certain derivatives just to balance out the interest rate risk." |
| 5<br>¶ 61 | WAMU's 1Q:03 Form 10-Q, filed on May 15, 2003. | "Our goal is to ensure that our senior management has timely access to all material financial and non-financial information concerning our business.  While we believe the present design of our disclosure controls and procedures is effective to achieve our goal, future events affecting our business may cause us to modify our disclosure controls and procedures." |
| 6<br>¶ 66 | Def. Killinger, in WAMU's July 15, 2003 press release discussing 2Q:03 financial results. | "Building on first quarter's momentum, Washington Mutual's balanced business model continued to deliver strong results in the second quarter." |
| 7<br>¶ 66 | WAMU's July 15, 2003 press release discussing 2Q:03 financial results. | "With interest rates remaining at near historic lows, high prepayment rates have reduced the value of the mortgage servicing asset; however, as in prior periods, the company's risk management activities effectively mitigated the change in the MSR valuation." |

ORDER – 43

| #<br>Source | Who, how, when, where | Statement |
|---|---|---|
| 8<br>¶ 67 | Def. Casey, during WAMU's 2Q:03 conference call, on July 16, 2003. | "Our tremendous second quarter results demonstrate the continued successful execution of our business strategy. . . .All parts of our business are delivering according to plan.  And in spite of an operating environment that presents a diverse mix of challenges and opportunities, our balanced business model allowed us to achieve record earnings. . . .Looking ahead, keep in mind that the servicing portfolio can be expected to contribute significant earnings when the interest rates eventually do rise. . . .We remain focused on balancing the demands of today while positioning the company for the eventual change in interest rates. . . .Home Loans is prepared for rapid changes in the interest rate environment.  We are confident that our balanced business model will provide the flexibility to grow market share in [a] changing environment. . . .We continue to actively monitor and collectively manage our sensitivity to changes in interest rates and still feel confident with that guidance." |
| 9<br>¶ 68 | Def. Casey, during the Q&A session of WAMU's 1Q:03 conference call, on July 16, 2003. | "With regard to your comment about changes in interest rates and the impact it will have on the market, we consistently and have been talking about this for quite some time, that we're preparing for this.  This is not new news     . . . .We have been stressing our environment to anticipate this kind of shortfall, so that the team has the plans in place and triggers in place to anticipate slowdowns in volumes. . . .We feel very good about that, but the forecast for the slowdown of the market it not new news.  We've been anticipating that for quite some time." |
| 10<br>¶ 73 | Def. Killinger, during a Lehman Brother Financial Services conference, on Sept. 9, 2003. | "We do continue to manage our credit risks function very carefully.  I think we continually improve all of our metrics and monitoring and put in some terrific talent that is staying right on top of all this." |

ORDER – 44

| #<br>Source | Who, how,<br>when, where | Statement |
|---|---|---|
| 11<br>¶ 74 | Def. Killinger,<br>during a Lehman<br>Brother Financial<br>Services<br>conference, on<br>Sept. 9, 2003. | "[S]everal mortgage banking process system challenges . . . came to light as a result of the spike in interest rates in late July and August.  And it's created some imprecision in the matching of our loan commitments and pipeline hedging activities. . . .Now, we took immediate steps to address any of the operating challenges and are back on track.  But fortunately, despite all this, our balanced business model has other parts, which performed very well in this interest rate environment.  Because rates have risen, for example, we experienced a large recovery in the value of our mortgage servicing rate assets . . . .And while a substantial portion of that benefit, of course, is offset with some of the hedging activities that we do, we do expect a recovery to outpace the loss on the derivatives. . . .So you're going to be seeing our retained portfolio grow fairly significantly. . . .And lastly, as we discussed in the first and second quarters, we took proactive steps to reposition our balance sheet for a rising interest rate environment and we're now in a position to recognize gains in the third quarter.  So as we look ahead, we have been preparing for this eventuality for quite some time. . . .So overall, as I look at the impact of these changing interest rates on Washington Mutual, I believe that our balanced business model is performing just as anticipated." |
| 12<br>¶ 77 | Def. Killinger, in<br>WAMU's Oct. 21,<br>2003 press release<br>discussing 3Q:03<br>financial results. | "We have identified the issues that led to these challenges [net loss from mortgage loans] and have implemented measures to address them." |
| 13<br>¶ 78 | Def. Casey, during<br>WAMU's 3Q:03<br>conference call, on<br>Oct. 22, 2003. | "Now let me provide some color on the market-driven issues that contributed to the loss from mortgage loans.  These fell into two main areas – first, the extreme volatility in interest rates down inefficiencies into the market for a period of time.  As we've seen with many other lenders, this situation impacted our ability to effectively hedge the pipeline.  As you'd expect, a component of our hedging strategy assumes that a certain percentage of loans in our pipeline will not be funded.  However, during the rate spike, we experienced a tremendous decrease in the percentage of loan fallout, as consumers rushed to close their loans at the lower rates they had locked in.  Accordingly, there were times in the quarter when we incurred losses, as we repositioned the hedge in response to significant interest rate movements." |

ORDER – 45

| # Source | Who, how, when, where | Statement |
|---|---|---|
| 14 ¶ 78 | Def. Casey, during WAMU's 3Q:03 conference call, on Oct. 22, 2003. | "Now, you'll recall that in early September, we also said that operational problems in our home loan business would contribute to third-quarter results. As Kerry mentioned earlier, we have identified these issues and implemented the appropriate measures to address them.  They were timeliness of information flows, due to the tremendous volume in our loan fulfillment area.  This resulted in certain loan commitments not being reflected in our hedging profile on a timely basis. . . .<br><br>The second item that affected us was that during the apex of the third-quarter volatility, many of the loans in the pipeline were not funded within their specified rate lock period. . . .We have addressed these problems through improved information flows, better tracking of loan commitments and stronger oversight.  Performance has since improved, and we are returning to normal conditions." |
| 15 ¶ 79 | Def. Killinger, during the Q&A session of WAMU's 3Q:03 conference call, on Oct. 22, 2003. | "I think, in terms of operational measures, as soon as we saw that there were – was an inconsistency of the data coming in between the rate locks and what we needed to do for hedging, we jumped on that immediately, put in a very large SWAT team of folks to get their arms around things.  They got that stabilized very quickly, and then we immediately implemented a variety of measures to be sure that that would not happen again.  We are very confident at this point in time, that the flows of information are accurate, and that the financial risk that we encountered early in the third quarter is taken care of at this point." |
| 16 ¶ 86 | Def. Killinger, during WAMU's Dec. Investor Day Conference, on Dec. 9, 2003. | "Under the leadership of Bill Longbrake, we have developed sophisticated risk management tools and processes which have allowed us to perform very well in a highly volatile interest rate environment.  This has given me a great deal of comfort in our management of risk overall." |
| 17 ¶ 87 | Def. Casey, during WAMU's Dec. Investor Day Conference, on Dec. 9, 2003. | "Kerry mentioned we also experienced operational challenges in our own mortgage business in the third quarter.  As we stated on several occasions, we have identified the issues that lead [*sic*] to these problems and have implemented the appropriate measures to address them." |
| 18 ¶ 97 | Def. Casey, during WAMU's 4Q:03 conference call, on Jan. 21, 2004. | "Overall we remain very comfortable with our valuation model for mortgage servicing rights, and our related derivative hedging continues to perform as expected." |

ORDER – 46

| # Source | Who, how, when, where | Statement |
|---|---|---|
| 19 ¶ 106 | Def. Killinger, during WAMU's 1Q:04 conference call, on April 20, 2004. | "Another point that sometimes gets overlooked is the excellent progress we've made in repositioning the balance sheet over the past year, and significantly reducing our exposure to the possibility of rising interest rates. . . .I'll just say that from an interest rate sensitivity standpoint, we are in a much stronger position today that I have ever seen since I joined the company about 20 years ago. . . .<br><br>[W]e have fully integrated our MSR and mortgage pipeline hedging activities and upgraded the capabilities of our capital market and treasury areas under Tom Casey." |
| 20 ¶ 107 | Def. Casey, during WAMU's 1Q:04 conference call, on April 20, 2004. | "Our risk management function performed extremely well again this quarter, and we remain very confident in our ability to manage the MSR asset effectively in any interest rate environment.  The steps we've taken to fully integrate our MSR and mortgage pipeline hedging activities have provided us with more effective and less-expensive hedging execution. . . .<br><br>The changes we have made over the past year in our interest rate risk management processes and capabilities, and the actions we've taken over the last couple of quarters to adjust our balance sheet position and optimize the management of our MSRs have helped us to significantly reduce the company's sensitivity to interest rates. . . .<br><br>Bottom line, we feel the company is in a strong position to withstand changes in rates." |
| 21 ¶ 114 | Def. Killinger, during a Lehman Brother Financial Services conference, on May 12, 2004. | "The question was, hedging for our mortgage-related products, both the pipeline and the MSR, which are the important parts, will those be from a single source when the systems are integrated?  I think a fair way to respond to that is that for those purposes of hedging, we integrated the essential information quite some time ago.  So that there is just one source to do all the hedging, and the portfolios are all pulled together. . . .<br><br>Now, we did run into a situation last year in the third quarter when the loan origination systems were not connected as well as what we thought they were, and there we ended up with some hedging issues out of our pipeline.  And once we saw that, we got all over it, and I have not had any issues come out of that since then." |
| 22 ¶ 115 | Def. Oppenheimer, during the Ragen MacKenzie 23d Annual Investment Conference, on May 18, 2004. | "I will say that we are as well positioned to weather any type of interest rate environment than we have been in the past. . . .We are looking at our whole balance sheet management in a very sophisticated fashion, with a number of various hedges and instruments that we are using to be able to hedge and be ready for any of those types of environments.  And we think we're as well positioned as we ever have been." |

ORDER – 47

| #<br>Source | Who, how,<br>when, where | Statement |
|---|---|---|

# APPENDIX B[11]

| CW#<br>(¶) | Job title | Time/location<br>employed at<br>WAMU | Job<br>responsibilities | Allegations |
|---|---|---|---|---|
| 1<br>(¶¶ 48, 51) | Loan Consultant | 4/01-8/04<br>Jacksonville, FL | loan processing and closing | Before Optis, closed 40-50 loans/month; after Optis, closed about 20/month<br><br>Despite problems, was instructed to keep accepting loan applications regardless of likelihood of approval |
| 2<br>(¶ 48) | Closing Coordinator | 4/03-1/04<br>Cincinnati, OH | loan closing | Optis slowed loan processing; loan rates often locked at or after 90 days; before Optis, closed 4-5 loans/day, but after Optis, the number dropped significantly and some days none at all |
| 3<br>(¶ 49) | VP Business Strategy/ Program Mgr. | 6/00-4/04<br>Seattle, WA | worked on technology programs for WAMU's consumer lending operations and emerging market strategies for risk management requirements | Did not have technological systems to integrate data needed to make calculations in the capital market or secondary market arena; Optis was supposed to help, but lacked capacity<br><br>Optis only partially deployed by mid-2003, almost one year late, then withdrawn because of capacity issues |

---

[11]Unless otherwise noted, all "source" information refers to paragraphs from Plaintiffs' Amended Complaint.

ORDER – 48

| CW# (¶) | Job title | Time/location employed at WAMU | Job responsibilities | Allegations |
|---|---|---|---|---|
| 4 (¶ 49) | VP Business Strategy & Analysis | 2000-1/05 IT 1/05-1/06 Long Beach Mortgage Div. | worked in IT during Class Period (Opp'n 29) | Optis had serious problems, including in June 2003 |
| 5 (¶ 50) | Loan Officer | | | WAMU so far behind in its loan processing that it consistently failed to send loan packages to customers on a timely basis |
| 6 (¶ 50) | VP | 2003-6/04 Seattle, WA | in charge of underwriting administration | WAMU's loans contained errors and problems because of lack of quality control in loan processing; Optis was a major part of WAMU's problems because could not support the necessary productivity; Optis repeatedly missed deadlines<br><br>It was widely known at WAMU that Optis was a failing technology |
| 7 (¶¶ 50, 51) | Loan Officer | 9/01-3/04 Jacksonville, FL | | Had to turn off phone for 3-4 months at the loan center to delay accepting new loan applications, due to Optis and inability to process pending loan applications<br><br>Despite problems, was instructed to keep accepting loan applications regardless of likelihood of approval, creating flood of loan applications<br><br>WAMU directive not to deter customers from locking in rates exacerbated delays |
| 8 (¶ 51) | Loan Consultant | 1/01-8/04 Jacksonville, FL | | Many of WAMU's loans needed extensions beyond 90-day rate locks, exacerbated by archaic computer systems requiring separate processing and underwriting systems |
| 9 (¶ 52) | IBM Consultant | 11/02-11/03 Fullerton, CA | worked on WAMU's conversion to Optis | Although Optis supposed to fix the problem of delays in loan closings, it made things worse because it required WAMU to transfer information between systems<br><br>Optis was designed when interest rates were decreasing |

ORDER – 49

| CW# (¶) | Job title | Time/location employed at WAMU | Job responsibilities | Allegations |
|---|---|---|---|---|
| 10 (¶ 52) | Asst. VP & Credit Analyst IIII | 9/02-8/04 Dallas, TX | involved in closing loans | WAMU did not know what its loan volume was, closed more loans than expected, and experienced delays in loan processing |
| 11 (¶ 53) | VP and Project Manager | 8/00-3/04 | initially hired to be Optis release manager for WAMU's correspondent channel

worked on strategic projects | Optis poorly designed and could not support too many concurrent users

Optis failed to upload systems correctly and was not being maintained by WAMU's operational centers

WAMU's multiple systems and failure to integrate product offerings from acquisitions were major problems; multiple systems created incorrect loan pipeline impression |
| 12 (¶ 54) | VP Portfolio Retention | 12/02-3/04 Seattle, WA | reported rate lock data to capital markets group | Accurate reporting of data was a problem because of technological issues, including Optis and multiplicity of platforms

Attended weekly teleconference meetings discussing technology, rate lock and pipeline challenges |

ORDER – 50