FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUTH FERRY LP, # 2, individually
and on behalf of all others
similarly situated,
                    *Plaintiff-Appellee,*

            v.

KERRY K. KILLINGER; DEANNA W.
OPPENHEIMER; WASHINGTON
MUTUAL, INC.,
                    *Defendants-Appellants.*

No. 06-35511

D.C. No.
CV-04-01599-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
April 8, 2008—Seattle, Washington

Filed September 9, 2008

Before: Raymond C. Fisher, Ronald M. Gould, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Gould

12533

**COUNSEL**

Stephen M. Rummage, Davis Wright Tremaine LLP, Seattle, Washington, and Jay B. Kasner (argued), and Scott D. Musoff, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for the appellants.

Melvyn I. Weiss, Lori G. Feldman, and John Rediker, Milberg Weiss & Bershad LLP, New York, New York, and Stuart J. Guber and James Evangelista, Motley Rice LLC, Atlanta, Georgia, and Professor Arthur R. Miller (argued), New York University School of Law, for the appellee.

## OPINION

GOULD, Circuit Judge:

Defendants-Appellants Kerry Killinger ("Killinger"), Thomas Casey ("Casey"), Deanna Oppenheimer ("Oppenheimer") and Washington Mutual, Inc. ("WAMU", collectively, "Defendants") appeal the district court's partial denial of their motion to dismiss a securities fraud action brought by Plaintiffs-Appellees South Ferry LP et al. ("South Ferry"), who allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and its underlying regulations, found at Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants argue that the district court erred by inferring that Defendants had knowledge of "core operations" at WAMU based on their management positions and argue that such an inference does not satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) ("PSLRA"). The district court certified for interlocutory appeal its order granting in part and denying in part defendants' motion to dismiss. We have jurisdiction pursuant to 28 U.S.C. § 1292(b), vacate the district court's order, and remand.

## I

WAMU is a publicly-traded financial services company that serves individuals and small businesses, offering consumer banking, mortgage lending, commercial banking, and other services. Defendants Killinger, Casey, and Oppenheimer all served as officers of WAMU during the class period, with Killinger serving as the Chairman of WAMU's Board of Directors, President, and CEO, Casey serving as Executive Vice-President and CFO, and Oppenheimer as President of WAMU's consumer group. Thus, they held not merely nominal but rather key officer positions at relevant times.

Plaintiffs are WAMU shareholders who seek to represent a class of individuals who owned WAMU stock between April 15, 2003 and June 28, 2004. The complaint relates to several related aspects of WAMU's mortgage lending business. That business involves originating home loans, buying and selling home loans in the secondary markets, mortgage servicing, and providing mortgage-insurance products.

When WAMU originates a home loan, it may later sell that loan to another institution on the secondary market. However, WAMU typically retains the mortgage servicing rights ("MSRs") for the loans that it sells. The holder of MSRs, WAMU here, provides billing and other services to mortgage customers for the life of the loans even though a different entity may actually own them. MSRs have an independent value to WAMU because WAMU is paid a portion of each loan payment for the services it provides.

This case relates to two types of risk present in WAMU's mortgage lending business, both of which are exacerbated by nationwide interest rate fluctuations. The first, "MSR-related risk," is the risk that WAMU will lose MSR-related revenue due to the pre-payment of loans that it services. MSR-related risk is greatest in an environment in which interest rates are falling, because falling rates make it more likely that borrowers will refinance their loans to take advantage of cheaper financing. When they do so, the original mortgage loan is paid in its entirety and replaced with a lower-interest loan, often from a different lender. Because WAMU's MSR-related revenue from a given loan comes from the services that it provides over the life of that loan, a loan that is fully repaid at an early date due to refinancing causes WAMU to lose future MSR-related revenue.

The second type of risk, "pipeline risk," is the risk that WAMU will commit to fund a loan at a certain interest rate only to see market interest rates change by the time the loan is finalized. This may occur whenever interest rates change.

Borrowers typically "lock in" an interest rate on their home mortgage loan several weeks before they actually close a mortgage deal. A loan in this lock-in period is referred to as a loan "in the pipeline." When mortgage rates are falling, borrowers may find that the rate that they have locked in is higher than the prevailing rates at the time of their closing. Those borrowers may abandon a lender with a loan in the pipeline, such as WAMU, to take a mortgage from a different lender at the lower then-current rate. Conversely, when rates are rising, borrowers may lock in rates that turn out to be below market by the time of their closing, leaving WAMU to fund at below market rates all loans that were in the pipeline at the time that rates rose.

To manage MSR-related and pipeline risk, WAMU hedges its expected MSR and mortgage-origination revenues with securities and derivative instruments. In a rising interest rate environment, WAMU also relies on an important "natural hedge" to protect its revenues. When rates are rising, WAMU faces greater pipeline risk because market rates are more likely to exceed the locked-in rates at the time mortgage deals close. However, MSR revenues provide some protection from this pipeline risk, because borrowers are less likely to refinance and pre-pay their mortgages when the rates that would apply to their refinancing loans are higher than the rates they pay on their existing mortgage. Accordingly, WAMU receives more stable MSR-related revenues when it suffers increased pipeline risk. This natural hedge, in theory, allows WAMU to have a more steady revenue stream despite volatility of interest rates.

South Ferry alleges that the individual defendants made materially false or misleading statements concerning WAMU's ability to manage MSR-related and pipeline risk during the class period. South Ferry also alleges that the individual defendants repeatedly assured investors that the natural hedge and additional securities and derivative hedges would allow WAMU to thrive in an environment where interest rates

were increasing, and that the individual defendants assured investors that WAMU had fully integrated the information systems that are central to WAMU's ability to maintain and update their various hedges in a timely fashion during periods of interest rate volatility. According to South Ferry, WAMU was unprepared for the interest rate volatility that occurred later because it failed to integrate its information systems to permit it to keep a close watch on the hedges that it maintains.

Defendants moved to dismiss South Ferry's complaint on May 17, 2005, and the district court granted the motion to dismiss as to defendants Chapman, Longbrake, and Vanesek, but denied the motion as to the remaining defendants. *South Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121 (W.D. Wash. 2005). The district court found that South Ferry satisfied the PSLRA's heightened pleading standard[1] by inferring that the remaining defendants had knowledge of WAMU's difficulties with their information systems "because of the nature of the statements they [Defendants] were making and the nature of these specific alleged operational problems," relying on *In re Northpoint Communications Group, Inc. Securities Litigation,* 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001), for the principle that it may be inferred that facts critical to a business's "core operations" or important transactions are known to key company officers (sometimes referred to in this opinion as the "core operations inference"). *South Ferry*, 399 F. Supp. 2d at 1141. Defendants moved for reconsideration or, alternatively, for a certification from the district court that interlocutory appeal was appropriate under 28 U.S.C. § 1292(b) to determine whether the district court properly imputed scienter in the complaint's allegations based on the inference that key officers had knowledge of the "core operations" of the company.

---

[1]The PSLRA requires, among other things, that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The district court denied the motion for reconsideration, but granted the certification motion. In the order granting the certification motion, the district court recognized that "the complaint does rely on circumstantial evidence and an inference of knowledge arising from the connection between Defendants' job roles and the core operations of the business," and that "[s]hould the Ninth Circuit rule that the core operations inference is improper, even Defendants' specific statements indicating first-hand knowledge of WAMU's technological and operational systems may be insufficient to support a strong inference of scienter." Defendants timely pursued this interlocutory appeal.

## II

The decisions of a district court on motions to dismiss are reviewed de novo. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir. 1999). We must accept as true all well-pleaded allegations in the complaint. *Id.*

## III

**[1]** Under the PSLRA, South Ferry must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "Under this provision, the mental state required for securities fraud liability is distinct from the level of pleading required to infer that mental state." *Silicon Graphics*, 183 F.3d at 975. In a securities fraud action like this one, there is no dispute as to the required state of mind: the plaintiffs must show that defendants engaged in "*knowing*" or "*intentional*" conduct. *Id.* We have held that reckless conduct can also meet this standard "to the extent that it reflects some degree of intentional or conscious misconduct," or what we have called "deliberate recklessness." *Id.* at 977 (internal quotation marks omitted).

**[2]** The United States Supreme Court has recently discussed this scienter requirement, holding in *Tellabs, Inc. v.*

*Makor Issues and Rights, Ltd.*, 127 S.Ct. 2499, 2510 (2007), that a strong inference "must be cogent and compelling, thus strong in light of other explanations." According to the Court, "[t]he reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.

**[3]** Before the *Tellabs* decision, we construed this pleading standard in light of the applicable substantive legal standard, explaining that, "the PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate recklessness," *Silicon Graphics*, 183 F.3d at 979, and specifying that "plaintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.*

The district court concluded that the PSLRA scienter standard was satisfied in this case because of alleged public statements by Defendants that WAMU's information systems were fully integrated and effective at a time when WAMU was suffering technology problems that affected its ability to control MSR related and pipeline risk and hedge effectively. It concluded: "Defendants' knowledge of this information can be inferred because of the nature of the statements they were making and the nature of the alleged operational problems" because "[i]t may be inferred that the facts critical to a business's core operations or important transaction are known to a company's key officers." *South Ferry*, 399 F. Supp. 2d at 1141 (citing *Northpoint*, 184 F. Supp. 2d at 998). Defendants argue that the district court's reliance on the "core operations" inference was erroneous in light of *In re Read-Rite Corp. Securities Litigation*, 335 F.3d 843, 848-49 (9th Cir. 2003). In *Read-Rite*, we held that while it might be a "reasonable inference" to conclude that high-ranking corporate officers have knowledge of the core operations of their companies, it was

not a "strong inference" as required by the PSLRA in that case. *Id.* (internal quotation marks omitted).

To evaluate the district court's judgment, we must consider whether a scienter theory that infers that facts critical to a business's "core operations" or an important transaction are known to a company's key officers satisfies the PSLRA's heightened pleading standard.

We have visited these issues before in several cases, most notably in *Silicon Graphics, In re Vantive Securities Litigation*, 283 F.3d 1079, 1087-88 (9th Cir. 2002)*, and Read-Rite. Silicon Graphics* does not specifically address whether the core operations inference can satisfy the heightened PSLRA pleading standard, but it sets a very high bar for securities plaintiffs under the PSLRA. As we there explained, the PSLRA requires that plaintiffs state with particularity all facts on which their belief of scienter is formed. 15 U.S.C. § 78u-4(b)(1); *Silicon Graphics*, 183 F.3d at 985. "This means that a plaintiff must provide, in great detail, all the relevant facts forming the basis of her belief. It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim." *Id.* We held that the plaintiffs' complaint was deficient in *Silicon Graphics* because it did not contain the requisite detail.[2] Without those details, we held that we could not conclude that the defendants had actual knowledge of the facts they were alleged to have misstated and that we

---

[2] *See id.* at 985 ("In this case, Brody's complaint does not include adequate corroborating details. She does not mention, for instance, the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them. Nor does she include an adequate description of their contents which we believe—if they did exist—would include countless specifics regarding ASIC chip shortages, volume shortages, negative financial projections, and so on. We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability.")

were forbidden by the PSLRA from finding a strong inference from such general allegations. *Id.*

Three years later, in *Vantive*, 283 F.3d at 1087-88, we elaborated on the *Silicon Graphics* standard, explaining that *Silicon Graphics* required " 'corroborating details' " to support the allegations in the complaint. (quoting *Silicon Graphics*, 183 F.3d at 985). In *Vantive*, plaintiffs alleged that internal company reports contained information contrary to the public statements of company management, and that said management would have known of the reports because of their "hands-on managerial style." *Id.* (internal quotation marks omitted). We held that these allegations did not meet the PSLRA requirements because plaintiffs did not offer details that would bridge the gap between the existence of the reports and actual knowledge on the part of the defendants. *Id.* We concluded that we could not infer such knowledge from the general allegation that management was informed about important issues in the company.

Finally, in *Read-Rite*, we rejected the notion that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers" under the PSLRA. *Read-Rite*, 335 F.3d at 848. The *Read-Rite* plaintiffs argued that defendants alleged false statements and high rank within the company, viewed in conjunction with the importance of the products that were the subject of the statements, created a strong inference of scienter under *Silicon Graphics*. We rejected that argument, holding that those facts presented only a "reasonable inference," but were not sufficiently detailed to meet the PSLRA and *Silicon Graphics* standard. *Read-Rite,* 335 F.3d at 848-49. While such an inference may have sufficed before the enactment of the PSLRA, it was not enough under the PSLRA's heightened pleading standard. *See id.*

**[4]** *Silicon Graphics*, *Vantive*, and *Read-Rite*, read without reference to *Tellabs*, will generally prevent a plaintiff from

relying exclusively on the core operations inference to plead scienter under the PSLRA. *See Read-Rite*, 335 F.3d at 848-49. Plaintiffs recognize this. However, the Supreme Court's recent *Tellabs* decision also discusses the level of detail required under the PSLRA, and with its controlling and persuasive weight, it suggests that perhaps *Silicon Graphics*, *Vantive*, and *Read-Rite* are too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright. In *Tellabs*, the Court explained that "omissions and ambiguities count against inferring scienter," but held that they were still properly considered. 127 S. Ct. at 2511. *Tellabs* suggests that while a high level of detail is required under the PSLRA, a court should look to the complaint as a whole, not to each individual scienter allegation as *Silicon Graphics* suggests. Thus, *Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.

Consistent with this thematic idea, though without the benefit of later-decided *Tellabs*, Plaintiffs argue that *Read-Rite* prevents only total reliance on the core-operations inference absent other particularized supporting allegations. In Plaintiffs view, the core-operations inference can be one relevant part of a complaint that raises a strong inference of scienter.

**[5]** We conclude that this position is correct in light of *Tellabs*. The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement, the prior holdings of *Silicon Graphics*, *Vantive*, and *Read-Rite* notwithstanding. Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter. *See* 127 S. Ct. at 2511 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis. The allegations, read as a whole, must

raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations," *id.* at 2510, to satisfy the PSLRA standard. In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.

  **[6]** A question remains, however, about reliance on the core-operations inference when it is the only basis for scienter in the complaint. Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard. In such cases the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the inference that defendants remained unaware. As a general matter, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud" or other allegations supporting scienter. *See Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, no. 06-55826, 2008 WL 2853402 at *13 (9th Cir. July 25, 2008) (concluding that the bare core operations inference fell short of the *Tellabs* standard). However, in some unusual circumstances, the core operations inference, without more, may raise the strong inference required by the PSLRA.[3]

---

  [3]In *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008), we permitted a securities plaintiff to rely on the core operations inference without particularized allegations about defendants' access to the relevant information. In *Applied Signal*, the defendants allegedly failed to disclose "stop-work orders" from its largest customers even though those orders had "a devastating effect on the corporation's revenue." *Id.* at 987. The first stop-work order "halted between $10 and $15 million of work on the company's largest contract with one of its most important

**[7]** Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company. For example, in *In re Daou Systems, Inc.,* 411 F.3d 1006, 1022-23 (9th Cir. 2005), plaintiffs relied in part on "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database" to support a strong inference of scienter. The complaint in *Daou* relied on specific and particular accusations about the role played by the defendants in managing the company, including specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements. *Id.* That is sufficient under the PSLRA. Similarly, in *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004), we held that the plaintiffs had pleaded facts showing a strong inference of scienter because, among other things, the CEO of the defendant company was quoted as saying: "All of our information is on one database. We know exactly how much we have sold in the last hour around the world," a specific and detailed statement about defendants' actual knowledge. *Id.* (emphasis omitted); *see also id.* ("Plaintiffs here [also] have hard numbers and make specific allegations regarding large portions of Oracle's sales data."). The allegations at issue in *Daou* and *Oracle* go beyond a mere inference of management knowledge of all "core operations,"

---

customers," and the second halted $8 million. *Id.* at 988 n.5. The complaint alleged that only two government agencies made up 80% of the company's revenue, making the loss of even one contract disastrous for the entire company. *Id.* at 983. Moreover, the defendants admittedly knew about the stop-work orders only two weeks after the alleged false statements. *Id.* at 988 n.5. All of these factors put *Applied Signal* into the exceedingly rare category of cases in which the core operations inference, without more, is sufficient under the PLSRA.

and were sufficient under the PSLRA because they included details about the defendants' access to information within the company.

**[8]** In summary, allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." *Tellabs,* 127 S.Ct. at 2510. This view takes such allegations into account when evaluating all circumstances together. Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information, as in *Daou* and *Oracle.* Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter. *See Allied Signal*, 527 F.3d at 988 (internal quotation marks omitted).

### IV

We pause to consider again the district court's order. South Ferry contends that the district court had adequate alternative bases for its decision even if the core operations inference was improperly applied. However, the district court made clear in its certification order that it had serious doubts about the viability of the complaint unless South Ferry could rely on the core operations inference:

> "It is also apparent that the viability of the core operations inference is central to the outcome of this case . . . . Should the Ninth Circuit rule that the core operations inference is improper, even Defendants' specific statements indicating first-hand knowledge of

WAMU's technological and operational systems may be insufficient to support a strong inference of scienter."

This also suggests that the district court was concerned whether an alternative basis might exist for affirming the complaint if the core operations inference was improper.

**[9]** Regardless of the district court's uncertainty as to the outcome under a different standard, the parties urge us to resolve the entirety of the case in this interlocutory appeal. South Ferry urges us to conclude that the complaint contained an alternative basis for a strong showing of scienter, while WAMU urges us to dismiss the entire action if the core operations inference is improper. Although we have jurisdiction to reach the merits of the entire complaint because it was at issue in the certified order, we decline to do so.

**[10]** The district court and the parties at the time of the certified order were without the benefit of much of the case law underlying this opinion, including the Supreme Court's guidance on theory in *Tellabs*. We conclude that the district court in the first instance, and with its detailed knowledge of the facts, should have the opportunity to review Defendants' motion to dismiss under the appropriate standard. *See Tellabs*, 127 S. Ct. at 2513; *Bassiri v. Xerox Corp.*, 463 F.3d 927, 934 (9th Cir. 2006) (remanding to the district court for consideration of alternative basis for its dismissal order after initial basis was rejected on interlocutory appeal). Accordingly, we **VACATE** the order of the district court with regard to the PSLRA scienter requirement and **REMAND** the case to the district court for further proceedings consistent with *Tellabs* and consistent with this opinion. This opinion does not disturb the other conclusions reached by the district court.

**JUDGMENT VACATED, ORDER VACATED IN PART AND REMANDED.**