1

THE HONORABLE JOHN C. COUGHENOUR

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

SOUTH FERRY LP #2, et al., individually and on
behalf of all others similarly situated,

10

Plaintiffs,

CASE NO.:  C04-1599 JCC

11

v.

**INDIVIDUAL DEFENDANTS' JOINT
OPENING BRIEF ON REMAND**

12

KERRY K. KILLINGER, et al.,

13

Defendants.

*Note on Motion Calendar:*
June 12, 2009

14

15

16

17

18

19

20

21

22

23

24

25

26

27

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1

# TABLE OF CONTENTS

2

**Page**

3

INTRODUCTION ................................................................................................................ 1

4

BACKGROUND ................................................................................................................. 4

5

I.      PROCEDURAL POSTURE ................................................................................... 4

6

II.     FACTS RELEVANT TO THE SCIENTER ANALYSIS ................................... 5

7

        A.      Washington Mutual's Hedging Practices........................................... 5

8

               1.     The Natural Hedge ................................................................. 5

9

               2.     Financial Hedging .................................................................. 6

10

                     a.     Pipeline Hedging.......................................................... 6

11

                     b.     MSR Hedging ............................................................... 6

12

        B.      The Challenged Statements And The Events Of The Class Period ...... 6

13

               1.     The First Quarter Of 2003................................................... 7

14

               2.     The Second Quarter Of 2003 .............................................. 7

15

               3.     The Third Quarter Of 2003 ................................................. 7

16

               4.     The Fourth Quarter Of 2003 And Full Year 2003 ................... 9

17

               5.     The First Quarter Of 2004................................................... 9

18

               6.     The Second Quarter Of 2004 .............................................. 11

19

ARGUMENT ..................................................................................................................... 12

20

I.      THE STANDARD FOR PLEADING SCIENTER ........................................ 12

21

II.     THE COMPLAINT FAILS TO RAISE A STRONG INFERENCE OF SCIENTER. .......................................................................................... 14

22

        A.      Plaintiffs' Theory Of Scienter.............................................................. 14

23

        B.      Plaintiffs' Allegations Do Not Qualify For The Narrow Exceptions To The Rule That Allegations Regarding Core Operations Are Insufficient To Plead Scienter................................................. 15

24

25

               1.     The Complaint Lacks Allegations Of "Patently Obvious" Problems Undermining The Challenged Statements. ............................. 15

26

27

INDIVIDUAL DEFENDANTS' OPENING BRIEF RE
DEFICIENCIES IN SCIENTER ALLEGATIONS
CASE NO. C04-1599 JCC

i

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

a.   Challenged Statements Relating To Technical And Operational Problems Impacting Information Flows ................... 16

i.   Plaintiffs Fail To Allege Falsity........................................ 16

ii.   Falsity Was Not Patently Obvious. .................................. 19

b.   Challenged Statements Relating To MSR Hedging...................... 19

i.   Plaintiffs Fail To Allege Falsity........................................ 19

ii.   Falsity Was Not Patently Obvious. .................................. 20

2.   The Complaint Lacks Detailed And Specific Allegations Regarding The Individual Defendants' Exposure To Factual Information. ............... 21

C.   The Aggregate Of Plaintiffs' Allegations Does Not Raise A Strong Inference Of Scienter. .......................................................................................... 22

CONCLUSION ............................................................................................................ 24

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON REMAND
CASE NO. C04-1599 JCC

ii

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Berson v. Applied Signal Tech., Inc.,
    527 F.3d 982 (9th Cir. 2008) ................................................................. passim

Glazer Capital Mgmt., LP v. Magistri,
    549 F.3d 736 (9th Cir. 2008) ......................................................................1

In re Daou Sys., Inc.,
    411 F.3d 1006 (9th Cir. 2005) .................................................................13

In re Northpoint Commc'ns Group, Inc. Sec. Litig.,
    184 F. Supp. 2d 991 (N.D. Cal. 2001) ......................................................4

In re Read-Rite Corp. Sec. Litig.,
    335 F.3d 843 (9th Cir. 2003) ...................................................................14

In re Silicon Graphics, Inc. Sec. Litig.,
    970 F. Supp. 746 (N.D. Cal. 1997) .........................................................24

In re Vantive Corp. Sec. Litig.,
    283 F.3d 1079 (9th Cir. 2002) .................................................................12

In re Zumiez Inc. Sec. Litig.,
    No. C07-1980-JCC, 2009 WL 901934 (W.D. Wash. Mar. 30, 2009) .........12, 20

Metzler Inv. GMBH v. Corinthian Colleges, Inc.,
    540 F.3d 1049 (9th Cir. 2008) .................................................................22

Nursing Home Pension Fund, Local 144 v. Oracle Corp.,
    380 F.3d 1226 (9th Cir. 2004) ............................................................13, 23

Segal Co. (E. States), Inc. v. Amazon.com,
    280 F. Supp. 2d 1229 (W.D. Wash. 2003) ..............................................24

South Ferry LP # 2 v. Killinger,
    99 F. Supp. 2d 1121 (W.D. Wash. 2005) ..................................................4

South Ferry LP # 2 v. Killinger,
    542 F.3d 776 (9th Cir. 2008) ............................................................. passim

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    127 S. Ct. 2499 (2007) ....................................................................... passim

Zucco Partners, LLC v. Digimarc Corp.,
    552 F.3d 981 (9th Cir. 2009) ............................................................. passim

## STATUTES

15 U.S.C. § 78u-4(b)(2) ...........................................................................1

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC

iii

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1

**MISCELLANEOUS**

2    Rule 12(b)(6)................................................................................................................................12

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Wilson Sonsini Goodrich & Rosati
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

**INTRODUCTION**

The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) (the "Reform Act") requires, among other things, that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." In five cases decided within the past year, the Ninth Circuit has defined the circumstances under which a court may infer "the required state of mind" from a defendant's management role. These cases squarely hold that mere allegations of a corporate officer's role in a company's "core operations" ***cannot*** alone give rise to the required "strong inference" that the officer has acted with scienter in making a false statement concerning the company. That general principle bars plaintiffs' claims.

But the Ninth Circuit has recognized "two exceptions to this general rule," which arise "under certain narrow conditions." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009). Both exceptions depend, first and foremost, on particularized allegations that the defendant has made material false statements concerning a company's core operations. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) (core operations scienter inference cannot be drawn where "plaintiffs ha[ve]n't even alleged that defendants' optimistic statements were false or misleading when made"); *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 746-47 (9th Cir. 2008) (plaintiffs adequately pleaded false statements, but facts establishing falsity not the type of which senior management would be aware). If a plaintiff adequately alleges falsity, a court may draw a strong inference of scienter from falsity alone if plaintiffs make detailed and specific factual allegations of a defendant's "'actual access'" to contemporaneous information that contradicted the defendant's public statements. *Digimarc*, 552 F.3d at 1000 (quoting *South Ferry LP # 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)). In addition, a court may draw a strong inference of scienter where the complaint alleges specific facts about the falsity of the information that would have been "patently obvious" to an officer in the defendant's position, such that it would be "'absurd' to suggest that management was without knowledge of the matter." *Id.* (quoting *South Ferry*, 542 F.3d at 786).

Here, the Complaint does not challenge the accuracy of Washington Mutual's reporting of

INDIVIDUAL DEFENDANTS' OPENING BRIEF RE
DEFICIENCIES IN SCIENTER ALLEGATIONS
CASE NO. C04-1599 JCC

1

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   profits, losses, or other financial results.  Instead, it relies on conclusory allegations that

2   defendants misled investors about WaMu's ability to implement complex financial hedging

3   strategies to protect against interest rate risks.  The Complaint focuses on hedging losses that

4   WaMu incurred in two quarters between April 2003 and June 2004, a period during which

5   WaMu's stock price appreciated 5% and shareholders received record dividends every quarter.

6   Plaintiffs do not claim that defendants concealed these hedging losses; to the contrary, the

7   Complaint shows that they promptly disclosed the magnitude and causes of the losses.  Instead,

8   plaintiffs' claims rest on the unsupported premise that defendants made false statements about

9   hedging practices in the months *before* WaMu suffered the hedging setbacks.

10      But plaintiffs have not adequately pleaded that defendants made a false statement about

11  the company's core operations.  And even if they had pleaded falsity, they do not plead facts that

12  suffice under either the first or second exception to the rule that allegations based on a defendant's

13  management role in "core operations" cannot alone suffice to plead his or her scienter.  Thus,

14  under current Ninth Circuit law, plaintiffs have not pleaded scienter.

15      ***Third Quarter 2003.***  In the third quarter of 2003, WaMu announced that operational and

16  technical problems arising early in that quarter adversely affected its ability to hedge so-called

17  "pipeline risk," *i.e.*, the risk that interest rates would rise while WaMu had new loans in the loan

18  origination pipeline with lower rates locked in.  But plaintiffs do not allege that defendants made

19  any prior inaccurate public statements about pipeline hedging.  Instead, plaintiffs rely on general

20  (and accurate) statements that WaMu had a "balanced business model," that it used financial

21  hedging to "smooth out … peaks and troughs a little bit," and that it was preparing for "changes

22  in interest rates."  ¶¶ 56, 59, 67.[1]  Plaintiffs do not allege particular facts showing that these

23  statements were false.  Further, even assuming falsity, plaintiffs have not alleged (a) that

24  defendants had actual access to information contradicting any statements that concerned pipeline

25  hedging, or (b) that any "patently obvious" facts contradicted defendants' public statements.

26  _____

27      [1] Citations to the Consolidated Amended Class Action Complaint For Violations Of The Federal Securities Laws
    are in the form "¶ _"

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC                                    2                    **WILSON SONSINI GOODRICH & ROSATI**
                                                                                 701 Fifth Avenue, Suite 5100
                                                                                 Seattle, WA  98104-7036
                                                                                 Tel: (206) 883-2500
                                                                                 Fax: (206) 883-2699

*Second Quarter 2004.*  In the second quarter of 2004, WaMu announced losses arising from hedging designed to protect against an entirely different risk, *i.e.*, the risk that the value of WaMu's mortgage servicing rights ("MSRs") would fall if interest rates fell.  In the second quarter of 2004, interest rates increased, so the value of MSRs increased as well.  But because of a peculiar interest rate environment, the losses on MSR hedges – which by nature are designed to move in the opposite direction of MSR value – dwarfed the MSR gains.  Plaintiffs claim that, before announcing these losses, defendants misled the public by saying that WaMu had fixed the problems with information flow that had caused pipeline hedging losses in the third quarter of 2003.  In fact, plaintiffs broadly assert, without alleging any particular facts, that those problems had not been fixed, and again, without support, that those problems led to the 2004 MSR hedging losses.

But plaintiffs' theory contradicts the allegations in their Complaint and defies common sense.  As plaintiffs acknowledge, Mr. Casey told investors that WaMu had rectified the operational problems that had led to pipeline hedging losses by implementing "improved information flows, better tracking of loan commitments and stronger oversight."  ¶ 78.  Mr. Killinger likewise discussed improvements in "flows of information."  ¶ 79.  After that, plaintiffs tacitly concede that WaMu did not suffer pipeline hedging losses, much less losses associated with "imprecision in the matching of our loan commitments and pipeline hedging activities."  Further, plaintiffs do not allege *any* facts suggesting that renewed problems with information flows or tracking of originations – the operational challenges that led to the pipeline hedging losses – had *anything* to do with the MSR hedging losses suffered in 2004.  In fact, as the Complaint alleges, an unprecedented tightening of basis spreads led to the MSR hedging loss.  *See* ¶ 120.

Moreover, even if the Court indulged the plaintiffs' effort to link the 2003 data reporting issues that caused pipeline hedging losses to the 2004 losses in MSR hedging, plaintiffs have not made detailed and specific factual allegations that defendants had "actual access" to information that contradicted their statements.  Nor have plaintiffs alleged specific facts about WaMu's operations that made it "patently obvious" to defendants that the operational issues that led to the pipeline hedging problem had not been addressed.  They therefore have not pleaded the two

3

"narrow" exceptions to the now-settled principle that courts may not draw a strong inference of scienter from the mere fact that an executive's statements related to a matter important to the company.

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007), the Supreme Court held that a complaint would survive a motion to dismiss under the Reform Act "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." (Emphasis added.) Plaintiffs have fallen short. By far the most likely inference from plaintiffs' allegations is that defendants truthfully expressed confidence in WaMu's hedging – which performed well and contributed to WaMu's financial results throughout most of the Class Period – and then timely and properly disclosed hedging issues as they arose. The Complaint should be dismissed with prejudice.

## BACKGROUND

### I.        Procedural Posture

This Court granted defendants' motion to dismiss as to Messrs. Chapman, Longbrake and Vanesek, but denied the motion as to Messrs. Casey, Killinger and Ms. Oppenheimer (the "Individual Defendants") and Washington Mutual, Inc. Regarding scienter, this Court found that plaintiffs satisfied the Reform Act's heightened pleading standard based on an inference that the Individual Defendants had knowledge of certain technical and operational difficulties at WaMu "because of the nature of the statements that they were making and the nature of these specific alleged operational problems." *South Ferry LP # 2 v. Killinger*, 399 F. Supp. 2d 1121, 1141 (W.D. Wash. 2005) ("MTD Order"). In so holding, the Court relied on the "core operations" principle: that "'it may be inferred that facts critical to a business's core operations or important transaction are known to a company's key officers.'" *Id.* (quoting *In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001)). The Court found that the core operations theory supplied the only basis for scienter: neither the Individual Defendants' stock sales nor purported GAAP violations satisfied plaintiffs' heavy pleading burden. MTD Order at 1144-47.

4

1    Defendants appealed, asking the Ninth Circuit "to determine whether the district court

2    properly imputed scienter ... based on the inference that key officers had knowledge of the 'core

3    operations' of the Company." *South Ferry*, 542 F.3d at 781.  The Ninth Circuit narrowly defined

4    the core operations principle in a way that precludes its application here.  Noting that this Court

5    had expressed "serious doubts about the viability of the complaint unless South Ferry could rely

6    on the core operations inference," the Ninth Circuit remanded the case to give this Court "the

7    opportunity to review Defendants' motion to dismiss under the appropriate standard." *Id*. at 786.

8    **II.  Facts Relevant To The Scienter Analysis**

9    **A.  Washington Mutual's Hedging Practices**

10    As this Court has noted, the central theme of the Complaint is that, throughout the Class

11    Period, WaMu was facing operational and technical problems that made it impossible to

12    effectively hedge its MSR and pipeline risks.  MTD Order at 1127.  In order to determine whether

13    the Individual Defendants knowingly or recklessly made false statements material to WaMu's

14    ability to hedge, it is essential to understand what hedging is and how WaMu did it.

15    Simply put, a hedge is a financial position taken to offset a risk to a business investment.

16    It is designed to increase in value as the subject of the hedge goes down in value – and vice versa.

17    Hedges thus reduce downside risk but also generally moderate any upside, thereby stabilizing the

18    overall valuation.

19    **1.  The Natural Hedge**

20    WaMu's business model involved a "natural" hedge, where "WaMu's loan origination

21    business and its mortgage servicing business balanced or were expected to balance each other out

22    as interest rates changed." *Id.* at 1126.  When interest rates were low, WaMu's loan origination

23    business did well.  In that environment, however, more borrowers would be expected to refinance

24    their loans, thus decreasing the value of WaMu's MSR asset. *Id*.; ¶¶ 35, 59.  Conversely, when

25    interest rates were high, WaMu would originate fewer new loans – but the value of its MSR asset

26    would increase due to the expectation that fewer borrowers would pay off the loans whose

27    servicing rights comprised the MSR.  MTD Order at 1126; ¶¶ 35, 39.  The complementary

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

relationship between these two businesses served as a natural hedge. Plaintiffs have not alleged any problems with this hedge.

### 2. Financial Hedging

In addition to this natural hedge, WaMu actively hedged its loan origination business and MSR asset. Because fluctuating interest rates affected the value of the loan pipeline and MSR asset value differently, WaMu independently hedged the risks associated with each.

### a. Pipeline Hedging

Pipeline risk relates to risk associated with new loans in the origination pipeline that are not yet closed and funded. MTD Order at 1126. If interest rates fell, WaMu faced the risk that borrowers who had locked in at higher rates might abandon their loans and switch to other lenders offering lower rates. *South Ferry*, 542 F.3d at 780. Conversely, if rates went up, WaMu would be committed to funding loans at the lower, locked-in rate and thus to funding loans in the pipeline at below-market rates. *Id.* WaMu hedged against these short-term risks by entering into various investments, such as "forward sales commitments, interest rate contracts, mortgage option contracts and interest rate futures." MTD Order at 1126.

### b. MSR Hedging

MSR risk is tied to the number of years a bank will be able to service a loan, which in turn depends on the number of years the borrower keeps the loan. *Id.* The longer borrowers are expected to keep their loans, the more valuable the MSR asset. However, falling interest rates may induce borrowers to refinance their loans, thereby reducing the overall MSR value. To hedge against this specific long-term risk, WaMu purchased "financial instruments which tend to increase in value when long term interest rates decline." *Id.* at 1126-27.

### B. The Challenged Statements And The Events Of The Class Period

The Court's scienter analysis depends on assessing the challenged statements in context, without which it would be impossible to determine if those statements are even false, let alone whether knowledge of falsity should be imputed to the Individual Defendants under the core operations inference. Absent allegations sufficient to satisfy the threshold requirement of falsity,

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON REMAND
CASE NO. C04-1599 JCC

6

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   the core operations principle does not even come into play.  As detailed below, plaintiffs fail to

2   plead specific facts that undermine the truth of the statements they challenge.

### 1.  The First Quarter Of 2003

4          WaMu announced record financial results for the first quarter of 2003.  ¶ 56.  During the

5   quarterly conference call, Mr. Casey reported that WaMu's MSR hedge effectively offset the

6   change in value of the Company's MSR asset.  *Id.*  Mr. Casey also stated that, as part of its

7   ongoing interest rate risk management program, WaMu repositioned certain assets and liability

8   hedging during the quarter to help position the Company for the future rise in interest rates.  *Id.*

9   During the question and answer session, Mr. Casey said: "[W]e feel very good about our hedging

10  activities for mortgage servicing rights [MSR]."  ¶ 57.  Later that day, Mr. Killinger explained in

11  an interview how WaMu uses both natural and "financial" hedging.  ¶ 59.  None of the challenged

12  statements specifically refers to pipeline hedging.  Further, plaintiffs do not allege any problems

13  with respect to the performance of WaMu's pipeline or MSR hedge during this quarter that would

14  make these statements incorrect.

### 2.  The Second Quarter Of 2003

16         WaMu announced record results again for the second quarter of 2003.  ¶ 66.  Mr. Killinger

17  credited the Company's "balanced business model," and WaMu indicated that its hedging

18  "activities effectively mitigated the change in the MSR valuation" (¶ 66) – just as Mr. Casey

19  predicted in the prior quarter.  Mr. Casey again indicated that WaMu was "prepared for rapid

20  changes in the interest rate environment" and that WaMu's MSR hedging was performing well.

21  ¶¶ 67, 68.  Plaintiffs have not alleged any problems with respect to the performance of WaMu's

22  pipeline or MSR hedge during this quarter that undermine the truth of these statements.

### 3.  The Third Quarter Of 2003

24         On September 9, 2003, Mr. Killinger spoke at a Lehman Brothers Financial Services

25  Conference.  At the conference, he revealed that WaMu had been impacted by

26         several mortgage banking process system challenges, which I think came to light
       as a result of the spike in interest rates in late July and August.  And it's created
27     some imprecision in the matching of our loan commitments and pipeline hedging
       activities.  And the result will be a loss in the quarter from the sale of mortgage

1    loans, which is not entirely offset by our hedging activities.  Now, we took
2    immediate steps to address any of the operating challenges and are back on track.

3    ¶ 74.  According to Mr. Killinger, despite the problems affecting WaMu's *pipeline* hedge, other

4    parts of the balanced business model performed very well, *including the MSR asset*.  ¶¶ 74, 75.

5    Rather than take issue with Mr. Killinger's reports of hedging performance, plaintiffs rely on that

6    report as a predicate for their Complaint.

7        Despite "significant volatility in interest rates," WaMu announced another quarter of

8    record results for the third quarter of 2003.  ¶ 77.  One component of the results, however, was a

9    $126 million loss from mortgage loans resulting both from the volatile interest rates and the

10   reported operational issues.  *Id.*  Specifically, the problems involved the "timeliness of

11   information flows, due to the tremendous volume in [WaMu's] loan fulfillment area.  This

12   resulted in certain loan commitments not being reflected in our hedging profile on a timely basis."

13   ¶ 78.  This statement referred to the *pipeline* hedge, which (according to plaintiffs) had performed

14   flawlessly up to this point.  Further, the Complaint alleges no performance issues with respect to

15   the MSR hedge in the third quarter or at any time before the second quarter of 2004.

16       In WaMu's press release, Mr. Killinger reported that WaMu had "identified the issues that

17   led to these challenges and [had] implemented measures to address them."  ¶ 77.  He elaborated:

18       [A]s soon as we saw that there were – was an inconsistency of the data coming in
19       between the rate locks and what we needed to do for hedging, we jumped on that
         immediately, put in a very large SWAT team of folks to get their arms around
20       things.  They got that stabilized very quickly, and then we immediately
         implemented a variety of measures to be sure that that would not happen again.
21       We are very confident, at this point in time, that the flows of information are
         accurate, and that the financial risk that we encountered early in the third quarter is
22       taken care of at this point.

23   ¶ 79.  Mr. Casey also stated that WaMu "quickly got on the problems, and those problems are

24   behind us."  *Id.*  WaMu included additional details in its Form 10-Q for the third quarter,

25   explaining that the corrective measures included "the timely interface of rate lock activity from

26   the origination systems to the secondary marketing risk management system," and a variety of

27   other measures.  ¶ 83.

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC                    8        WILSON SONSINI GOODRICH & ROSATI
                                                  701 Fifth Avenue, Suite 5100
                                                  Seattle, WA  98104-7036
                                                  Tel: (206) 883-2500
                                                  Fax: (206) 883-2699

1    The Complaint does not allege any specific facts suggesting that WaMu did not fix the

2    operational problems with information flows that had impacted the pipeline hedge, no facts

3    suggesting that any of the problems ever reoccurred (let alone affected WaMu's financial results),

4    and, indeed, no facts that would in any way make these statements incorrect.

5    **4.    The Fourth Quarter Of 2003 And Full Year 2003**

6    On December 9, 2003, WaMu issued a press release adjusting downward its growth

7    initiatives and guidance for 2004.  ¶ 84.  At an Investor Day Conference that day, Ms.

8    Oppenheimer candidly acknowledged that the firm had not fully integrated its new point-of-sale

9    origination system (known as Optis) and that it currently had "nine different loan origination

10    systems."  ¶ 89.  Ms. Oppenheimer made no reference to hedging whatsoever, and plaintiffs

11    allege no facts linking the acknowledged need to integrate WaMu's loan origination systems with

12    either the pipeline or MSR hedge.[2]

13    On January 20, 2004, WaMu announced record results for the fourth quarter and the full

14    year 2003.  ¶ 94.  In discussing the results, Mr. Casey noted that the MSR asset performed well,

15    "highlight[ing] the natural balance in our mortgage banking model."  ¶ 97.  He also stated that

16    WaMu remained "very comfortable with our valuation model for [MSR] and our related

17    derivative hedging continues to perform as expected."  *Id*.  Plaintiffs have not alleged any

18    problems with respect to the performance of WaMu's pipeline or MSR hedge during this quarter,

19    nor have they alleged any facts that would make these statements incorrect.

20    **5.    The First Quarter Of 2004**

21    WaMu reported another quarter of strong financial and operational results for the first

22    quarter of 2004.  ¶ 104.  Among the highlights, the net interest margin remained essentially

23    unchanged due, in part, to "the company's successful interest rate management activities."  *Id*.  In

24    the press release, Mr. Killinger gave credit to the Company's "balanced business model" in which

---

[2]  Although the MTD Order discusses whether Ms. Oppenheimer's statement was forward-looking, it does not include this statement in its summary of actionable statements.  *See* MTD Order at 1130.  In fact, this comment could not possibly be actionable:  WaMu's share price *dropped* immediately following Ms. Oppenheimer's remarks, from a closing price of $43.85 on December 8 to a closing price of $38.57 on December 10 (just ten cents more than the share price at the end of the class period, $38.47).

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC

9

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  the "Retail Banking and Financial Services business posted very strong net income gains, year-

2  over-year, which helped to off-set the significantly lower industry-wide mortgage volume."

3  ¶ 105.  On the conference call, Mr. Killinger stated that WaMu "significantly reduc[ed its]

4  exposure to the possibility of rising interest rates" and "that from an interest rate sensitivity

5  standpoint, we are in a much stronger position today than I have ever seen since I joined the

6  company about 20 years ago."  ¶ 106.  Mr. Killinger also stated that WaMu had "fully integrated

7  its MSR and mortgage pipeline hedging activities."  *Id.*  Mr. Casey echoed that "[t]he steps we've

8  taken to fully integrate our MSR and mortgage pipeline hedging activities have provided us with

9  more effective and less-expensive hedging execution."  ¶ 107.

10      Mr. Casey further stated that WaMu took steps in prior quarters to optimize MSR

11  management, which "helped us to significantly reduce the company's sensitivity to interest rates."

12  *Id.*  Mr. Casey discussed an example, included in WaMu's Form 10-K for the 2003 Fiscal Year,

13  of how an extreme increase in interest rates might affect WaMu's results.  He noted that, while

14  the example was based on a parallel shift in the yield curve, "[o]f course interest rates don't

15  always shift in parallel fashion and the slope of the yield curve as well as spreads between

16  mortgages, treasuries and LIBOR indices also have an impact on us and other lenders."  *Id.*  Mr.

17  Casey concluded that he "feel[s] the company is in a strong position to withstand changes in

18  rates."  *Id.*  He made similar statements in response to analyst questions.  ¶ 108.

19      Mr. Killinger appeared at a Lehman Brothers conference on May 12, 2004, and discussed

20  "the ability [WaMu has] to reduce the interest rate sensitivity of the Company," including some

21  successful mitigation actions taken during the first quarter.  ¶ 113.  He also discussed the example

22  in WaMu's 10-Q of the impact of an extreme increase in interest rates, assuming parallel rate

23  movements.  *Id.*  Mr. Killinger reiterated his belief that WaMu had "taken a number of measures

24  to reduce the impact of changing interest rates on the [C]ompany."  *Id.*

25      At the conference, Mr. Killinger was asked about integration.  He explained that, "for

26  [the] purposes of hedging, we integrated the essential information quite some time ago.  So that

27  there is just one source to do all the hedging, and the portfolios are all pulled together."  ¶ 114.  In

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC

10

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  the past, Mr. Killinger had commented that the integration of recent acquisitions and their various

2  loan origination and servicing platforms had been on the back burner but, with refinancing

3  slowing down, WaMu was going to ramp up those integration efforts.  ¶ 79.  But, as Mr. Killinger

4  explained, those platforms were distinct from the now-integrated hedging systems:

> The various platforms that I was talking about is primarily how we have to interact with the customer out of point-of-sale where I may have had a salesforce that came from one acquisition from another, had different products in areas where it was a bit disjointed.  There were two loan servicing systems that we had for part of our customers on one and part on the other.  ***But in terms of the financial information coming off of those to do our mortgage servicing valuation and hedging, we have always had those pulled together.***

9  ¶ 114 (emphasis added).  Mr. Killinger also commented on the problems impacting the pipeline

10  hedge in the third quarter of 2003, stating that "once we saw that, we got all over it, and I have

11  not had any issues come out of that since then." *Id*.  (In fact, plaintiffs themselves have not

12  alleged a single instance of pipeline hedging "issues" since the third quarter of 2003.)

13       Ms. Oppenheimer attended a conference on May 18, 2004, at which, in the second of only

14  two statements attributed to her in the Complaint, she opined that WaMu was "as well positioned

15  to weather any type of interest rate environment than we have been in the past" and that WaMu

16  managed its balance sheet in a "very sophisticated fashion, with . . . various hedges and

17  instruments."  ¶ 115.  Ms. Oppenheimer did not mention or refer to technical or operational

18  problems, or to systems integration.  Moreover, plaintiffs have not alleged any facts suggesting

19  that WaMu's ability to manage interest rates had deteriorated, that it did not employ hedges, or

20  any other facts that would render her statement false.

21  ### 6.  The Second Quarter Of 2004

22       On June 2, 2004, Mr. Killinger cautioned investors that, "[b]ecause of the general market

23  uncertainty about interest rates and the cyclical nature of the mortgage banking performance, we

24  are more cautious than we were in early April about the earnings outlook for the mortgage

25  banking part of our business." ¶ 118.  On June 28, 2004, WaMu issued a press release stating that

26  it expected the "sustained increase in long-term interest rates [to] significantly impact the

27  [C]ompany's Mortgage Banking business resulting in 2004 earnings below previous guidance."

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON REMAND
CASE NO. C04-1599 JCC

11

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

¶ 119.  One factor impacting the results was WaMu's MSR hedge.  MSR "hedging results benefit when [interest rate] spreads are wider, as they were in the fourth quarter of 2003 and the first quarter of 2004, and will be negatively affected as spreads tighten, as they have in the second quarter of [2004]."  ¶ 120.  Specifically,

> in the second quarter, significantly tightening basis spreads (the difference between the mortgage and interest rate swap indices) are expected to cause the loss in hedge value to exceed the increase in mortgage servicing rights [MSR] value, thus reducing the Mortgage Banking income. ***The company's pipeline hedging has not been adversely affected by these factors.***

¶ 120 (emphasis added).  The Complaint fails to allege facts suggesting that the previously disclosed (and remedied) operational issues relating to the timeliness of information flows that had adversely affected the ***pipeline*** hedge in Q3 '03 had any impact on WaMu's second quarter results.

## ARGUMENT

### I.   The Standard For Pleading Scienter

"To survive the exacting requirements of the [Reform Act], Plaintiffs must plead, with sufficient particularity, facts that raise a strong inference that Defendants made false or misleading statements with at least deliberate recklessness."  *In re Zumiez Inc. Sec. Litig.*, No. C07-1980-JCC, 2009 WL 901934, at *7 (W.D. Wash. Mar. 30, 2009) (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002)).  The Supreme Court has construed this to mean that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged."  *Tellabs*, 127 S. Ct. at 2510 (emphasis added).  A court reviewing scienter allegations must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss," and "must take into account plausible opposing inferences."  *Id*. at 2509.

By invoking the core operations inference, plaintiffs seek to lighten their pleading burden, suggesting that courts should presume scienter as to any false statement made by senior management about a matter important (or "core") to a company's business.  But that glib approach to pleading ignores the very purpose of the Reform Act's scienter standard.  Thus, examining the

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON REMAND
CASE NO. C04-1599 JCC

12

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    core operations principle in light of *Tellabs*, the Ninth Circuit has recognized that efforts to

2    establish scienter through the core operations inference alone "usually fall short of the [Reform

3    Act] standard." *South Ferry*, 542 F.3d at 784. "However, in some *unusual circumstances*, the

4    core operations inference, without more, may raise the strong inference required by the [Reform

5    Act]." *Id.* at 785 (emphasis added). The Ninth Circuit recognized two narrow exceptions to the

6    general rule that "core operations" allegations are inadequate to raise a strong inference of scienter,

7    applicable only in an "exceedingly rare category of cases." *Id.* at 785 n.3.

8           First, "falsity may itself be indicative of scienter where it is combined with 'allegations

9    regarding a management's role in the company' that are 'particular and suggest that the defendant

10   had actual access to the disputed information.'" *Digimarc*, 552 F.3d at 1000 (quoting *South*

11   *Ferry*, 542 F.3d at 786). This limited exception applies only where plaintiffs provide specific

12   allegations (often in the form of admissions by defendants) that the defendants had access to the

13   precise information misstated.[3] Allegations that management closely analyzed information or

14   attended meetings where the information was discussed are "not enough to satisfy the narrow

15   exception" absent ***particularized*** factual allegations supporting an inference that "management

16   was in a position to know" about the alleged falsity. *Id.* at 1000-01.

17          Second, a court may draw a strong inference of scienter from properly alleged falsity

18   "where 'the nature of the relevant fact is of such prominence that it would be "absurd" to suggest

19   that management was without knowledge of the matter.'" *Id.* (quoting *South Ferry*, 542 F.3d at

20   786). "Nevertheless, reporting false information will only be indicative of scienter ***where the***

21   ***falsity is patently obvious*** – where the 'facts [are] prominent enough that it would be "absurd to

22   suggest" that top management was unaware of them.'" *Id.* (quoting *Applied Signal*, 527 F.3d at

23

24          [3] *See, e.g.*, *In re Daou Sys., Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (defendants knew company reported
     revenues before those revenues were earned because of admission that defendants were "knowledgeable about . . .
25   revenue recognized under [Daou's accounting system]"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
     380 F.3d 1226, 1231-32 (9th Cir. 2004) (defendant knew economic slowdown would not benefit the company, despite
26   statements to the contrary, because he admitted involvement with many failed deals accounting for nearly 75% of
     eventual revenue shortfall); *Digimarc*, 552 F.3d at 1000-01 (rejecting core operation inference based on allegations
27   that management had access to manipulated accounting numbers because "[n]othing in the complaint suggests that
     [defendant] had access to the underlying information from which the accounting numbers were derived").

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC

13

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    989) (emphasis added).  In *Applied Signal*, for example, the Court distinguished *In re Read-Rite*

2    *Corp. Securities Litigation*, 335 F.3d 843, 848-49 (9th Cir. 2003), which held that mere

3    allegations of the defendants' positions and the importance of the products at issue were

4    insufficient to give rise to a strong inference of scienter.  According to the Ninth Circuit in

5    *Applied Signal*, the plaintiffs in *Read-Rite* had not met the threshold requirement of alleging that

6    the challenged statements were false or misleading when made.  527 F.3d at 988-89.  By contrast,

7    in *Applied Signal*, the plaintiffs successfully pleaded contemporaneous, inconsistent facts about

8    which defendants' knowledge could be strongly inferred.  *Id.*

9         The touchstone of both of these narrow exceptions is falsity.  Indeed, in its most recent

10    decision, the Ninth Circuit reviewed its post-*Tellabs* cases and stated that "we have recognized

11    two exceptions to the general rule" where "falsity itself may be indicative of scienter."  *Digimarc*,

12    552 F.3d at 1000-01.  For example, in *Applied Signal*, the court applied the inference to a

13    relatively small company, where work was halted on more than $20 million worth of contracts for

14    the company's largest clients, reassigning 50-75 employees and turning one facility into a "ghost

15    town."  *Applied Signal*, 527 F.3d at 988 & n.5; *see also Digimarc*, 552 F.3d at 1001.  Facts of that

16    magnitude would be obvious not only to management, but to nearly anyone who worked at the

17    company.  By contrast, in *Digimarc*, the Court rejected the adequacy of facts alleged to trigger the

18    core operations inference even where the company had restated earnings, thus admitting falsity.

19    In that case, unlike in *Applied Signal*, the misstatements did not address "especially prominent

20    facts," but instead involved accounting characterizations that "would not be immediately obvious

21    to corporate management."  *Digimarc*, 552 F.3d at 1001.  For that reason, falsity alone could not

22    give rise to an inference of scienter on the part of management defendants.

23    **II.  The Complaint Fails To Raise A Strong Inference Of Scienter.**

24         **A.  Plaintiffs' Theory Of Scienter**

25         Plaintiffs' scienter theory rests on the premise that operational and technical problems

26    impaired the flow of information from WaMu's loan origination system, leaving WaMu unable to

27    hedge against interest rate movements throughout the Class Period, and that statements about

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  hedging (as well as statements about the resolution of those technical problems) therefore were

2  false and misleading, as well as material.  ¶ 55.  Plaintiffs' scienter theory is fatally flawed in

3  several respects.  It erroneously assumes first, that **all** of the purported "hedging problems" arose

4  from operational problems that adversely affected information flows and, second, that WaMu

5  failed to resolve those operational problems (as it said it had), which in turn caused MSR hedging

6  losses in Q2 '04.  Reasoning from these unfounded assumptions (which plaintiffs do not support

7  with any factual allegations, much less the detailed facts required by the Reform Act), plaintiffs

8  posit that the Individual Defendants **must** have known that problems affecting information

9  reporting from the loan origination systems were not, in fact, resolved, because the technical and

10 operational issues were part of WaMu's core operations.  The final step in plaintiffs' convoluted

11 scienter theory is that knowledge of hedging problems can be strongly inferred from the imputed

12 knowledge of operational difficulties.

     But plaintiffs' own Complaint shows these premises to be baseless.  For that reason,

14 plaintiffs cannot rely on the core operations theory to establish scienter.

15       **B.  Plaintiffs' Allegations Do Not Qualify For The Narrow Exceptions To The
           Rule That Allegations Regarding Core Operations Are Insufficient To
16         Plead Scienter.**

17            **1.  The Complaint Lacks Allegations Of "Patently Obvious" Problems
                  Undermining The Challenged Statements.**
18

19       Plaintiffs have relied largely on the theory that the matters at issue would have been

20 "patently obvious" to management.  To claim the benefit of this narrow core operations inference,

21 the Complaint must allege specific facts showing (a) that the challenged statements were, in fact,

22 false; and (b) that the falsity was "patently obvious – where the 'facts [are] prominent enough that

23 it would be absurd to suggest that top management was unaware of them.'"  *Id.* (quoting *Applied*

24 *Signal*, 527 F.3d at 989).  Here, plaintiffs do not come close to mustering these extraordinary

25 allegations.  Indeed, plaintiffs have failed to plead particularized facts suggesting that any of the

26 challenged statements were even *false*, let alone that the falsity was "patently obvious."

27

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC

15

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

### a. Challenged Statements Relating To Technical And Operational Problems Impacting Information Flows

#### i. Plaintiffs Fail To Allege Falsity.

In September 2003, Mr. Killinger disclosed that certain operational and technical problems came to light as a result of the spike in interest rates in July and August and that those problems negatively impacted WaMu's pipeline hedging activities.[4] ¶ 74. As plaintiffs tacitly concede, the problems related to the "timeliness of information flows," which "resulted in certain loan commitments not being reflected in [WaMu's] hedging profile on a timely basis." ¶ 78. The problems impacted only the *pipeline* hedge, not the *MSR* hedge or WaMu's balanced business model. ¶¶ 74, 75. Multiple disclosures detailed how WaMu promptly addressed and resolved these problems. ¶¶ 74, 77-79, 83, 96.

The Complaint does not assert that WaMu failed to engage in the remedial measures described in its public statements. Nothing in the Complaint suggests that the operational and technical problems arose and were known earlier; that WaMu did not immediately act to remedy the problems in the manner described in its public statements; or that the problems persisted beyond the third quarter of 2003. Indeed, WaMu reported record financial and operating results from the beginning of the Class Period through all of 2003, as well as strong results in the first quarter of 2004. ¶¶ 56, 66, 77, 94, 104. The Complaint does not point to a single repetition of "imprecision in the matching of our loan commitments and pipeline hedging activities" or any pipeline hedging challenges following the implementation of remedial measures.

Plaintiffs do make the conclusory assertion that the same technical and operational problems that were disclosed in 2003 caused the earnings shortfall in Q2 '04. But the facts alleged in the Complaint itself belie that claim. Although the Complaint sweepingly refers to "hedging problems" impacting WaMu's results for Q2 '04 (¶ 120), the Complaint's specific allegations show that the Q2 '04 shortfall had nothing to do with WaMu's *pipeline* hedge or with

---

[4] The challenged statements made early in the Class Period related to WaMu's natural hedge and MSR hedge and did not mention the *pipeline* hedge. This is the first challenged statement relating to WaMu's pipeline hedge.

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC

16

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    the operational problems that disrupted information flows from the loan origination system and

2    impaired pipeline hedging in Q3 '03.  As plaintiffs allege, the Q2 '04 hedging-related shortfall

3    arose from "the company's ***mortgage servicing rights* [MSR] *hedging program***." ¶ 124

4    (emphasis in Complaint).  Specifically, as a result of tightening basis spreads, the loss in the MSR

5    hedge value exceeded the increase in the MSR asset value, thereby reducing Mortgage Banking

6    income.  ¶ 120.  Moreover, plaintiffs do not dispute that "[t]he company's loan pipeline hedging

7    has not been adversely affected by these factors."  *Id.*

8         Because the only hedging-related shortfall in Q2 '04 related to the *MSR* hedge, not the

9    *pipeline* hedge, plaintiffs have not alleged facts to support their assertion that the information flow

10    issues impacting the pipeline hedge in Q3 '03 came back to WaMu's detriment in Q2 '04 or that

11    the separate issues identified in Q2 '04 were, in any sense, the "truth coming out" with respect to

12    something that was earlier misrepresented.

13         Plaintiffs also conflate *all* "operational challenges" into a single problem.  In fact, like any

14    business, WaMu routinely encountered and resolved a variety of issues.  For that reason,

15    plaintiffs' reliance on confidential witness accounts of problems with Optis is a red herring.  Optis

16    was a proprietary platform designed to handle WaMu's point-of-sale home loan operations such

17    as processing, underwriting and closings. ¶ 44.  According to plaintiffs' confidential witnesses,

18    problems with Optis hindered the bank's ability to close loans in a timely manner and negatively

19    affected efficiency and productivity.  ¶¶ 48-54.  This Court held, "the remaining confidential

20    witness statements are sufficient to allege that ... Optis was a failure and was never completely

21    rolled out[.]"  MTD Order at 1141.  Even so, the alleged problems with Optis do not undermine

22    statements regarding the effectiveness of WaMu's MSR hedging – which dealt with the balance

23    sheet value of servicing rights on existing mortgages, not with point-of-sale home loan operations.

24         First, assuming *arguendo* that Optis was linked to WaMu's pipeline hedging systems and

25    thus impaired WaMu's ability to hedge, that would not render any of the challenged statements

26    false when made.  The technological shortcomings of certain information reporting systems that

27    impacted the pipeline hedge did not manifest until July and August of 2003, and they were

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC

17

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    promptly disclosed – not hidden.  ¶¶ 74, 77-79.  The challenged statements made prior to the

2    disclosures did not mention the pipeline hedge, and the information reporting problems affecting

3    the pipeline hedge thus did not contradict those statements or call into question their accuracy.

4        Second, the Complaint alleges facts suggesting that operational problems had an effect on

5    hedging *only* with respect to pipeline hedging in Q3 '03.  ¶¶ 77-79.  Even if the operational

6    problems with Optis persisted thereafter, they are not alleged to have had any impact on the

7    information used to hedge in any subsequent quarters.  If problems with Optis throughout the

8    Class Period meant that WaMu never could effectively hedge (as plaintiffs have implied, without

9    alleging specific facts), WaMu's pipeline hedging should have been impacted in more than just

10   Q3 '03.  Instead, WaMu reported record results during nearly every quarter of the Class Period –

11   and suffered pipeline hedging losses in only one quarter.

12       Finally, Optis's problems affected hedging only to the extent that they delayed data

13   reporting in Q3 '03 "result[ing] in certain loan commitments not being reflected in our hedging

14   profile on a timely basis."  ¶ 78.  The fact that integration of Optis's loan origination functions did

15   not go as smoothly as it should have (¶ 45),[5] had no bearing on WaMu's *hedging system*, which

16   *had* been successfully integrated by the third quarter of 2003.  *See* ¶ 83 (November 13, 2003

17   statement that WaMu's "[c]orrective measures include the timely interface of rate lock activity

18   from the origination systems to the secondary marketing risk system"); ¶ 106 (April 20, 2004

19   statement that WaMu had "fully integrated [its] MSR and mortgage pipeline hedging activities");

20   ¶ 114 (May 12, 2004 statement distinguishing point-of-sale platforms, which were not fully

21   integrated, from systems relating to "hedging, [where WaMu] always had those pulled together").

22   Thus, while problems with Optis allegedly had a negative impact on productivity, the Complaint

23   alleges *no facts* to support the proposition that Optis had any impact on WaMu's *hedging*-related

24   shortfall in Q2 '04.  Plaintiffs' allegations about problems implementing the Optis loan

25

26       [5] Ms. Oppenheimer's first statement in December 2003 frankly assessed the need to integrate Optis,
     Significantly, she did not relate Optis to hedging activity.  Plaintiffs do not, and cannot, argue that any part of this
27   statement inflated WaMu share prices, given that share prices dropped the day following her statement.

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC                                    18

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    origination platform are not probative of scienter as to statements concerning hedging.

2    ## ii.    Falsity Was Not Patently Obvious.

3    Even if plaintiffs had adequately alleged falsity with respect to statements concerning

4    reporting and information flows, they have failed to plead facts showing that the purported falsity

5    would have been patently obvious to any defendant.  The Complaint does not allege any specific

6    facts suggesting that operational and technical problems arose before Q3 '03 (when the Individual

7    Defendants fully disclosed them) or that any defendant knew that problems with information

8    flows rendered any of their statements false or misleading when made.  Any such allegations,

9    moreover, would be farfetched.  A perfect storm of events caused the pipeline hedging losses that

10   WaMu encountered in Q3 '03:  a flood of new loan applications; an increase in interest rates after

11   the new loans had been locked in; delays in processing the applications; difficulty in getting real-

12   time information into the hedging system; and a resulting inability to match hedging strategies to

13   the pipeline assets that needed to be hedged.  Plaintiffs do not allege any facts (much less the

14   specific facts required by the Reform Act) suggesting that this convergence of events was

15   foreseeable, much less known, at the time of the challenged statements.

16   ## b.    Challenged Statements Relating To MSR Hedging

17   ## i.    Plaintiffs Fail To Allege Falsity.

18   The remaining challenged statements relate to the present and future effectiveness of

19   WaMu's MSR hedge and its balanced business model.  ¶¶ 56, 57, 59, 66-68, 74, 75, 97, 104-108,

20   113-115.   They include statements such as, "[W]e feel very good about our hedging activities for

21   mortgage servicing rights" (¶ 57); that WaMu's hedging "activities effectively mitigated the

22   change in the MSR valuation" (¶ 66); and that WaMu was "prepared for rapid changes in the

23   interest rate environment" (¶ 67).  "One obvious difficulty with Plaintiffs' theory" is that WaMu's

24   MSR hedge undeniably performed well through every quarter but one during the Class Period.

25   *See Zumiez*, 2009 WL 901934, at *7 (noting problem with plaintiffs' theory where actual results

26   exceeded predictions for most of the Class Period).  Indeed, the Complaint concedes that WaMu's

27   MSR hedge and balanced business model contributed to WaMu's record financial results through

1  the first quarter of 2004.  *See, e.g.*, ¶¶ 56, 66-68, 77, 94, 97, 104-07.  Plaintiffs allege no facts to

2  indicate that the defendants' statements concerning MSR hedging or the balanced business model

3  were false or in any way undermined by undisclosed problems.

4        With respect to reassurances about WaMu's ability to weather future interest rate

5  environments through its hedging strategies, plaintiffs seek to establish falsity through statements

6  made by Messrs. Killinger and Casey that WaMu had sufficient technology for the future and that

7  operational problems relating to loan origination information flows had been resolved.  Yet

8  plaintiffs plead no facts establishing that the Q2 '04 loss arose from operational and technical

9  problems at all.  As discussed above, the Complaint itself alleges that when the MSR hedge

10  negatively impacted WaMu's Mortgage Banking income in Q2 '04, it was *not* because of any

11  technical or operational problems plaguing the Company or untimely information flows.  Rather,

12  the hedging loss occurred because the relevant rates did not move in parallel, as is optimal for the

13  MSR hedge.  ¶¶ 107, 113, 120.  During the second quarter, the basis spread unexpectedly

14  tightened, and *that* caused the loss in the MSR hedge value that exceeded the increase in the MSR

15  asset value, thereby resulting in a net loss.  ¶ 120.  Plaintiffs do not allege any specific facts,

16  through confidential witnesses, analyst reports, or otherwise, suggesting any other explanation.

17                    **ii.  Falsity Was Not Patently Obvious.**

18        Even if plaintiffs had adequately alleged misrepresentations regarding WaMu's MSR

19  hedge, they still fail to plead facts showing that any such misrepresentations would have been

20  patently obvious to any Individual Defendant.  Plaintiffs allege no facts to suggest that any

21  defendant anticipated the dramatic tightening of basis spreads in the second quarter of 2004 or the

22  impact that such an extraordinary event would have on MSR hedging.  As a result, they allege no

23  facts to suggest that any defendant had any reason to believe their statements were not fully

24  accurate when made.  MSR hedging is a highly complex endeavor.  Even if the exact performance

25  of the MSR hedge in the event of an unexpected tightening of basis spreads had been theoretically

26  knowable at the time of the challenged statements, no one could plausibly claim that it would

27  have been "immediately obvious" to the Individual Defendants – and plaintiffs have not done so.

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC                    20          **WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   *See Digimarc*, 552 F.3d at 1001 (because GAAP violations were "largely definitional, the falsity

2   of the original representations would not be immediately obvious to corporate management").

### 2. The Complaint Lacks Detailed And Specific Allegations Regarding The Individual Defendants' Exposure To Factual Information.

5        Because the Complaint does not allege any contemporaneous facts inconsistent with the

6   challenged statements, it likewise fails to plead that any Individual Defendant had access to such

7   facts. Plaintiffs' allegations also fail to fall within the narrow exception permitting an inference

8   of scienter through the core operations theory based on a defendant's access to information.

9        To avail themselves of this exception, plaintiffs would need to buttress allegations about

10  management's role in the corporate structure and the importance of the subject matter of the false

11  statements with "'detailed and specific allegations about management's exposure to factual

12  information within the company.'" *Digimarc*, 552 F.3d at 1000 (quoting *South Ferry*, 542 F.3d at

13  785). Plaintiffs do not even come close to satisfying this exacting standard. For example, in

14  *Digimarc*, the complaint included "allegations that senior management ... closely reviewed the

15  accounting numbers generated by Digimarc each quarter (through the use of Access databases),

16  and that top executives had several meetings in which they discussed quarterly inventory

17  numbers." *Id.* However, even "[a]llegations that Digimarc's management had access to the

18  purportedly manipulated quarterly accounting numbers, or that management analyzed the

19  inventory numbers closely, do not support the inference that management was in a position to

20  know that such data was being manipulated." *Id.* at 1000-01. As a result, those allegations were

21  "not enough to satisfy the narrow exception" to the general rule that core operations allegations are

22  inadequate to plead scienter. *Id.*

23       Here, the Complaint is devoid of detailed allegations about the Individual Defendants'

24  actual exposure to information that would tell them that false statements were being made. There

25  are no allegations of specific information conveyed to any defendant inconsistent with the

26  challenged statements. Because plaintiffs have not made specific factual allegations suggesting

27  that the technical and operational problems impacting the pipeline hedge in Q3 '03 were

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON REMAND
CASE NO. C04-1599 JCC

21

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    discovered earlier or that they were not promptly fixed, it follows that they have not alleged that

2    any such information was given to any defendant.  Likewise, just as the Complaint contains no

3    facts suggesting that WaMu's MSR hedge was affected by technical or operational problems, it

4    alleges no facts indicating that any defendant was told about such problems.  Plaintiffs therefore

5    cannot benefit from a strong inference of scienter based on detailed factual allegations of the

6    Individual Defendants' exposure to information inconsistent with the challenged statements.

7
8    **C.  The Aggregate Of Plaintiffs' Allegations Does Not Raise A Strong Inference Of Scienter.**

9    "Although none of the [Complaint's] allegations of scienter is individually cogent or

10   compelling enough to survive under the [Reform Act, the Court] must also 'consider the

11   complaint in its entirety' to determine whether '*all* of the facts alleged, taken collectively, give

12   rise to a strong inference of scienter.'"  *Digimarc*, 552 F.3d at 1006 (quoting *Tellabs*, 127 S. Ct. at

13   2509).  "But the *Tellabs* Court's directive that a complaint must be read in its entirety cuts both

14   ways."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008).

15   The Court must also "take into account plausible opposing inferences" that could weigh against a

16   finding of scienter.  *Tellabs*, 127 S.Ct. at 2509.

17       The aggregate of plaintiffs' scienter allegations does not suggest scienter at all.  As

18   detailed above, the Complaint's allegations flatly contradict plaintiffs' core operations theory.

19   Given that, plaintiffs' scienter allegations are certainly not as cogent and compelling as the

20   plausible alternative inferences – namely, that the Individual Defendants (1) made accurate

21   statements about WaMu hedging practices and that the Company's hedging strategy positively

22   contributed to its record quarterly results throughout most of the Class Period and (2) believed

23   those statements were accurate.  Some operational and technical problems impacting the

24   timeliness of information flowing to WaMu's pipeline hedge arose in Q3 '03, but they were

25   promptly addressed and disclosed.  The Complaint does not allege specific facts suggesting that

26   those problems reappeared.  Indeed, the pipeline hedge performed well throughout the rest of the

27   Class Period.  Basis spreads unexpectedly tightened in Q2 '04, causing the MSR hedge to

1    negatively impact Mortgage Banking results in that quarter.  But this, too, was promptly and

2    timely disclosed.   Nothing in the Complaint suggests that the operational or technical problems

3    addressed earlier in the Class Period affected the MSR hedge (and it would defy common sense to

4    claim that they did).  None of the challenged statements was false or misleading, and thus the

5    Individual Defendants could not have made false statements with scienter.

6         With respect to Ms. Oppenheimer, the Complaint identifies only two statements (made

7    more than five months apart), neither of which provides reassurances about WaMu's

8    technological or operational problems or suggests that she understood that there was a link

9    between operational issues and hedging.  The Complaint contains no allegations, through

10   application of the core operations theory alone or in combination with other allegations, which

11   rebut the strong inference that she understood her statements to be true.  Plaintiffs attempt to

12   bolster their scienter allegations against Ms. Oppenheimer through her stock sales in 2004.  To

13   determine the probative value of stock sales as they relate to scienter, courts consider the amount

14   and percentage of shares sold by insiders, the timing of the sales, and whether the sales were

15   consistent with the insider's prior trading history.  *Digimarc*, 552 F.3d at 1005.  This Court

16   already held that the timing of Ms. Oppenheimer's trades was "less than optimal" as an indicator

17   of scienter.  MTD Order at 1146.  Indeed, Ms. Oppenheimer's January 28, 2004 trade bore no

18   close temporal relationship to either her December or May statements or WaMu's June 28

19   corrective disclosure.  *See Oracle*, 380 F.3d at 1232 (comparing the time of sale to the time of the

20   negative revenue report).  Rather, the timing of the trade follows closely after WaMu's January

21   21, 2004 earnings announcement (before which it can be inferred that her trading would have

22   been restricted).  Moreover, as this Court noted, Ms. Oppenheimer did not optimize her profit, as

23   one would expect of somebody trading on inside information.  MTD Order at 1145-46.

24        Plaintiffs, through pleading sleight of hand, have suggested that Ms. Oppenheimer sold

25   "over 50% of [her] holdings" on January 28, 2004.  MTD Order at 1146.  However, plaintiffs do

26   not in fact allege that Ms. Oppenheimer sold a majority of her holdings, but only that she sold

27   52.52% of "Stock and *Exercised* Options."  ¶ 157 (emphasis added).  The relevant analysis is

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC          23          **WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   what percentage of her total holdings, including both exercised and unexercised options, Ms.

2   Oppenheimer sold on January 28.[6]  Ms. Oppenheimer's January 28 sale involved not the sale of

3   stock that she previously held, but the exercise of options.[7]  In the absence of any allegation

4   concerning Ms. Oppenheimer's actual holdings, the Court should discount any inference drawn

5   from Ms. Oppenheimer's stock sales.  *See Segal Co. (E. States), Inc. v. Amazon.com*, 280 F. Supp.

6   2d 1229, 1232 (W.D. Wash. 2003) ("[U]nwarranted inferences of fact urged by the nonmoving

7   party are insufficient to defeat a motion to dismiss.").

8                                                          **CONCLUSION**

9            The Ninth Circuit has identified two narrow exceptions to the general rule that allegations

10   regarding core operations are insufficient to give rise to a strong inference of scienter.  The

11   Complaint fails to allege particularized facts sufficient to qualify for either of those exceptions.

12   Moreover, the allegations of the Complaint reveal that none of the challenged statements are even

13   false, let alone that they were made with knowledge or reckless disregard of their falsity.

14            For these reasons, plaintiffs have failed to plead adequately that any of the Individual

15   Defendants acted with scienter.  Because amendment would be futile, this action should be

16   dismissed with prejudice.

17            Respectfully Submitted,

18   Dated:  May 1, 2009                                    By:s/ Barry M. Kaplan

19                                                          Barry M. Kaplan, WSBA #8661
                                                            Douglas W. Greene, WSBA #22844

20                                                          **WILSON SONSINI GOODRICH & ROSATI**
                                                            Professional Corporation

21                                                          701 Fifth Avenue, Suite 5100
                                                            Seattle, Washington 98104-7036

22                                                          Tel.:  (206) 883-2500  Fax:  (206) 883-2699
                                                            Email: bkaplan@wsgr.com

23                                                          Email: dgreene@wsgr.com

24                                                          *Counsel for Kerry Killinger*

25        [6] *See Digimarc*, 552 F.3d at 1005 (considering the percentage of "total personal ... stock holdings, including
      options"); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 752 n.13 (N.D. Cal. 1997) ("Exercisable options,

26   not actual stock holdings, represent the owner's trading potential; by limiting their allegations to stock shares,
      plaintiffs artificially inflate defendants' activities.").

27        [7] *See* Decl. of R. M. Sulkin in Support of Defendant Deanna W. Oppenheimer's Motion to Dismiss, May 1, 2009.

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON     24
REMAND
CASE NO. C04-1599 JCC

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

**SIMPSON THACHER & BARTLETT LLP**
Barry R. Ostrager (*pro hac vice*)
Mary Kay Vyskocil (*pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Tel.:       (212) 455-2500
Fax:      (212) 455-2502
Email:   bostrager@stblaw.com
              mvyskocil@stblaw.com

              -*and*-

Robert J. Pfister (*pro hac vice*)
Gabriel D. Miller (*pro hac vice*)
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067
Tel.:       (310) 407-7500
Fax:      (310) 407-7502
Email:   rpfister@stblaw.com
              gdmiller@stblaw.com

By:  s/ Stephen M. Rummage
       Stephen M. Rummage, WSBA #11168
       Steven P. Caplow, WSBA #19843
**DAVIS WRIGHT TREMAINE LLP**
1201 Third Avenue, Suite 2200
Seattle, Washington 98101-3045
Tel.: (206) 757-8108
Fax: (206) 757-7136
Email: steverummage@dwt.com
Email: stevencaplow@dwt.com

*Counsel for Thomas Casey*

**MCNAUL EBEL NAWROT
    & HELGREN PLLC**
Robert M. Sulkin, WSBA # 15425
600 University St., Suite 2700
Seattle, WA 98101-3143
Tel.: (206) 467-1816
Fax: (206) 624-5128
Email: rsulkin@mcnaul.com

By:  s/ Cyrus Vance, Jr.
       Cyrus Vance, Jr., WSBA # 18615
       Judith L. Mogul (*pro hac vice*)
**MORVILLO ABRAMOWITZ GRAND
    IASON & SILBERBERG, PC**
565 Fifth Avenue
New York, New York 10017
Tel.: (212) 856-9600
Fax: (212) 856-9494
Email: CVance@maglaw.com
Email: JMogul@maglaw.com

*Counsel for Deanna Oppenheimer*

INDIVIDUAL DEFENDANTS' JOINT OPENING BRIEF ON
REMAND
CASE NO. C04-1599 JCC

25

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel.: (206) 883-2500
Fax: (206) 883-2699

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on May 1, 2009, I electronically filed the foregoing with the Clerk of

3   the Court using the CM/ECF system, which will send notification of such filing to the following:

4   Candice Aloisi caloisi@maglaw.com                Judith L. Mogul jmogul@maglaw.com

5   Steve W. Berman steve@hbsslaw.com                William H Narwold
                                                     bnarwold@motleyrice.com
6   Fred B Burnside fredburnside@dwt.com
                                                     Barry Robert Ostrager
7   Clifford A Cantor cacantor@comcast.net           bostrager@stblaw.com
    cliffcantor@hotmail.com
8                                                    Kevin L Oufnac
    Steven P Caplow stevencaplow@dwt.com             kevin.oufnac@kgscounsel.com
9
    Martin D Chitwood                                Robert Jerrod Pfister rpfister@stblaw.com
10  MChitwood@chitwoodlaw.com
                                                     Stephen M. Rummage
11  Juli E. Farris jfarris@KellerRohrback.com        steverummage@dwt.com

12  Lori G Feldman lfeldman@milberg.com              Lynn Lincoln Sarko
                                                     lsarko@kellerrohrback.com
13  Douglas W Greene dgreene@wsgr.com
                                                     Robert M Sulkin rsulkin@mcnaul.com,
14  Robert T Haefele rhaefele@motleyrice.com         rlindsey@mcnaul.com

15  Todd Kammerman                                   Michael A Swick michael.swick@kglg.com
    tkammerman@milberg.com
16                                                   Cyrus R Vance , Jr. cvance@maglaw.com
    Barry M Kaplan bkaplan@wsgr.com
17                                                   Andrew M Volk andrew@hbsslaw.com
    Jay B Kasner jkasner@skadden.com
18                                                   Mary Kay Vyskocil
    David L Lansky dlansky@wsgr.com                  mvyskocil@stblaw.com
19
    Elizabeth Ann Leland                             Charles S Wright charleswright@dwt.com
20  bleland@kellerrohrback.com

21  Gabriel D Miller gdmiller@stblaw.com

22

23  Dated:  May 1, 2009

24
                                                     s/ Barry M. Kaplan
25                                                   Barry M. Kaplan, WSBA# 8661

26

27

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699