The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| SOUTH FERRY LP #2, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br> vs.<br><br>KERRY K. KILLINGER *et al.*,<br><br>    Defendants. | Master File No. C04-1599 JCC<br><br>**PLAINTIFFS' OPENING SUPPLEMENTAL OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**<br><br>NOTE ON MOTION CALENDAR:<br>June 12, 2009 |

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

## Table of Contents

I.    INTRODUCTION ...................................................................................................1

II.   PROCEDURAL HISTORY AND LAW OF THIS CASE....................................2

    A.    The Complaint ...........................................................................................2

    B.    This Court's 2005 Decision .......................................................................2

    C.    The Appeal.................................................................................................3

    D.    Pleading Scienter After Tellabs v. Makor Issues & Rights, Ltd..............4

    E.    The Ninth Circuit Held the Core-Operations Inference Is Viable ...........5

III.  DETAILED REVIEW OF PLAINTIFFS' SCIENTER ALLEGATIONS.........6

    A.    Plaintiffs' Scienter Allegations Are Particularized, Cogent, and
        Compelling..................................................................................................6

        1.    Operational Capacity to Manage Risk Was Crucial to WaMu's
              Business ........................................................................................7

        2.    WaMu's Risk-Management Systems Were Dysfunctional .........8

        3.    Defendants Had Access to and Knowledge of Information
              Concerning WaMu's Structural Deficiencies and Technological
              Failures........................................................................................10

              a.    Defendants Held Key Positions Within WaMu's
                  Management Structure ....................................................10

              b.    Defendants' Statements Demonstrate Access to and
                  Knowledge of Information Concerning WaMu's
                  Systematic Operational Failures ....................................11

        4.    WaMu's Financial Statements Further Demonstrate Defendants'
              Access to and Knowledge of Information Concerning  Pervasive
              Operational Failures in WaMu's Risk-Management Systems..................18

        5.    Defendants Killinger and Oppenheimer Took Personal Advantage
              of Information Concealed from the Market................................18

IV.   PLAINTIFFS PLEADED A STRONG INFERENCE OF SCIENTER ............19

    A.    The Particularized Core-Operations Allegations, When Read Together
        with the Complaint's Other Allegations, Raise a Strong Inference of
        Scienter .....................................................................................................19

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- i -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627  208th  Ave.  SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813  ●  Fax: (425) 868-7870

B.    The Particularized Core-Operations Allegations Show that Defendants Had Actual Access to the Information Regarding WaMu's Technological Problems ...........................................................................................................22

C.    It Would Be Absurd To Suggest That Defendants Were Without Knowledge of WaMu's Pervasive Technological Problems ...............................23

D.    Plaintiffs Should Be Granted Leave to Replead .......................................24

V.    CONCLUSION.............................................................................................25

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS                    - ii -
Master File No. C04-1599 JCC

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

**Table of Authorities**

**CASES**

*Berson v. Applied Signal*,
    527 F. 3d 982 (9th Cir. 2008) ................................................................ 12, 24

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................ 20

*In re Daou Systems, Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ................................................ 10, 21, 22, 23

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ............................................................. 24

*In re Gilead Sciences Sec. Litig.*,
    2005 U.S. Dist. LEXIS 46910 (N.D. Cal. 2005) ................................... 24

*Lormand v. US Unwired, Inc.*,
    2009 U.S. App. LEXIS 7452 (5th Cir. 2009) ...................................... 21

*M.J. v. Clovis Unified School District*,
    2007 U.S. Dist. LEXIS 28761 (E.D. Cal. 2007) .................................. 24

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .................................................. 6, 10, 12, 24

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    2008 U.S. Dist. LEXIS 68419 (C.D. Cal. 2008) ................................. 21

*Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008) ................................................................. 21

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .............................................................. 24

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ..................................................... 8, 21, 23

*South Ferry LP #2 v. Killinger*,
    399 F. Supp. 2d 1121 (W.D. Wash. 2005) ..................................... *passim*

*South Ferry LP, #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ........................................................ *passim*

*Tellabs v. Makor Issues & Rights, Ltd*,
    551 U.S. 308, 127 S. Ct. 2499 (2007) .......................................... *passim*

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS                    - iii -
Master File No. C04-1599 JCC

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

*Wilcox v. First Interstate Bank, N.A.,*
   815 F.2d 522 (9th Cir. 1987) .......................................................................................... 24

### STATUTES & RULES

28 U.S.C. § 1292(b) ............................................................................................................ 2

Fed. R. Civ. P. 15(a) .......................................................................................................... 24

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- iv -

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

# I.    INTRODUCTION

This Court, in its 2005 opinion denying Defendants' motion to dismiss, *South Ferry LP #2 v. Killinger*, 399 F. Supp. 2d 1121, 1148 (W.D. Wash. 2005) (the "MTD Order") (Dkt. 72), found that Plaintiffs' core-operations allegations gave rise to a strong inference that Defendants acted with scienter.  On interlocutory appeal, the Ninth Circuit concluded that it was proper for courts to infer a strong inference of scienter from core-operations allegations.  *South Ferry LP, #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ("*South Ferry*").  Hence, this Court's 2005 opinion finding the requisite scienter under the PSLRA and sustaining Plaintiffs' claims against the current Defendants was correct.

The Ninth Circuit further held that, under *Tellabs v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 127 S. Ct. 2499 (2007), previous Ninth Circuit pronouncements regarding pleading a strong inference of scienter may have been too strict.  Therefore, not only did this Court properly rely on core-operations allegations in 2005, but it now may evaluate the consolidated amended complaint (the "Complaint") under a more lenient standard.  Applying these principles, Plaintiffs' claims remain well-pleaded.

The Ninth Circuit remanded this case for this Court to apply *Tellabs* and the three disjunctive tests for properly pleading a strong inference of scienter using core-operations allegations it pronounced in *South Ferry*.  *See South Ferry*, 542 F.3d at 785-86.  As set forth herein, the Complaint meets these new standards, and the reasoning of the MTD Order continues to show that Plaintiffs' claims are well-stated.

Below, Part II details the path of this action since the MTD Order and sets forth the legal standard to be applied, now, after the Ninth Circuit's consideration of Defendants' interlocutory appeal.  In Part III, Plaintiffs provide this Court with a comprehensive review of the scienter allegations in the Complaint, which *Tellabs* dictates must be read together, and in conjunction with one another.  In Part IV, Plaintiffs apply the Ninth Circuit's three-pronged, core-operations analysis in *South Ferry* to their allegations and show that, under *Tellabs* and *South Ferry*, the Court should again sustain the Complaint.

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 1 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

## II.     PROCEDURAL HISTORY AND LAW OF THIS CASE

### A.     The Complaint

Plaintiffs filed the Complaint on March 1, 2005 on behalf of investors who purchased Washington Mutual, Inc. ("WaMu" or the "Company") securities between April 15, 2003 and June 28, 2004 (the "Class Period") ¶ 24,[1] alleging, *inter alia*, that Defendants violated the federal securities laws by falsely telling investors that WaMu:  (1) had integrated successfully the various technology platforms and operational processes from recently-acquired mortgage lending and banking institutions; and (2) could withstand changes in interest rates by hedging its positions against interest-rate fluctuations (which were dependent on timely, accurate, and complete information from the Company's information technology systems).  ¶¶ 35-55.

### B.     This Court's 2005 Decision

On November 17, 2005, this Court denied Defendants' motion to dismiss the Complaint with respect to Killinger, Casey, Oppenheimer, and the Company and granted it with respect to the remaining three Defendants.  *See* MTD Order.  In that Order, this Court found that Plaintiffs had pleaded sufficiently particularized core-operations allegations so that knowledge of the Company's technological and operations problems could be imputed to Defendants who made statements concerning them.  MTD Order, 399 F. Supp. 2d at 1141-42.  Moreover, this Court found that Plaintiffs had pleaded particularized allegations describing:

> (1) how WAMU's ability to effectively integrate the various information technology systems of its recent acquisitions would impact its ability to withstand changes in the interest-rate environment; (2) the availability of contemporaneous information indicating that WAMU had *not* effectively integrated those technologies, and thus had exposed itself to significant interest-rate risks; (3) the Defendants' job responsibilities and potential exposure to this information; and (4) the specificity with which Defendants' public statements referred to these technologies yet denied the apparent scope and effect of the problems.

Order granting Defendant's Motion for Certification for Interlocutory Appeal Under 28 U.S.C. § 1292(b) dated March 6, 2006 (the "1292(b) Order") (Dkt. 96) at 3 (citing MTD Order, 399 F. Supp. 2d at 1139-43) (emphasis in original).  As a result, this Court stated:

---

[1] Citations to "¶ _" are to paragraphs of the Complaint.

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS                                   - 2 -
Master File No. C04-1599 JCC

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

Plaintiffs allege that Defendants' knowledge of this information can be inferred because of the nature of the statements they were making and the nature of these specific alleged operational problems. The Court agrees. In addition, as discussed below, because of the specific nature of the challenged statements, the Court finds that the complaint alleges with sufficient particularity that making the challenged statements without knowing whether they were accurate was actionably reckless.

MTD Order, 399 F. Supp. 2d at 1141 (citation omitted). Regarding the role of the core-operations inference, this Court explained:

The facts alleged in the complaint show that WAMU needed to reassure the market that it could successfully integrate its many acquisitions and that it was well positioned to perform well in a potentially unstable interest rate environment. According to Plaintiffs, in order to do both of these, WAMU needed to have certain technological capabilities. Thus, WAMU's assurances on both counts also amounted to an acknowledgment that its technology systems were adequate. Because of this, the Court finds that Plaintiffs have made sufficient allegations that technological capabilities were critical to WAMU's core operations.

In addition to the inferred statements about WAMU's technological capabilities, Defendants made several statements expressly addressing WAMU's technological capabilities. For this reason, the Court finds that WAMU's technological systems and the actions it was taking with respect to the systems amounted to an "important transaction" that would have been known to the officers making statements about them.

*Id*. (citations to appendix omitted).

## C.    **The Appeal**

The Ninth Circuit heard and decided an interlocutory appeal of the MTD Order under this Court's 1292(b) Order, which requested clarification on the following:

[T]he viability of the core operations inference is central to the outcome of this case: notwithstanding the specificity of Plaintiffs' allegations, the complaint does rely on circumstantial evidence and an inference of knowledge arising from the connection between Defendants' job roles and the core operations of the business. See 2005 Order, 399 F. Supp. 2d at 1142 ('Plaintiffs' circumstantial evidence regarding this factor alone is sufficient.'). Should the Ninth Circuit rule that the core operations inference is improper, even Defendants' specific statements indicating first-hand knowledge of WAMU's technological and operational systems may be insufficient to support a strong inference of scienter.

1292(b) Order at 5. In *South Ferry*, the Ninth Circuit agreed with Plaintiffs and this Court's MTD Order that "the core-operations inference can be one relevant part of a complaint that raises a strong inference of scienter." *South Ferry*, 542 F.3d at 784. However, the Ninth Circuit remanded the case for further proceedings solely to give this Court an opportunity to review the

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 3 -

Law Offices of
Clifford A. Cantor, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1  scienter portion of Defendants' Motion to Dismiss in light of *Tellabs* and its opinion in this case.

2  *Id*. at 786.  The Ninth Circuit "d[id] not disturb the other conclusions reached by the district

3  court," (*id.*), which include falsity and materiality.

4  **D.     Pleading Scienter After Tellabs v. Makor Issues & Rights, Ltd.**

5         In *Tellabs*, the Supreme Court held that a court's scienter inquiry must determine

6  "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

7  whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551

8  U.S. at 232 (emphasis in original);[2] *see also id.* at 326 ("the court's job is not to scrutinize each

9  allegation in isolation but to assess all the allegations holistically").  "In sum, the reviewing court

10 must ask:  *When the allegations are accepted as true and taken **collectively**, would a reasonable*

11 *person deem the inference of scienter at least as strong as any opposing inference?*"   *Id.*

12 (emphasis added).

13       When determining whether the pleaded facts give rise to a strong inference of scienter,

14 "the court *must* take into account plausible opposing inferences."  *Id.* at 336 (emphasis in

15 original).  These inferences must be "rationally drawn from the facts alleged."  *Id*. at 314.  Thus,

16 a defendant may not place before the court additional facts beyond those it normally may

17 consider on a motion to dismiss.  The Supreme Court confirmed that "courts must, as with any

18 motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual

19 allegations in the complaint as true."  *Id.* at 322.

20       Also in *Tellabs*, the Supreme Court defined what a "strong inference" of scienter means:

21       The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of
         the 'smoking gun' genre, or even the 'most plausible of competing inferences.' . . .
22       Recall in this regard that § 21D(b)'s pleading requirements are but one constraint
         among many the PSLRA installed to screen out frivolous suits, while allowing
23       meritorious actions to move forward.  Yet the inference of scienter must be more
         than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus
24       strong in light of other explanations.  A complaint will survive, we hold, only if a
         reasonable person would deem the inference of scienter cogent and *at least as*
25       compelling as any opposing inference one could draw from the facts alleged.

26 *Id*. at 324 (citations omitted) (emphasis added).  Under this standard, although the inference of

27

28 [2] This Court recognized this principle in the MTD Order.  399 F. Supp. 2d at 1139.

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627  208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

scienter must be "cogent," it need only be "*at least as* compelling" as any opposing, non-culpable inference, and decidedly need not be "the most plausible of competing inferences." *Id.* at 314, 317 (emphasis added) (citation omitted).

The Ninth Circuit explained the impact of *Tellabs* as follows:

> [T]he Supreme Court's recent *Tellabs* decision also discusses the level of detail required under the PSLRA, and with its controlling and persuasive weight, it suggests that perhaps *Silicon Graphics*, *Vantive*, and *Read-Rite* are too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright. … *Tellabs* suggests that while a high level of detail is required under the PSLRA, a court should look to the complaint as a whole, not to each individual scienter allegation as *Silicon Graphics* suggests. Thus, *Tellabs* counsels us to consider the totality of the circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.
>
> *     *     *
>
> The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement, the prior holdings of *Silicon Graphics*, *Vantive*, and *Read-Rite* notwithstanding. Vague or ambiguous allegations are now properly as part of a holistic review when considering whether the complaint raises a strong inference of scienter.

*South Ferry*, 542 F.3d at 784 (citing *Tellabs*, 127 S. Ct. at 2511). Hence, after *Tellabs*, this Court should apply a more comprehensive, and likely more liberal, scienter standard than when this Court issued its MTD Order.

**E.    The Ninth Circuit Held the Core-Operations Inference Is Viable**

On appeal, the Ninth Circuit held that core-operation allegations can satisfy the PSLRA's scienter standard in three ways:  (a) "the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations'" (*South Ferry*, 542 F.3d at 785 (quoting *Tellabs*, 127 S.Ct. at 2510)); (b) the "allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information" (*id.* at 786); and (c) the "allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.*

Plaintiffs' Complaint satisfies all three standards, as explained in Part IV, below.

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 5 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

III.    **DETAILED REVIEW OF PLAINTIFFS' SCIENTER ALLEGATIONS**

A.    **Plaintiffs' Scienter Allegations Are Particularized, Cogent, and Compelling**

Plaintiffs' allegations paint a detailed picture of severe problems with WaMu's technical systems that were essential to managing risk in WaMu's business during the Class Period.  While WaMu dove into the home mortgage business through a series of quick acquisitions, Defendants intentionally put off developing a full, working set of technical tools to manage the interest-rate-fluctuation risk associated with that business.    Defendants, the Company's managers, aggressively pursued a strategy of seizing business opportunities that they understood WaMu lacked the capacity to handle.  Under this cart-before-the-horse model, Defendants gambled, hoping that the business would sustain itself -- notwithstanding its systemic technology problems -- long enough to cover up that the operational structures in place were deeply inadequate.

Defendants attempted to buy time during the Class Period by repeatedly offering investors false or misleading assurances regarding, *inter alia*, WaMu's operational controls and hedging ability, as well as the Company's ability to steer its mortgage business through a sea of changing interest rates.  Ultimately, Defendants' efforts to deceive the market by intentionally hiding the truth regarding WaMu's failing risk-management controls in the home mortgage sector fell apart.  The fundamental defects in WaMu's business model came to light, exposing the vivid divide between the truth Defendants knew and the false representations Defendants told to the market.[3]

In fact, in this vein, this Court already reached the following conclusions (which the

---

[3] Defendants' false and misleading statements were an effort to hold back the truth regarding WaMu's technology issues in the hope that they would right themselves before the truth became apparent.  *Compare* the striking analogy in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Posner, J.) ("*Tellabs II*") (citation omitted):

> [Tellabs's CEO] may have thought that there was a chance that the situation regarding the two key products would right itself.  If so, the benefits of concealment might exceed the costs.  Investors do not like to think they're riding a roller coaster.  Prompt disclosure of the truth would have caused Tellabs's stock price to plummet, as it did when the truth came out a couple of months later. . . . The fact that a gamble -- concealing bad news in the hope that it will be overtaken by good news -- fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.  It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

Ninth Circuit's opinion in *South Ferry* did not disturb (*South Ferry*, 542 F.3d at 786)):

- "WAMU suffered technology problems affecting its ability to timely process and monitor loans after customers had locked in rates" (MTD Order, 399 F. Supp. 2d at 1140);

- "Optis [WAMU's proprietary platform for handling its home-loan operations (Complaint ¶ 44)] was a failure and was never completely rolled out" (*id*.);

- "WAMU's failure to integrate its different technology platforms created significant problems, including insufficient and inaccurate reporting of data critical to its hedging operations" (*id*.); and

- "WAMU needed to reassure the market that it could successfully integrate its many acquisitions and that it was well positioned to perform well in a potentially unstable interest rate environment," and "in order to do both of these, WAMU needed to have certain technological capabilities" (*id.* at 1141).

These conclusions were correct, as explained in greater detail below.

### 1.  Operational Capacity to Manage Risk Was Crucial to WaMu's Business

By the beginning of the Class Period, WaMu was the nation's second-largest home mortgage loan originator, made possible by "a period of rapid acquisitions [in the home mortgage area]." ¶¶ 30, 79.  In addition to loan origination (*i.e.*, new loans "in the pipeline"), WaMu derived revenue in the home mortgage sector through mortgage servicing rights ("MSR") on pre-existing loans.  ¶ 34.  Both activities -- loan origination and loan servicing -- inherently are subject to substantial risk from fluctuations in interest rates.  Loan origination business falls off when interest rates rise and consumer borrowing decreases.  ¶ 35.  MSR business falls off when interest rates decline and give consumers an incentive to refinance, often with other lenders.  *Id.*  WaMu hoped that those businesses would operate symbiotically -- *i.e.*, when interest rates increase, mortgage banks like WaMu earn less on new loan origination but rely on increased MSR income in part to offset variability in the net income or earnings of the Company. As Defendant Killinger explained in a CNBC interview on April 16, 2003:

> [W]e have a very balanced business model one in which when housing's doing [sic] strong, we get high levels of loan originations and gains on sales of those loans and so forth.  When interest rates go up and we start to get a slowdown in housing, then we have a real benefit of the servicing portfolio that we have of loans that we service for others, and that income should really kick in. . . . Part of our business does better when interest rates are going up, part of it does better when interest rates are going down.  And those really do a nice job of offsetting each other.

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC                                    - 7 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

¶ 59.  *See also* ¶ 114 (Killinger stated at an industry conference, in May 2004, "there is just one source to do all the hedging and the portfolios are all pulled together") and *compare South Ferry*, 542 F.3d at 785 (internal quotations omitted) (noting plaintiffs in *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) had pleaded facts showing a strong inference of scienter where, *inter alia*, the CEO of the defendant company was quoted as saying:  "All of our information is on one database.  We know exactly how much we have sold in the last hour around the world . . . .").

Attempting to preserve an interactive balance between those two businesses thus was one way in which WaMu hedged risk associated with exposure to changing interest rates -- according to Killinger "a pure, natural business hedge."  ¶¶ 35, 59.  In addition, as Killinger described it, to "smooth out those peaks and troughs a little bit more[,]" WaMu engaged in "financing hedging[,] . . . normally us[ing] either securities or certain derivatives just to balance out the interest rate risk."  ¶¶ 37, 59.  With respect to loan origination, this may be referred to as "pipeline hedging," and with respect to loan servicing as "MSR hedging."

Hedging, of course, does not happen by itself.  To manage risk by hedging, WaMu's business demanded the operational capacity and intelligence to gather and integrate metrics and other information necessary to, *inter alia*:  (1) identify its positions in loan origination and servicing; (2) assess internal trends in loan origination and servicing; (3) measure changes in loan origination and servicing requiring an offset to account for risk, (4) compare the status of the loan origination and servicing businesses directly to facilitate "pure, natural business hedg[ing]"; and (5) firmly grasp its business portfolio to know when, how, by what means, and to what degree to hedge in the marketplace.  Complete and precise information required effective communication between and among WaMu's many computer systems.  ¶ 46.  Without that corporate intelligence, effective risk management -- which Killinger said "*must infuse the entire operating culture of the company*" (¶ 85 (emphasis added)) – does not and cannot exist.

## 2.    WaMu's Risk-Management Systems Were Dysfunctional

In WaMu's home mortgage business, the linchpin of the Company's "entire operating culture" was rife with problems during the Class Period, crippling WaMu's ability to address risk

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 8 -

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627  208th  Ave.  SE
Sammamish,  WA  98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

in its home mortgage business arising from interest-rate fluctuation.  In the first instance, WaMu placed little priority on developing risk-management operations as the home mortgage business poured in.  In a conference call with investors and analysts on October 22, 2003, Killinger flatly admitted:  "[W]e went through a period of rapid acquisitions [in the home mortgage area].  Because we needed to respond to the refinancing boom, and we needed to have the volume capacity that it took to be able to handle that, *we had to put the final integrations of these acquisitions a bit more on the back burner*."  ¶ 79 (emphasis added).[4]  Indeed, WaMu did not have the systems in place to provide accurate risk management information.  The Company simply did not have reliable risk-management intelligence.  *See* MTD Order, 399 F. Supp. 2d at 1140 (concluding that "WAMU suffered technology problems affects its ability to timely process and monitor loans after customers had locked in interest rates").

Most home mortgage business operations at WaMu were intended to be handled by a platform called Optis, meaning "best."  ¶ 44.  But with acquisitions in the home mortgage sector came the (unmet) challenge of integrating "foreign" systems with Optis to continue the business going forward.  *Id.*  Optis itself was a source of problems, however.  Optis created slowdowns in loan processing capacity at WaMu, and the inadequacies within the platform resulted in loan rate lock-ins that left WaMu vulnerable when interest rates changed.  ¶¶ 48, 51.  Delays in processing imperiled, *inter alia*, customer service and legal compliance.  ¶ 50.  But the errors ran deeper.  For instance, Optis lacked the capacity to process loan transactions from start to finish.  ¶ 52.  Fundamental systems deficiencies in Optis yielded loan processing that was riddled with errors due to poor and virtually non-existent quality controls in loan processing.  ¶ 50.  In the face of high business volume, but flawed administration systems, WaMu accepted applications and fees from customers who had no chance of being approved.  ¶¶ 50, 51.  In short, "Optis was a failure and was never completely rolled out."  MTD Order, 399 F. Supp. 2d at 1140.

---

[4] *See also* ¶ 44 ("CEO Killinger [told *Fortune* magazine] that *WaMu delayed integrating its acquisitions during the boom* so that it could focus on writing more loans -- a strategy that generated huge profits until last fall's meltdown.") (emphasis added); ¶ 89 (At WaMu's December 9, 2003 Investor Day Conference, Defendant Oppenheimer told investors:  "[W]e have not been in a position to fully integrate the system to the mortgage companies that we acquired in 2000 and 2001.  The end of the refinance wave *now* affords us that opportunity. . . .") (emphasis added).

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 9 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

Apart from Optis, WaMu did not have appropriate systems to integrate the data required to hedge in the marketplace. ¶ 49. Processing delays affected all hedging activities because WaMu lacked the capacity to determine reliably the time required to close a loan after customers had locked in a rate. ¶¶ 51. Moreover, with WaMu's acquisitions preceding the beginning of the Class Period, WaMu failed to integrate acquired systems into existing ones, yielding incorrect data regarding WaMu's home mortgage portfolio. ¶¶ 53, 54. As late as *August 2004*, WaMu performed loan origination procedures with *nine*, *nonintegrated* computer systems. ¶ 44.

So, WaMu's home-mortgage business could not cope with risks of interest-rate fluctuation. The Company was without effective methods to acquire accurate data regarding that business, pieces of that business were splintered across separate and independent systems, and WaMu did not have the capacity to integrate data regarding secondary markets above and beyond their own internal home mortgage business. As such, WaMu lacked the tools to manage risk within this business; yet Defendants not only concealed that truth but deliberately lied (or stated with reckless indifference) to the market that WaMu's risk-management systems were operational and effective. Indeed, "WAMU's failure to integrate its different technology platforms created significant problems, including insufficient and inaccurate reporting of date critical to its hedging operations." MTD Order, 399 F. Supp. 2d at 1140.[5]

### 3. Defendants Had Access to and Knowledge of Information Concerning WaMu's Structural Deficiencies and Technological Failures

#### a. Defendants Held Key Positions Within WaMu's Management Structure

During the Class Period, Defendant Killinger was WaMu's CEO and the Chairman of its Board of Directors, serving as the former since 1990 and the latter since 1992. ¶ 8. He was also a member of WaMu's Executive Committee and President's Council, which was "purportedly focused on operational efficiency, operational decision-making, and strategic execution...." *Id*. Defendant Casey was WaMu's CFO and Executive Vice President during the Class Period. ¶ 10.

---

[5] This section relies on allegations in the Complaint derived only from those confidential witnesses this Court has previously found "were in a position to have personal knowledge of the information about which they spoke" and presented evidence of a "consistent and interlocking nature [that] bolsters the evidence's reliability and credibility." MTD Order, 399 F. Supp. 2d at 1140.

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 10 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

Casey also served on WaMu's Executive Committee and President's Counsel.  *Id.*  Defendant Oppenheimer was President of WaMu's Consumer Group during the Class Period and a member of the Company's executive management team.  ¶ 11.  Oppenheimer was responsible for two WaMu reporting segments:  (1) Retail Banking and Financial Services and (2) Mortgage Banking.  *Id.*  In October 2003, Killinger announced to analysts and investors that Oppenheimer would head the entirety of WaMu's home lending business.  ¶ 79.  Defendant Oppenheimer became a WaMu officer in 1985, a member of the Executive Committee in 1990, Executive Vice President in 1993, and a member of the President's Counsel when it was formed in 2002. ¶ 11.  She abruptly resigned from WaMu after the Class Period closed.  *Id.*

As discussed below, Defendants Killinger and Casey ran conference calls throughout the Class Period during which they discussed WaMu's technical systems and risk-management capacity in the home mortgage sector.  Defendant Killinger was WaMu's public face in multiple press releases for those issues.  Defendant Oppenheimer was placed at the helm of WaMu's home mortgage business during the Class Period.  ¶ 79.  Each of the Defendants appeared and spoke at industry conferences regarding risk management in WaMu's home mortgage business, as detailed directly below.  In short, Defendants were WaMu's voice during the Class Period with respect to the issues of systems integration and functionality at the heart of WaMu's risk-management apparatus.  As the Ninth Circuit observed, "[Defendants] held not merely nominal but rather key officer positions at relevant times."  *South Ferry*, 542 F.3d at 780.

### b.    Defendants' Statements Demonstrate Access to and Knowledge of Information Concerning WaMu's Systematic Operational Failures

Investors and analysts learned what they knew -- or at least what they were led to believe -- regarding WaMu's risk-management systems straight from the proverbial horses' mouths (*i.e.*, from Defendants).  Defendants did not purport to rely on the statements of intermediaries or reports by lower-level management.  Defendants exhibited first-hand knowledge of, and sometimes direct involvement in, WaMu's risk-management operations.  From the perspective of investors, analysts, and others relying on their statements, Defendants spoke with personal knowledge when providing false or misleading assurances regarding WaMu's systems

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 11 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813  ●  Fax: (425) 868-7870

challenges.  *See, e.g.*, MTD Order 399 F. Supp. at 1138-39 (finding a repeated nexus during the Class Period between WaMu's systems deficiencies, Defendants' false statements regarding these problems, and the market impact of Defendants' statements).

Moreover, Defendants spoke in detail regarding WaMu's technical capacities, and in technical terms.  Defendants' statements show Defendants' specific understanding of the underlying systems issues they claimed to have addressed, or to have been addressing. Defendants took credit for personally overseeing and personally involving themselves in tackling problems arising from WaMu's inadequate operational systems.  Taken together, Defendants' statements demonstrate access and knowledge.  *See Tellabs II*, 513 F.3d at 704 ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk."); *Applied Signal*, 527 F.3d at 987 ("[O]nce defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what the backlog consisted of.").[6]

A review of Defendants' statements, presented in the chart below, demonstrates that this Court properly upheld the Complaint on the motion to dismiss, and that the sufficiency of the Complaint continues under *Tellabs* and *South Ferry*.

| Context & Date of Statement | Statement | Indicia of Access and Knowledge |
|---|---|---|
| Conference Call: April 16, 2003 | ¶ 56:  Defendant Killinger stated that WaMu would be in a "stronger position when the current [interest rate] environment changes." | • Killinger's personal assurance that WaMu was equipped to confront interest-rate fluctuations |
| | *Id.*:  Defendant Casey stated that WaMu was taking necessary and proper steps to account for "eventual changes in [the] interest rate environment."  Continuing, Casey explained: "At this time, we are focused on balancing the demands of today while positioning the company for the eventual change in interest rate environment.  And our balanced business model will provide the leverage to continue to grow market share in a changing environment. . . . As | • Casey's' personal assurance that WaMu was situated to "grow market share" in the face of changing interest rates<br>• Casey's personal involvement in updating "the company's ongoing interest rate risk |

---

[6] This Court previously found that "that Plaintiffs' complaint sufficiently alleges that knowledge of WAMU's various technology problems may be inferred to those Defendants making statements about them."  MTD Order, 399 F. Supp. 2d at 1141-42.

| Context & Date of Statement | Statement | Indicia of Access and Knowledge |
|---|---|---|
| | part of the company's ongoing interest rate risk management program and positioning of the balance sheet for future rising rates, we repositioned certain acts and liability hedging during the quarter. . . . We believe this was a prudent step that will help us position for the future rise in interest rates." | management program" |
| | ¶ 58:  Defendant Casey explained, in response to a question from an analyst from J.P. Morgan: "With regard to the MSR hedge, just -- not to get into detail, we can go off line and take you through how this works, but the fact that we anticipated the amortization during the quarter and actual results came through, our hedge was effectively doing the same thing.  If you notice, we didn't have to take any available for sale gains in our portfolio, which indicates that the hedge and the amortization and the derivative portion of our hedge, were working in tandem with one another.  Again, we're very confident that our risk management is working here, and when you see the offset here, I think we're feeling very good about where we are. | • Casey's representation that his own knowledge of the components of WaMu's hedging process is *more comprehensive* than the provided analysis<br>• Casey's personal assurance of the strength of WaMu's risk-management systems (*e.g.*, "we're feeling very good about where we are") |
| Conference Call: July 16, 2003 | ¶ 67:  Defendant Casey touted WaMu's risk-management apparatus:  "All parts of our business are delivering according to plan.  And in spite of an operating environment that presents a diverse mix of challenges and opportunities, our balanced business model allows us to achieve record earnings. . . . Our unique model combines our origination strength . . . with a fixed rate product preference, but also with a broad product line of adjustable rate offerings, which will be in demand when consumers prefers shift in a rising rate environment."  Casey then assured investors and analysts" "We continued to *actively monitor* and *collectively manage* or sensitivity to changes in interest rates. . . ."  (emphasis added) | • Casey's personal understanding of balance sought via systems technology<br>• Casey's representation that he actively monitors and manages the Company's ability to weather interest rate changes |
| Lehman Brothers Financial Services Conference: September 9, 2003 | ¶¶ 40, 74:  Defendant Killinger explained, in response to a question from an attendee:  "Now, [reduced gains from fixed rate mortgage loans due to declining fixed rate applications] has been heightened in the current quarter by several mortgage banking process system challenges, which I think came to light as a result of the spike | • Killinger's personal understanding of systems technology problems experienced by the Company<br>• Killinger's knowledge of the "immediate steps" the |

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

| Context & Date of Statement | Statement | Indicia of Access and Knowledge |
|---|---|---|
| | in interest rates in late July and August. And it's created some imprecision in the matching of our loan commitments and pipeline hedging activities. . . . Now, we took immediate steps to address any of the operating challenges and are back on track." | Company supposedly took to fix these problems |
| *Business Wire* Press Release: October 21, 2003 | ¶ 77: Announced that WaMu recorded a net loss from mortgage loans of $126 million in the third quarter of 2003. This loss "was due, in part, to significant volatility in interest rates during the quarter and previously reported operations issues in the Company's mortgage business." Killinger asserted the problems in this area were under control, and is quoted in the press release as stating that, "[w]e have identified the issues that led to these challenges and have implemented measures to address them…." (emphasis omitted). | • Killinger's personal assurances that problematic systems technology issue had been identified and were being managed |
| Conference Call: October 22, 2003 | ¶ 41: Defendant Killinger acknowledged "an inconsistency of the data coming in between the rate locks and what we needed to do for hedging…." Killinger continued, attempting to assuage investors and analysts: "[W]e jumped on that immediately, put in a very large SWAT team of folks to get their arms around things. They got that very stabilized very quickly, and then we immediately implemented a variety of measures to be sure that that would not happen again. We are very confident, at this point in time, that the flows of information are accurate, and that the financial risk that we encountered early in the third quarter is taken care of at this point." | • Killinger's knowledge and understanding of the source of the Company's hedging problems<br>• Killinger's involvement in addressing systems technology issues<br>• Killinger's understanding of the deep importance of fixing the hedging problems by putting in "a very large SWAT team" to figure out the problems. |
| | ¶ 79: Defendant Killinger addressed, in detail, the staffing measures that WaMu had taken to tackle operations issues in its home mortgage business: "[W]e have a very, very strong and seasoned team of people in our home lending area. We did make some changes I mentioned, both to put the entire area under Deanna Oppenheimer, along with all of our consumer business. . . . We also made a change to bring in our strongest operations person in the organization, Diana Beido, who has run the operations for all of our consumer group. We put her in charge of doing that for the home lending | • Killinger's deep personal involvement in staffing decisions regarding risk-management systems technology<br>• Oppenheimer's direct oversight and responsibilities of the home mortgage business |

| | Context & Date of Statement | Statement | Indicia of Access and Knowledge |
|---|---|---|---|
| | | group, because we felt that it was time to bring the strongest expertise we had in the whole complex to make that happen.  Again, they are going through a very thorough review of everything that we have." | |
| | | ¶¶ 41, 79:  Defendant Casey acknowledged "operations problems" regarding the "timeliness of information flows," which resulted in "certain loan commitments not being reflected in [WaMu's] hedging profile on a time basis."  Elaborating, Casey explained that "many of the loans in the pipeline were not funded within their specific rate lock period, through no fault of the borrower."  Then, Casey sought to reassure investors and analysts:  "We have addressed these problems through improved information flows, better tracking of loan commitments and stronger oversight.  Performance has since improved, and we are returning to normal conditions. . . . [W]e quickly got on the [operational] problems, and these problems are behind us." | • Casey's technical understanding of systems technology and its effects on WaMu's risk management<br>• Casey's detailed explanation of the supposed fix to WaMu's information flows, loan commitment tracking, and oversight |
| | WaMu Investor Day Conference: December 9, 2003 | ¶ 86:  Defendant Killinger told investors:  "[W]e have developed sophisticated risk management tools and processes which have allowed us to perform very well in a highly volatile interest rate environment.  This has given me a great deal of comfort in our management of risk overall. . . . [C]redit and risk management practices must infuse the entire operating culture of the company, and I believe we've made good progress in this area." (Emphasis omitted). | • Killinger's personal understanding that the systems technology was critical to "sophisticated" risk management<br>• Killinger's emphasis on the importance of risk management to the entirety of the Company's business |
| | | ¶¶ 42, 87:  Defendant Casey told investors:  "Kerry [Killinger] mentioned we also experienced operational challenges in our mortgage business in the third quarter.  As we have stated on several occasions, we have identified the issues that lead to these problems and have implemented the appropriate measures to address them." | • Casey's personal explanation of the identification and addressing of "operation challenges" |
| | | ¶ 89:  Defendant Oppenheimer told investors:  "[W]e have not been in a position to fully integrate the system to the mortgage companies that we acquired in 2000 and 2001.  The end of the refinance wave now affords us that opportunity…."  (emphasis omitted). | • Oppenheimer's emphasis on the importance of systems integration to home mortgage business<br>• Oppenheimer's personal assurances of oversight |

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

| Context & Date of Statement | Statement | Indicia of Access and Knowledge |
|---|---|---|
| | | and management |
| Conference Call: January 21, 2004 | ¶ 96: Defendant Killinger attempted to explain $180 million of technology write-offs: "Nearly all of these charges were related to technology write-offs in our mortgage fulfillment operation. Our senior management team has completed its end to end diagnostic review of the mortgage business and expects significant improvement in efficiency as the year progresses. This will be the result of further elimination of redundant operations, improvements in technology performance and streamlining of business process." | • Killinger's personal understanding of centrality of systems technologies to home mortgage business<br>• Killinger's personal assurances of systems technology improvements<br>• Defendants' personal involvement (e.g. "senior management team review") in confronting mortgage business issues |
| | ¶ 97: Defendant Casey stated: "Now, the refinance activity has slowed. We have accelerated our integration activities as well as our efforts to drive down our mortgage cost structure overall. As we progressively gain efficiencies from the integrations and other cost reduction efforts in the mortgage area, we should see our margin on gain from mortgage sales improve as the year progresses." | • Casey's personal understanding that systems technology integration was central to reducing costs and to the operation of home mortgage business<br>• Casey's personal assurances of systems technology improvements |
| Conference Call: April 20, 2004 | ¶ 106: Defendant Killinger stated: [W]e have fully integrated our MSR and mortgage pipeline hedging activities . . . under [Defendant] Tom Casey. This has led to better execution than ever before." (emphasis omitted). | • Killinger's knowledge concerning the integration of MSR and pipeline hedging activity<br>• Killinger's representation that Defendant Casey was directly responsible for integration of systems technologies |
| Lehman Brothers Financial Services Conference: May 12, 2004 | ¶ 114: Defendant Killinger responded to an audience member's question regarding the operational aspects of hedging and WaMu's mortgage-related products: "[F]or those purpose of hedging, we integrated the essential information quite some time ago. So that there is just one source to do all the hedging and the portfolios are all pulled together. . . . [I]n terms of the financial information coming off of those to do our mortgage servicing valuation and hedging, *we have always had those pulled together.* Now we did run into a situation last year in the third | • Killinger's knowledge of how hedging is conducted<br>• Killinger's representations that systems technologies are critical to risk management and had been fully integrated<br>• Killinger's involvement in fixing hedging issues and knowledge of the |

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 16 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

| | Context & Date of Statement | Statement | Indicia of Access and Knowledge |
|---|---|---|---|
| | | quarter when the loan origination systems were not connected as well as what we thought they were, and there we ended up with some hedging issues out of our pipeline. And once we saw that, we got all over it, and I have not had any issues come out of that since then." (emphasis added). | current state of WaMu's hedging abilities (e.g. "I have not had any issues come out of that since then…") |
| | | ¶ 115: Defendant Oppenheimer responded to an audience member's question: "[E]ssentially what we are doing is we are measuring -- we are managing our expenses very aggressively during this timeframe, particularly in the mortgage business, where we see seeing [sic] those volumes in the mortgage business come down significantly. We are looking at our whole balance sheet management in a very sophisticated fashion, with a number of various hedges and instruments that we are using to be able to hedge and be ready for any of those types of environments. And we think we're as well positioned as we have ever been. . . ." (emphasis omitted). | • Oppenheimer's personal understanding that systems technology metrics are critical to hedging and risk management<br>• Oppenheimer's detailed knowledge of the Company's hedging and risk management activities |
| | Conference Call: July 22, 2004 | ¶ 45: Defendant Killinger stated in a July 22, 2004 conference call with investors and analysts, *inter alia*: (1) During the refinancing boom, "we did not execute on a long held practice of fully integrating acquisitions unto a common systems platform in a short period of time"; (2) "[W]hen we did undertake this integration effort, *we did not execute as well as we should have. . . . We did not execute our normal game plan.* That then delayed building the kind of mortgage business we want to have . . . high-volume, low-cost, scalable, focused. *This integration has simply taken too long.*"; and (3) "Last call, it became apparent to me that the management teams leading our mortgage banking groups was [sic] *not making satisfactory progress* in addressing these challenges. So, we made some big changes. We replaced several people and asked our entire executive team to step up and help assess the situation. We discovered the problems of the mortgage banking unit were substantial." (emphasis added) | • Killinger's detailed knowledge of the Company's mortgage banking unit's "substantial" problems, "lack of execution," delay of integration, and lack of progress in "addressing these challenges." |

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 17 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

4.    **WaMu's Financial Statements Further Demonstrate Defendants' Access to and Knowledge of Information Concerning  Pervasive Operational Failures in WaMu's Risk-Management Systems**

Multiple representations in WaMu's financial statements during the Class Period dovetail with statements that Defendants made and, similarly, demonstrate access and knowledge.  *See, e.g.*, ¶ 61 ("Our goal is to ensure that our senior management has timely access to all material financial and non-financial information concerning our business.") (emphasis omitted); ¶ 83 ("Corrective measures [with respect to operational performance and risk management] include . . . a more rigorous origination oversight process…."). These financial statements were reviewed and certified by Defendants Killinger and Casey.  *See, e.g.*, ¶¶ 62-63, 72, 82.  Moreover, these statements were made in the context of public filings that, viewed holistically as *Tellabs* mandates, contained numerous false and misleading statements, omitted material required disclosures, and did not comport with GAAP requirements.  *See generally* ¶¶ 61-64, 72, 82-83, 101-102, 110-12, 128-49.

5.    **Defendants Killinger and Oppenheimer Took Personal Advantage of Information Concealed from the Market**

Defendants Killinger and Oppenheimer personally reaped the benefits of the false and misleading statements alleged in the Complaint through their stock sales and other stock dispositions.  ¶¶ 154-63.  During the Class Period, Defendant Killinger sold or otherwise disposed of a total of 231,587 shares of WaMu stock valued at $9,734,093.50.  ¶¶ 155-57.  By contrast, during the three-year time period from 2000-03, he disposed of only 79,102 shares valued at $2,793,553.21.  ¶¶ 157-59.  Defendant Oppenheimer also sold or otherwise disposed of substantially more shares during the Class Period than during the prior three years.  *Id.*

In addition to these probative insider dispositions, Defendants Killinger and Oppenheimer were strongly motivated to keep WaMu's stock inflated through the end of 2003 due to their participation in the Company's Performance Share Program, by which the amount of shares awarded to them under the program was linked to the price of the Company's stock.  ¶ 164.  In total, Defendants Killinger and Oppenheimer were granted $11,295,738 worth of stock in the program, which exceeded their ordinary bonuses for all three years combined prior to the

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 18 -

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

start of the Class Period.  ¶¶ 165-66.

## IV.    PLAINTIFFS PLEADED A STRONG INFERENCE OF SCIENTER

### A.    The Particularized Core-Operations Allegations, When Read Together with the Complaint's Other Allegations, Raise a Strong Inference of Scienter

The Ninth Circuit held that, after *Tellabs*, core-operations allegations properly are considered as part of a scienter analysis.  *South Ferry*, 542 F.3d at 785.  When the allegations about Defendants' positions (*see* Part III.A.3.a, *supra*) and the vital importance of the Company's hedging abilities (*see* Part III.A.1, *supra*) are read together with the other allegations of the Complaint, the result inescapably is a strong inference that Defendants acted with scienter.

Defendants occupied positions in WaMu that would have made it impossible for them not to know about the serious risk management problems that were plaguing the Company.  *See* Part III.A.3.a, *supra*.  Also, the Company's balanced business model and risk management capabilities, which included hedging and which depended on WaMu's technological capabilities, were of singular importance to the profitability of the Company.  *See* Part III.A.1, *supra*.  Moreover, the very nature of Defendants' Class Period statements demonstrates that they had first-hand knowledge of the state of the Company's technological capabilities.  *See* Part III.A.3.b, *supra*.[7]  The Company's actual risk management capabilities, however, bore no resemblance to their detailed public statements.  *Compare* Parts III.A.2 & III.A.3.b.

At the end of the Class Period, the Company announced that "expectations for a sustained increase in long-term interest rates will significantly impact the company's Mortgage Banking business resulting in 2004 earnings below previous guidance."  ¶ 119.  Moreover, the Company announced that its system conversions had not been completed and that its Mortgage Banking results were being reduced because of the "higher cost of hedging mortgage servicing rights in the changed interest rate environment."  ¶ 120.  Defendant Casey admitted that WaMu's risk

---

[7] This Court found, in essence, that by making these statements, Defendants had taken ownership of the Company's problems.  This Court was correct that knowledge of the Company's problems could be imputed to Defendants.  Moreover, this Court also was correct to find that if Defendants did not know that their statements were false, it was actionably reckless for them to speak publicly on such vital Company issues without knowledge about the true state of its technological operations.  MTD Order, 399 F. Supp. 2d at 1141-42.

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS                      - 19 -
Master File No. C04-1599 JCC

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

management approach "does not attempt to fully hedge the effects of changes in basis spreads." *Id*. *Fortune* magazine reported in August 2004 (less than three months after Oppenheimer's statement regarding WaMu's sophistication and hedging abilities to confront any type of interest rate environment) that:

> Today WaMu still uses an amazing nine separate systems to originate loans, including one called LoanWorks that it has employed since its days as a small thrift and others that it picked up from its acquisitions. The systems have great trouble talking to one another.

¶ 44. In the MTD Order, this Court found that Plaintiffs properly pleaded that: (a) WaMu suffered technology problems affecting its ability to process and monitor loans in a timely fashion after customers had locked in rates; (b) Optis was a failure and never was rolled out completely; and (c) WaMu's failure to integrate its different technology platforms created significant problems, including insufficient and inaccurate reporting of data critical to its hedging operations. MTD Order, 399 F. Supp. 2d at 1140-41.

In light of the systematic operational failures at the heart of the Company's risk-management capabilities that were essential to the Company's touted "balanced business model," that Defendants' statements contain great detail about (1) the supposed fix to the Company's problems, (2) Defendants' involvement in the attempt to fix them, and (3) the Company's ability to face a volatile interest rate environment in the future, these statements show that Defendants had knowledge of the true situation. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1185 (C.D. Cal. 2008) (the defendants' statements were "so objectively out of line" with the company's practices that those statements "contribute to a strong inference of scienter"). Moreover, after *Tellabs*, this Court must consider other allegations indicative of scienter in conjunction with Defendants' statements. *See South Ferry*, 542 F.3d at 784 ("Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter.").

For instance, in January 2005 the Company announced the abrupt resignation of Oppenheimer, who beginning in October 2003 was leading WaMu's consumer group, including home lending. ¶ 126. That resignation, taken together with other allegations suggesting that

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 20 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

Oppenheimer knew her public statements on WaMu's risk management capacities were false, strengthens the scienter inference against Oppenheimer. *See, e.g.*, *Middlesex Ret. Sys. v. Quest Software, Inc.*, 2008 U.S. Dist. LEXIS 68419, *24 (C.D. Cal. 2008) (resignation of corporate officer or executive may be considered in evaluation of scienter).

Further telling facts include the Company's failure to comply with GAAP, as well as the benefits Defendants Killinger and Oppenheimer reaped from insider selling and the Company's Performance Share Program. *See* Parts III.A.4-5, *supra*. When these allegations are viewed in conjunction with Defendants' statements, they only support the conclusion that Defendants acted with scienter. *See, e.g., Daou*, 411 F.3d at 1016 (citing cases) ("[v]iolations of GAAP standards can . . . provide evidence of scienter"). *See also Lormand v. US Unwired, Inc.*, 2009 U.S. App. LEXIS 7452, *73 n.17 (5th Cir. 2009) ("Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts") (citations omitted); *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 92 (1st Cir. 2008) (citations omitted) (same); *Oracle*, 380 F.3d at 1232 (same).

Hence, under *Tellabs*, this Court must ask whether (1) Defendants' positions, which included responsibilities of direct oversight and involvement of the WaMu's risk management activities; (2) the vital importance of risk management to the Company's success; (3) Defendants' detailed statements about their efforts to fix WaMu's hedging problems and abilities to thrive in a volatile interest rate environment in the future; (4) Defendants' statements at the end of the Class Period that undermine their Class Period statements; (5) Defendants' statements within the context of WaMu's public financial filings; (6) Oppenheimer's sudden resignation; (7) the Company's GAAP violations; (8) Defendant Killinger and Oppenheimer's insider trading activity; and (9) the Company's Performance Share Program, when read together, create an inference that Defendants acted with scienter that is cogent and at least as compelling as any competing innocent inference. As explained, the answer to this question is yes.

**B.    The Particularized Core-Operations Allegations Show that Defendants Had Actual Access to the Information Regarding WaMu's Technological Problems**

"Allegations regarding management's role in a corporate structure and the importance of

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 21 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *South Ferry*, 542 F.3d at 785. The "corporate information" at issue -- the Company's balanced business model, including its ability to hedge and integrate its acquisitions properly -- was of prime importance to WaMu. *See* Part II.C.1. The mortgage sector was a major part of WaMu's business. It was also the riskiest part of WaMu's business because of interest-rate volatility, which is precisely what made the Company's risk-management and hedging capabilities so vitally important. *See* Parts III.A.1-2.[8] Defendants repeatedly, improperly, and falsely reassured investors of WaMu's ability to hedge and manage risk effectively. *See* Part III.A.3.b. The truth is the Company's computer systems could not and did not function properly to enable WaMu to hedge and manage that risk, and Defendants knew that truth. *See* 1292(b) Order at 3.

The Ninth Circuit, in holding that core-operations allegations can satisfy the PSLRA's scienter requirement when "made in conjunction with detailed and specific allegations about management's exposure to factual information within the company," referred to two previous decisions. *South Ferry*, 542 F.3d at 785. The first was *Daou*, in which the complaint "relied on specific and particular accusations about the role played by the defendants in managing the company, including specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements." *Id.* (citing *Daou*, 411 F.3d at 1022-23). The second was *Oracle*, in which the CEO stated that "'[a]ll of our information is in one database. We know exactly how much we have sold in the last hour around the world'...." *Id.* (quoting *Oracle*, 380 F.3d at 1231). Here, Defendants not only told investors that WaMu had experienced risk management and hedging problems but also provided multiple specific reassurances that those problems had been fixed (when they were not) and that WaMu was prepared for rising

---

[8] The Court previously accepted these allegations which it found that Plaintiffs properly alleged that the Company's technological capabilities were critical to WaMu's core operations because: (a) "WaMu needed to reassure the market that it could successfully integrate its acquisitions"; (b) WaMu needed to reassure the marketing "that it was well positioned to perform well in a potentially unstable interest rate environment"; and (c) "in order to do both of these, WaMu needed to have certain technological capabilities." MTD Order, 399 F. Supp. 2d at 1141.

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS                    - 22 -
Master File No. C04-1599 JCC

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

interest rates (when it was not); it is analogous to the sins in both *Daou* and *Oracle*.

Defendants' own statements concerning WaMu's supposedly successful effort to fix the Company's ability to hedge risk properly, as described above, show that Defendants had personal knowledge of, and access to, the poor state of WaMu's hedging abilities, or that they were deliberately reckless in making the statements and assurances. Moreover, reading together the particularized fact allegations about (a) the importance of the Company's technological capabilities to its business and (b) the Company's pervasive risk management and hedging problems, together with the Defendants' detailed statements about the Company's supposed success in fixing those risk management and hedging problems, raises a strong inference of scienter that is cogent and *at least* as compelling -- indeed *more compelling* -- than any competing inference. *See Tellabs*, 551 U.S. at 314.[9]

C.    **It Would Be Absurd To Suggest That Defendants Were Without Knowledge of WaMu's Pervasive Technological Problems**

This Court previously found that:

> [B]ecause WaMu's technological capabilities were apparently so crucial to its ability to perform as promised, the Court finds that Plaintiffs' complaint sufficiently alleges that these defendants' reckless misinformation, or failure, if any, to acquire the relevant knowledge before making the accused statements was deliberate or conscious recklessness.

MTD Order, 399 F. Supp. 2d at 1142. So, even putting aside the remainder of the particularized fact allegations, this Court can infer scienter based on the core-operations allegations alone. *See South Ferry*, 542 F.3d at 785 n.3. S*ee also Allied Signal*, 527 F.3d at 988 ("[The CEO and CFO] were directly responsible for Applied Signal's day-to-day operations . . . , so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work.") (citation omitted); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) (plaintiffs' allegations as to outside directors on America West's board gave rise to strong inference of scienter regarding the company's maintenance problems, and the government's

---

[9] This Court previously reached the same conclusion. *See* MTD Order, 399 F. Supp. 2d at 1141-42.

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC                                        - 23 -

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627  208th Ave.  SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

1  investigation into them, as they were so important to the company it was "absurd to suggest that

2  the Board of Directors would not discuss" them).

3          The importance of WaMu's technological capabilities to hedge risk was paramount.  The

4  pervasive problems that the Company experienced with those capabilities had a devastating

5  effect.  Hence, this case presents an proper application of the core-operations inference.

6          As Judge Posner explained on remand to the Seventh Circuit in *Tellabs*:

7          [A]t the top of the corporate pyramid sat [Defendant] Notebaert, the CEO.  The
           [devices] were his company's key products.  Almost all the false statements that we
8          quoted emanated directly from him.  Is it conceivable that he was unaware of the
           problems of his company's two major products and merely repeating lies fed to him
9          but other corporate executives at the company?  It is conceivable, yes, but it is
           exceedingly unlikely."
10

11  *Tellabs II*, 513 F.3d at 711.  Likewise, it is "exceedingly unlikely" that Defendants, given their

12  positions and the vital importance of risk management to the Company, would not have known

13  of the Company's pervasive risk management problems.

14  **D.      Plaintiffs Should Be Granted Leave to Replead**

15          Should this Court grant Defendants' motion to dismiss, Plaintiffs seek leave to replead in

16  light of *Tellabs* and *South Ferry*.  The operative Complaint in this action is the first Plaintiffs

17  have filed since this Court appointed them as Lead Plaintiffs in this action in November 2004.[10]

18                          **V.      CONCLUSION**

19          For the reasons set forth above, the Court should deny Defendants' motion to dismiss.

20

21          Dated:  May 1, 2009                      Respectfully submitted,

22                                                   LAW OFFICES OF CLIFFORD A. CANTOR, P.C.

23                                                   By:   s/  Clifford Cantor (WSBA # 17893)

24  [10] Leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  "[L]eave
     to amend is warranted where there has been an intervening change in the applicable law."  *M.J. v.*
25  *Clovis Unified School Dist.*, 2007 U.S. Dist. LEXIS 28761, *12 (E.D. Cal. 2007) (citing *Wilcox v.*
     *First Interstate Bank, N.A.*, 815 F.2d 522, 530 (9th Cir. 1987)); *In re Gilead Sciences Sec. Litig.*,
26  2005 U.S. Dist. LEXIS 46910, *29 (N.D. Cal. 2005) (same).  *See also Eminence Capital, LLC v.*
27  *Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) (holding "the district court did not appropriately
     exercise its discretion by denying plaintiffs leave to amend where . . . plaintiffs were endeavoring in
28  good faith to meet the heightened pleading requirements [of the PSLRA]").

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS                         - 24 -
Master File No. C04-1599 JCC

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

627 208th Ave. SE
Sammamish, WA 98074-7033
(425) 868-7813

**Plaintiffs' Counsel**

Lori G. Feldman (WSBA # 29096)
Todd Kammerman
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119-0165
(212) 594-5300

William H. Narwold
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000

**Lead Counsel for Plaintiffs**

Michael A. Swick
LAW OFFICES OF MICHAEL A. SWICK, LLP
One William Street, Suite 900
New York, New York  10005
(212) 584-0770

Peter D. Bull
Joshua M. Lifshitz
BULL & LIFSHITZ, LLP
18 East 41st Street, 11th Floor
New York, New York  10017
(212) 213-6222

**Other Plaintiffs' Counsel**

Certificate of Service

    The undersigned certifies that, on May 1, 2009, he caused the foregoing to be filed with the Clerk of the Court via the CM/ECF system, which will send notification of filing to all counsel of record.

     s/  Clifford Cantor, WSBA # 17893

PLTFS' OPENING SUPPL. OPP.
TO DEFS' MOT. TO DISMISS
Master File No. C04-1599 JCC

- 25 -