1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| SOUTH FERRY LP #2, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. CV04-1599C |
| Plaintiff, | ) ) ) | INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND |
| v. | ) ) | |
| KERRY K. KILLINGER, et al., | ) ) | ***Note on Motion Calendar:*** |
| Defendants. | ) ) | June 12, 2009 |

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

# TABLE OF CONTENTS

I.   INTRODUCTION .......................................................................................................1

II.  ARGUMENT ............................................................................................................2

   A.   After *Tellabs*, Core Operations Allegations Will Give Rise to a Strong Inference of Scienter Only in an "Exceedingly Rare Category of Cases". .........................................2

   B.   Plaintiffs Have Not Alleged Any False Statements .......................................................6

      1.   Plaintiffs' Brief Does Not Discuss Any False Statements with Respect to Pipeline Hedging Activities. ........................................................................8

      2.   Plaintiffs' Brief Does Not Address Any Alleged Misstatements with Respect to MSR Hedging. ............................................................................9

      3.   Plaintiffs' Have Not Linked the Disclosure of the MSR Hedging Loss to Any Prior Statements Concerning "Operational" Issues. ......................................11

   C.   Plaintiffs Have Not Alleged Facts Giving Rise to a Strong Inference of Scienter. .......13

      1.   Plaintiffs Fail to Plead Defendants' Actual Access to Information. .........................14

      2.   Plaintiffs Do Not Plead Facts Making It Absurd to Suggest that Management Would Not Know of the Alleged Falsity. ..................................................17

      3.   Holistic Review Does Not Save the Complaint. ......................................................18

         a.   Self-disclosure and Remediation. ..............................................................19

         b.   Confidential Witnesses. .............................................................................19

         c.   Alleged GAAP Violations and Certifications. ............................................20

         d.   Stock Sales. ..............................................................................................20

         e.   Participation in the Performance Share Program ..............................................22

         f.   Ms. Oppenheimer's Resignation. ...............................................................23

         g.   Plausible Alternative Inferences. ...............................................................24

III. CONCLUSION ........................................................................................................24

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — i
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1

2

# TABLE OF AUTHORITIES

3
                                                                        **Page(s)**

FEDERAL CASES

4

5
*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
   505 F. Supp. 2d 662 (D. Colo. 2007)..........................................................19, 21

6
*Berson v. Applied Signal Tech., Inc.*,
7
   527 F.3d 982 (9th Cir. 2008) ............................................................3, 5, 13, 18

8
*Collins v. Winex Invs., LLC*,
   2009 WL 861738 (S.D. Cal. Mar. 27, 2009) ......................................................14

9

*Constr. Laborers Pension Trust v. Neurocrine Biosciences, Inc.*,
10
   2008 WL 2053733 (S.D. Cal. May 13, 2008)......................................................23

11
*Dura Pharm. v. Broudo*,
12
   544 U.S. 336 (2005)..............................................................................................9

13
*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) .................................................................. passim

14

*In re Boeing Sec. Litig.*,
15
   40 F. Supp. 2d 1160 (W.D.Wash. 1998)............................................................16

16
*In re Calpine Corp. Sec. Litig.*,
17
   288 F. Supp. 2d 1054 (N.D. Cal. 2003) ............................................................23

18
*In re Cylink Sec. Litig.*,
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................................................16

19

20
*In re Daou Systems, Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ..........................................................................14

21
*In re Metawave Comm'ns Corp. Sec. Litig.*,
22
   298 F. Supp. 2d 1056 (W.D. Wash 2003)..........................................................16

23
*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ............................................................................23

24

25
*In re Tibco Software, Inc. Sec. Litig.*,
   2006 WL 2844421 (N.D. Cal. Sept. 29, 2006) ..................................................20

26
*In re Vantive Corp. Sec. Litig.*,
27
   283 F.3d 1079 (9th Cir. 2002) ....................................................................14, 22

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — ii
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

*In re Watchguard Sec. Litig.*,
   2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ...........................................................19, 20

*In re Zumiez Inc. Sec. Litig.*,
   2009 WL 901934 (W.D. Wash. Mar. 30, 2009) .................................................................20

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ............................................................................... passim

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...............................................................................14

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) .................................................................................22

*South Ferry LP # 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ................................................................................ passim

*South Ferry LP, No. 2 v. Killinger*,
   399 F. Supp. 2d 1121 (W.D. Wash. 2005)...........................................................passim

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.*,
   551 U.S. 308 (2007).................................................................................1, 2, 3, 5

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................................................ passim


**FEDERAL STATUTES**

Sarbanes-Oxley § 302(a) ...........................................................................................20


**RULES**

Fed. R. Civ. P. 9(b) ....................................................................................................16

Fed. R. Civ. P. 11.......................................................................................................14

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — iii
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

# I.    INTRODUCTION

Plaintiffs' Supplemental Brief compounds the flaws in their Complaint.  If plaintiffs have a claim, they should be able to state in declarative sentences exactly what defendants said that was false (and misled investors), why they claim defendants' statements were false, and the particular facts that should lead the Court to draw a "strong inference" of defendants' scienter.  But clarity does not appear to be the objective of plaintiffs' Supplemental Brief.  Instead, plaintiffs offer a dense, self-referential regurgitation of their allegations in a form that itself presumes scienter rather than explaining why the Court should infer it.  Given plaintiffs' inability to plead facts giving rise to a strong inference of scienter, the Court should now dismiss plaintiffs' complaint with prejudice, for the following reasons:

*First*, plaintiffs give short shrift to the post-*Tellabs* Ninth Circuit cases that control the analysis of scienter pleading.  The five Ninth Circuit scienter decisions in the past year show that it will be an "exceedingly rare category of cases in which the core operations inference" applies and gives rise to a strong inference of scienter.  *South Ferry LP # 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008).  To state a claim under the Reform Act, a plaintiff must allege both false statements and, in addition, specific facts leading to the strong inference that the corporate officer made the statements knowing they were false.  The recent Ninth Circuit cases teach that, assuming falsity, a plaintiff can rely on the core operations principle to satisfy the scienter pleading requirement only by alleging (a) particular facts showing that the officer had actual (not just theoretical) access to information contradicting the statements; (b) facts establishing the falsity of the statement that are so prominent it would be "absurd to suggest" that top management was unaware of them; or (c) a collection of facts that, examined in a "holistic" way, create a compelling inference that the officer made false statements knowing of the falsity.  Plaintiffs' allegations do not satisfy these tests.

*Second*, plaintiffs' brief makes clear that they have not alleged false statements by any defendant.  The brief does not point to a single statement before Q3 '03 that allegedly misled the public as to WaMu's ability to deliver information to its Treasury Department sufficient to

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 1
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1  allow effective hedging against interest rate risks associated with its pipeline of newly-

2  originated loans.  Nor do plaintiffs point to any false statement associated with MSR hedging.

3  WaMu's public filings disclosed the risk associated with non-parallel movements in interest

4  rates (i.e., a tightening of basis spreads), which led to the MSR hedging loss in Q2 '04.

5  Rather than address those statements directly, plaintiffs rely on obfuscation, implying (though

6  never directly stating) that MSR hedging losses in Q2 '04 resulted from the same information-

7  flow issues that caused pipeline hedging losses eight months before—which defendants had

8  said were fixed.  In fact, plaintiffs have not alleged *any* facts linking the Q2 '04 MSR hedging

9  losses to the pipeline hedging problems of Q3 '03, which WaMu disclosed and addressed.

10      ***Third***, a holistic analysis negates scienter.  The two discrete stock price drops that

11  form the basis of plaintiffs' claims occurred during a period of record dividends and steadily

12  rising stock prices.  (Indeed, WaMu shares sold for more at the end of the supposed class

13  period than they did at the beginning.)  WaMu never restated its financial statements.  Nor did

14  defendants engage in suspicious stock sales or any other behavior that might be considered

15  indicia of fraud.  Instead, the documents referred to in the Complaint show that defendants

16  promptly disclosed bad news, explained why it had come to pass, and described how they

17  intended to deal with it.  Viewed holistically in light of all circumstances, the inference of

18  scienter is exceptionally weak, not compelling, and does not satisfy the Reform Act.

**II.    ARGUMENT**

**A.    After *Tellabs*, Core Operations Allegations Will Give Rise to a Strong
Inference of Scienter Only in an "Exceedingly Rare Category of Cases".**

21      Plaintiffs suggest the Court has already decided the very issues that the Ninth Circuit

22  remanded for consideration.  Br. 1:7-9.  In fact, in remanding this case, the Court of Appeals

23  invited a comprehensive review of plaintiffs' allegations in light of scienter case law as it has

24  evolved since this Court issued its original order in 2005.  *See South Ferry*, 542 F.3d at 786.

25  The relevant body of law includes not only *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551

26  U.S. 308 (2007), but also *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir.

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 2
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200  ·  1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150  ·  Fax: (206) 757-7700

2009), *Metzler Inv. GMBH v. Corinthian Colls., Inc*., 540 F.3d 1049 (9th Cir. 2008), *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008), and *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008).

Taken as a whole, the post-*Tellabs* case law in this Circuit (which plaintiffs largely ignore) makes clear that "core operations" allegations can give rise to a strong inference of scienter only in an "exceedingly rare category of cases."  *South Ferry*, 542 F.3d at 785 n.3.  "[T]he Court's decision in *Tellabs* does not materially alter the particularity requirements for scienter claims established in [the Ninth Circuit's] previous decisions, but instead only adds an additional 'holistic' component to those requirements." *Digimarc*, 552 F.3d at 987.  Thus, under settled principles in this Circuit, a court can draw a strong inference of scienter from a defendant's management role only if the defendant has made untrue statements ***and*** (a) the defendant had actual access to information establishing the falsity of the disputed statement; (b) the nature of the fact undermining the public statement "is of such prominence that it would be 'absurd' to suggest" management's ignorance of the falsity; or (c) the allegations "when read together" give rise to an inference of scienter.  *South Ferry*, 542 F.3d at 785-86.

The Ninth Circuit did not apply these tests to plaintiffs' allegations, instead inviting this Court to do so in the first instance.  *Id.* at 786.  The recent cases that do apply the tests show that, even when a defendant has made false statements (which defendants here did not do), mere allegations of access to information and confidential witness statements will not suffice to create a strong inference of scienter in this Circuit in the wake of *Tellabs*:

- In *Digimarc*, the defendant company restated six quarters of earnings because it had improperly classified expenses relating to software development—meaning that it admitted the falsity of its prior financial statements.  552 F.3d at 988.  Plaintiffs argued that statements from confidential witnesses, the restatement, resignations of key accounting personnel in the wake of the restatement, Sarbanes-Oxley certifications, and officer compensation and stock sales established scienter.  *Id.* at 992.  The Ninth Circuit, however, found those were not enough, viewed either individually or holistically.  Although

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 3
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1    management "closely reviewed" accounting numbers and discussed inventory data in

2    meetings, plaintiffs could not allege facts showing that management was in a position to know

3    about the manipulation of the data from which the accounting numbers were derived. *Id*. at

4    1000-01. And the falsity of the statements "would not be immediately obvious to corporate

5    management," since there were no specific allegations that the precise stage of software

6    development "would be operationally visible to executives not intimately connected with the

7    development process and GAAP's definitions"—even though Digimarc was a development-

8    stage company trying to show that it had "turned the corner" to profitability. *Id*. at 1001, 988.

9    •    In *Corinthian Colleges*, the defendant received 82% of its revenue from federal

10    student loan funding. 540 F.3d at 1055 n.2. Plaintiffs alleged that as a result of pervasive

11    admissions fraud, 50% to 60% of students were unqualified to receive federal aid at all. *Id*. at

12    1055. Highly-placed confidential witnesses corroborated the allegations, and the company

13    restated up to 15% of its earnings for three quarters, thereby conceding the falsity of its prior

14    statements. *Id*. at 1056. Plaintiffs' scienter allegations relied on the defendants' public

15    statements, corroborated by confidential witnesses, that management exercised "close

16    oversight" and "closely monitored" operational data using a "sophisticated information

17    management system and database." *Id*. at 1058. The Ninth Circuit, however, held the

18    scienter allegations insufficient because the defendants' stock sales "viewed as a whole"

19    (rather than defendant-by-defendant) did not give rise to an inference of scienter and because

20    the detailed reporting showed only that management had "day-to-day" knowledge about

21    enrollment figures necessary to run the business—which did not give rise to a strong

22    inference that they knew the enrollment figures were fraudulent. *Id*. at 1067-68.

23    •    In *Glazer*, defendants were officers of a small manufacturer that relied on

24    overseas sales. 549 F.3d at 746. The company announced a merger with GE and attached to

25    the merger agreement its Form 10-K, in which it warranted compliance with all laws. *Id*. at

26    740. In due diligence, GE discovered bribes to foreign government officials in violation of

27    the Foreign Corrupt Practices Act ("FCPA"). *Id*. at 747-48. After the company announced

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 4
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

an internal investigation, its stock dropped by over $6.00. *Id*. at 740. Despite the company's size, the importance of overseas sales, and the defendants' role, the Court did not draw a strong inference of scienter. It was not absurd to suggest that the sales and marketing director concealed the illegal payments from senior management. *Id*. at 746-47. A holistic analysis of Sarbanes-Oxley certifications, profit motives, and the ease with which GE discovered the payments did not support scienter. *Id*. at 745-48. Even the company's settlement with DOJ and the SEC—in which it admitted it "was aware of the high probability that its foreign sales agents" violated the FCPA—did not create a strong inference of scienter. *Id*. at 748-49.

• Finally, in *Applied Signal*—the only Ninth Circuit case since *Tellabs* to hold that plaintiffs adequately alleged scienter—the Ninth Circuit addressed one of the "exceedingly rare category of cases in which the core operations inference" applies. *See South Ferry*, 542 F.3d at 785 n.3. *Applied Signal* involved a small company for which just two customers accounted for 80% of company revenue. 527 F.3d at 984. Even after the company received stop-work orders from its largest customer, it continued to include the halted work as part of its "backlog." *Id*. When the company finally accounted for the stopped work, revenue dropped by 25%, and the stock plummeted. *Id*. The Court refused to credit the argument that the top management of a company this small would be unaware of the loss of the "company's largest contract with one of its most important customers." *Id*. at 988 n.5. The Court also focused on the "temporal proximity" of the misleading statements relative to the disclosures: on August 24, 2004, management characterized one stopped contract as "backlog" to investors; just two weeks later, they admitted the work had been halted. *Id*. at 987-88 & nn.4, 5. Another stop-work order transformed one of the company's facilities into a "ghost town," while a third occurred only after management tried to negotiate its way out of contract requirements—suggesting management's full knowledge of the order. *Id*. at 988 n.5. In the circumstances, it would have been absurd to suggest that management was unaware that the announced backlog included contracts worth tens of millions of dollars for which stop-work orders had issued. *Id*. at 989.

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 5
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1       The cases show that even when falsity is a given, the Ninth Circuit insists that

2   plaintiffs do more than rely on the importance of the allegedly misstated matter to the

3   business, confidential witness statements that do not directly link defendants to the alleged

4   fraud, or neutral facts that can exist in the absence of fraud, such as stock sales, resignations,

5   Sarbanes-Oxley reports, and management's profit motives.  Instead, plaintiffs must allege

6   falsity with particularity and then allege specific facts leading to a compelling inference that

7   the defendants spoke knowing of falsity.  Plaintiffs' allegations fall short in every way.

8       **B.     Plaintiffs Have Not Alleged Any False Statements**

9       In arguing falsity, plaintiffs' brief relies largely on rhetorical flourishes and abstract

10  allegations about "structural deficiencies," "technological failures," "dysfunctional" risk-

11  management systems, and "systematic operational failures."  Br. 8:26, 10:18, 11:20.  But

12  plaintiffs' aptitude with slogans cannot satisfy their obligation under the Reform Act.  Instead,

13  plaintiffs must allege particularized facts showing falsity.  They have not done so.[1]

14      Plaintiffs tacitly concede that the mere fact that WaMu functioned as a large-scale

15  financial services company offset much of its interest rate risk:  operating a wide range of

16  diverse businesses under one umbrella acted as a "natural hedge."  "Part of our business does

17  better when interest rates are going up, part of it does better when interest rates are going

18  down."  Complaint ¶ 60 (hereafter cited as "¶" and paragraph number).  Plaintiffs do not

19  allege falsity with respect to any public statement concerning WaMu's natural hedge.  In

20  addition to the natural hedge, the WaMu Treasury Department managed interest rate risk,

21  liquidity, capital, funding, and securities held for risk management of the operating units.

22  Caplow Decl., Ex. A at 8 (03 10K/A at 1).  Plaintiffs' allegations revolve around the financial

23  hedging done by the Treasury Department.  In particular, plaintiffs allege false statements

24  with respect to hedging losses incurred in Q3 '03 and Q2 '04.

---

[1] Plaintiffs suggest that the Court decided falsity in 2005.  Br. 4:2-3.  But the Court previously considered only
defendants' arguments that the Complaint depended on (1) statements of historical fact; (2) non-actionable
puffery; and (3) forward-looking statements.  *South Ferry LP, No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129
(W.D. Wash. 2005).  The Court did not previously consider the falsity issues addressed in this brief, which form
the first part of the scienter analysis.  *See Digimarc*, 552 F.3d at 990-91.

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 6
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1    The documents cited in the Complaint and the Complaint itself make clear that these

2    losses arose from hedging activities designed to mitigate two distinct risks—loan pipeline (or

3    rate-lock) risk in Q3 '03 and MSR risk in Q2 '04.  Rate-lock commitments involve short-term

4    risk associated with interest rate fluctuations during the interval between the origination and

5    closing of new loans, i.e., while loans are in the "pipeline."  *South Ferry,* 542 F.3d at 780.

6    Because an increase in interest rates can result in the Bank funding loans at below market

7    rates, rising rates create pipeline risk.  *Id.*  MSR, on the other hand, involves multi-year

8    income streams arising from servicing rights on previously-funded loans, either held in

9    portfolio or sold to third parties with servicing rights retained.  *Id.*  Rising interest rates

10   generally ***increase*** MSR value, as rate increases make it likely that fewer mortgage holders

11   will decide to refinance, thus preserving the revenue stream.  *Id.*  By contrast, decreasing

12   interest rates create MSR risk, as lower rates encourage borrowers to prepay, eliminating the

13   promised revenue stream and diminishing MSR value.  The contradictory effect of an interest

14   rate increase on the two risks both illustrates the natural hedge inherent in WaMu's business

15   and suggests the differences between the hedges used to manage these risks.

16        Plaintiffs' brief, however, blurs the distinction between pipeline and MSR hedging and

17   between the events that gave rise to the pipeline hedging losses in Q3 '03 and then, 8 months

18   later, the events that led to MSR hedging losses in Q2 '04.  Although plaintiffs make the

19   predictable boilerplate assertion that they "paint a detailed picture" and make

20   "[p]articularized" allegations, Br. 6:2-3, their discussion avoids ***any*** specific discussion of

21   loan pipeline or MSR hedging activities.  Instead, plaintiffs describe WaMu's hedging with

22   generic references to efforts to "withstand changes in interest rates," Br. 2:8, a supposed

23   inability to "cope with risks of interest-rate fluctuation," Br. 10:8-9, and "risk management

24   operations."  Br. 11:25.  A rigorous examination shows that, in fact, plaintiffs' vagueness

25   conceals a complete absence of actionable allegations.

26

27

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 7
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1

2

### 1.    Plaintiffs' Brief Does Not Discuss Any False Statements with Respect to Pipeline Hedging Activities.

Plaintiffs' pipeline hedging claims involve a one-time event in Q3 '03, which WaMu promptly and publicly disclosed.  In late July and August 2003 a four standard deviation change in interest rates created a sharp and sudden impact in mortgage loan activity that briefly overwhelmed WaMu's home loan business unit.  Caplow Decl., Ex. B at 174 (Lehman Bros. 9/9/03).  Instead of the typical percentage of loans that "fall out" and do not fund, a rush of customers closed loans at locked-in below-market rates.  Caplow Decl., Ex. C at 181 ('Q3 '03 Earnings Call at 2).  The business units also agreed to honor rate-lock commitments on loans that could not be closed during the stated rate-lock period.  *Id.* at 181-82.  As a result, an atypical volume of loans remained in the pipeline for non-standard periods of time.

These extraordinary events would have been manageable if the Treasury employees responsible for hedging had up-to-date information concerning rate locks and the loan pipeline.  Regrettably, the Treasury employees who managed the hedging for WaMu's rate-lock commitments received incomplete information about the interest rates being locked in by business units.  "Washington Mutual did not have a clear understanding of its loan pipeline and the corresponding interest rate risk associated with those loans in the face of fluctuating interest rates."  Complaint ¶ 47.

WaMu identified and disclosed the issue.  On September 9, 2003, Mr. Killinger said that "the spike in interest rates in late July and August" created "imprecision in the matching of our loan commitments and pipeline hedging activities."  ¶ 74.  In this short period, interest rates changed by four standard deviations.  Caplow Decl., Ex. B at 174 (Lehman Bros. 9/9/03).  (To give a sense of the rarity of this event, 99.73% of values lie within three standard deviations, while 99.994% of values lie within four standard deviations.)  When WaMu realized that its Treasury Department was not receiving timely rate-lock data, it convened a "SWAT team" to identify the sources of the problem and correct rate-lock information flows to Treasury.  ¶ 79.

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 8
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1    Plaintiffs' Complaint does not allege that any of the defendants made any statements

2    about pipeline hedging or rate-lock information flows before the September 9, 2003, self-

3    announcement.  ¶¶ 56-72.  Their brief provides no further insight on the point—either in the

4    text or in the dense summary of allegations set forth in their table reviewing defendants'

5    statements.  Equally important, they do not allege any problems with respect to pipeline

6    hedging or information flows to Treasury *after* that date.  Indeed, plaintiffs plead that the

7    events that adversely affected MSR hedging in Q2 '04 had no impact on pipeline hedging.

8    ¶ 120 ("The company's loan pipeline hedging has not been adversely affected by these

9    factors.").  For all the rhetoric that accompanies plaintiffs' discussion of the pipeline hedging

10   loss in Q3 '03, then, they have not alleged any false statements pertaining to that event.

11            **2.      Plaintiffs' Brief Does Not Address Any Alleged Misstatements with
                        Respect to MSR Hedging.**

12

13        Unable to allege a false statement concerning pipeline hedging, plaintiffs' Complaint

14   focuses on MSR hedging losses, which occurred 8 months later.  Indeed, plaintiffs end their

15   proposed class period on the date WaMu disclosed its MSR hedging losses, which caused the

16   value of WaMu stock to drop.  ¶¶ 43, 119–121.  By ending the class period on this date,

17   plaintiffs necessarily contend that the revelation of "the truth" on that date caused their loss

18   from the earlier misstatements.  *See Dura Pharm. v. Broudo*, 544 U.S. 336, 347 (2005) (loss

19   causation requires allegation that the defendant's "share price fell significantly after the truth

20   became known").  Because the only relevant disclosure on that date related to the MSR loss,

21   plaintiffs have staked their claim on their ability to allege false statements about MSR

22   hedging, which the market allegedly discovered on June 28, 2004.

23        Like their Complaint, plaintiffs' brief does not describe any particular false statement

24   concerning WaMu's hedging of MSR risk that might have misled the public.  In fact, a review

25   of the documents properly before the Court, as well as the statements quoted in plaintiffs'

26   brief, shows that WaMu cautioned against the very events that occurred in Q2 '04.

27

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 9
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1    WaMu told investors that it hedged for potential impairment in value of its MSR asset

2    using a market basket of financial instruments that tend to increase in value when interest

3    rates decline, such as fixed–rate investment securities, interest rate contracts (swaps and

4    swaptions[2]), and forward commitments to purchase mortgage-backed securities.  Caplow

5    Decl., Ex. A at 13 ('03 10K/A at 6).  These MSR hedging instruments produced significant

6    gains in 2002 and 2003.  *Id.* at 36 ('03 10K/A at 32-33).  But WaMu prominently disclosed

7    that the judgments used to formulate the MSR hedging portfolio could "adversely" affect "net

8    income."  *Id.* at 13 ('03 10K/A at 6).  The ongoing "success of this strategy" was "dependent

9    on management's judgments regarding the amount, type and mix of MSR risk management

10   instruments" selected to "manage the changes in fair value of our mortgage servicing asset."

11   *Id*.  WaMu further disclosed that its portfolio of instruments used to hedge MSR was subject

12   to "basis risk" depending on the "spread" between mortgage rates and the swap rate:

13   Changes in the behavior of how MSR risk management instruments
     respond to changes in interest rates vary based on the specific
14   instrument.  The difference in market indices between the MSR and the
     risk management instrument results in basis risk.  For example, changes
15   in the fair value of interest rate swaps are driven by shifts in interest rate
     swap rates while . . . [m]ortgage rates may move more or less than the
16   rates on . . . interest rate swaps.  ***This could result in a change in the
     fair value of the MSR that differs from the change in fair value of the
17   MSR risk management instruments***.

18   *Id*. at 62 ('03 10K/A at 59) (emphasis added).  WaMu explained that its analysis "assumes

19   that mortgage and interest rate swap spreads remain ***constant*** in all interest rate environments.

20   ***Changes in these spreads*** could result in ***significant changes*** in projected ***net income***

21   sensitivity."  *Id.* at 64 ('03 10K/A at 60) (emphasis added).  As Mr. Casey cautioned:  "Of

22   course, interest rates don't always shift in parallel fashion and the slope of the yield curve as

23

24

25   [2] An interest rate swap is an agreement to make fixed-rate interest payments in exchange for floating rate interest
     payments.  The respective payment obligations are offset and only the net amount is paid at settlement.  The
26   swap has a "notional" value to establish value.  The "swap rate" refers to the fixed rate of interest being paid in
     the transaction.  For example, if the interest rate swap involved a fixed rate of 4% and a floating rate of LIBOR +
27   50 basis points (i.e., 0.5%) with a notional value of $1 million, and LIBOR was 4%, then at settlement, the
     counterparty that agreed to pay the fixed rate would receive a net payment of $5,000.00, i.e., 0.5% x $1 million.

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 10
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

well as spreads between mortgages, treasuries and LIBOR indices also have an impact on us and other lenders."  ¶ 107.

Plaintiffs do not claim that any of these statements were false.  In Q2 '04, the risks that WaMu had cautioned about came to pass:  the spread between 30-year mortgages and 10-year interest rate swaps tightened by an extraordinary ***two standard deviations***.  Caplow Decl., Ex. D at 195 (Q2 '04 Earnings Call).  On June 28, 2004, the end of the proposed class period, WaMu announced that the dramatic narrowing of the basis spreads from the historical mean caused a loss in hedge value that exceeded the increase in value of MSR, which reduced Q2 '04 mortgage banking income.  ¶ 120.  By Q3 '04, the basis spread returned to historic levels, which translated into a more favorable net MSR income for the quarter.  Caplow Decl., Ex. E at 22, 34 (Form 10Q Q3 '04).  Plaintiffs do not allege any hedging losses thereafter.

Plaintiffs thus allege an MSR hedging loss in a single quarter of the proposed class period—nothing more.  They do not allege that WaMu previously told investors that its MSR hedging operation functioned differently from how it actually functioned.  They do not allege that WaMu claimed that MSR hedging would produce results different from what it produced in the extraordinary circumstances caused by a two standard deviation tightening of basis spreads.  Plaintiffs have not alleged a false statement with respect to MSR hedging.

### 3.    Plaintiffs' Have Not Linked the Disclosure of the MSR Hedging Loss to Any Prior Statements Concerning "Operational" Issues.

Faced with an inability to point to any arguably untrue statements about MSR hedging, plaintiffs try to bootstrap the MSR claim by insinuating that it shared a common cause with the earlier pipeline hedging loss.  According to plaintiffs, "[t]he Company was without effective methods to acquire accurate data regarding that [mortgage] business, pieces of that business were splintered across separate and independent systems, and WaMu did not have the capacity to integrate data regarding secondary markets above and beyond their own internal home mortgage business."  Br. 10:9-12.  Based on this assertion, plaintiffs declare

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 11
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1  that defendants "deliberately lied" when they said that WaMu's "risk management systems

2  were operational and effective." *Id.* 10:13-15.

3      But when one penetrates beyond the rhetoric, the Complaint does not actually allege

4  that the MSR hedging loss established the falsity of any of defendants' prior challenged

5  statements.  In arguing to the contrary, plaintiffs (Br. 12-17) identify statements by the

6  company that: (a) "process system" or "operational" challenges were being addressed, ¶¶ 40,

7  41, 74, 77, 79;  (b)  "flows of information" had improved, ¶¶ 42, 87; (c) steps were being

8  undertaken to "fully integrate" both acquisitions and hedging operations, ¶¶ 45, 89, 106, 114;

9  (d) it made improvements in efficiency, ¶¶ 96, 97; and (e) it used "sophisticated" risk

10  management and hedging, ¶¶ 56, 58, 67, 86, 115.  But plaintiffs do not allege any facts

11  suggesting problems with information flow or operations with respect to the MSR portfolio

12  being hedged, and no confidential witness talks about reporting problems as to MSR.  Further,

13  no confidential witness, no analyst, and no paragraph in the complaint links the MSR hedging

14  loss in Q2 '04 to operational problems, information flows, lack of integration, or the like.

15      In short, plaintiffs have identified an event (i.e., the Q3 '03 pipeline hedging loss),

16  public statements that the causes for the event had been addressed (i.e., the inadequate flow of

17  loan origination information to Treasury employees responsible for pipeline hedging), and a

18  subsequent loss associated with a different event (i.e., the Q2 '04 loss on MSR hedging).

19  Although no one has ever linked the MSR loss to the same causes as the pipeline loss,

20  plaintiffs ask the Court to infer that the mere fact of the MSR loss revealed the defendants'

21  public statements addressing the causes for the pipeline loss to be lies.  But as plaintiffs

22  themselves point out, MSR hedging protects against interest rate risks associated with existing

23  loans for which WAMU has the servicing rights.  Br. 8:13.  By definition, problems with the

24  information flow for pipeline hedging—i.e., information concerning loans that WaMu had not

25  yet closed—have nothing to do with MSR, interest rate risk as to MSR, basis risk, or MSR

26  hedging.  Plaintiffs do not argue to the contrary.  Instead, they blandly point to the fact that

27  the Court has found that plaintiffs adequately alleged "technology problems," difficulties with

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 12
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1    Optis, and system integration challenges.  Br. 7:2-9.  But they draw no link between the MSR

2    hedging loss and those allegations, *all* of which relate to loan origination, not the servicing of

3    existing loans that gives rise to the MSR asset.

4         This case does not involve a restatement of earnings, as did *Digimarc*, *Corinthian*

5    *Colleges*, and *Applied Signal*.  It does not involve a plea agreement or a concession of

6    wrongdoing, as did *Glazer*.  It does not even involve a loss of share value during the class

7    period.  Instead, it involves prompt disclosures of adverse events, remedial action that appears

8    to have been successful, and accurate disclosure of the "basis risk" associated with MSR

9    hedging.  Because the Complaint has not alleged the false statement that must serve as the

10   foundation for any analysis of scienter (or any indicia of falsehood), the Court should dismiss.

11        **C.    Plaintiffs Have Not Alleged Facts Giving Rise to a Strong Inference of
             Scienter.**

12        Even assuming falsity *arguendo*, plaintiffs have not satisfied their pleading obligation

13   under the Reform Act.  As explained above, a court can draw a strong inference of scienter

14   from a defendant's management role only if (a) the plaintiff alleges with particularity facts

15   showing that the defendant had actual access to information contradicting the disputed

16   statement; (b) the nature of the fact undermining the public statement "is of such prominence

17   that it would be 'absurd' to suggest" management's ignorance; or (c) the allegations taken

18   holistically give rise to a strong inference of scienter.  *South Ferry*, 542 F.3d at 785-86.

19        Plaintiffs cannot satisfy these tests.  Instead, their Complaint relies on unrelated one-

20   time events involving exceptional interest rate behavior.  In late July and August 2003 interest

21   rates increased by four standard deviations and the Treasury Department was not getting

22   timely information about loans in the pipeline; eight months later, in Q2 '04, basis spreads

23   tightened by two standard deviations.  Each event caused hedging losses, though for unrelated

24   reasons.  Plaintiffs do not identify a single internal report or confidential witness that

25   discusses the defendants' foreknowledge of these events or the causes underlying them.

26   Instead, plaintiffs rely on the disclosures themselves to suggest that any problems that caused

27

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 13
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1   the temporary declines in share price *must* have been known all along.  That is nothing more

2   than "fraud by hindsight," which the Ninth Circuit has condemned as contrary to the Reform

3   Act.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002).  *See also*

4   *Collins v. Winex Invs., LLC*, 2009 WL 861738, at *3 (S.D. Cal. Mar. 27, 2009) (claim that

5   defendants failed to fulfill promised "constant review" of "portfolio risk exposure" and

6   "conservative policies" on risk management improperly alleged fraud by hindsight).

7             **1.      Plaintiffs Fail to Plead Defendants' Actual Access to Information.**

8         In arguing that defendants had access to information contrary to their public

9   statements, plaintiffs analogize this case to *In re Daou Systems, Inc.*, 411 F.3d 1006, 1022

10  (9th Cir. 2005), and *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226,

11  1231 (9th Cir. 2004), where defendants "actually did monitor the data that were the subject of

12  the allegedly false statements."  *South Ferry*, 542 F.3d at 785.  Plaintiffs rely on the fact that

13  defendants reassured the public that "those problems" (which plaintiffs do not specify, but

14  which presumably refer to the problems with information flows that impaired pipeline

15  hedging in Q3 '03) had been fixed.  Br. 22:24.  They also rely on vague allegations about "the

16  importance of the Company's technological capabilities to its business," Br. 23:6-7, and

17  allegedly "detailed statements about the Company's supposed success in fixing those risk

18  management and hedging problems."  Br. 23:8-9.

19        But these scienter arguments (for they are not factual allegations) all turn on the notion

20  that the false statements whose truth was exposed on June 28, 2004, revolved around fixing

21  the problems that arose out of the pipeline hedging issues in Q3 '03.  ¶¶ 109; 116.  But that is

22  wrong, for the reasons explained above.  There is no link between any of these statements and

23  the MSR hedging losses in Q2 '04.  MSR hedging did not rely on system integration, Optis,

24  or loan origination information flows—and plaintiffs do not allege specifically that it did (and

25  Rule 11 would forbid such an allegation).  MSR hedging processes therefore did not depend

26  on fixing the distinct issues that led to pipeline hedging losses in 2003, which explains why

27  the MSR hedge performed well in Q3 '03, even while the pipeline hedge faltered.  Plaintiffs

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 14
DWT 12865842v3 0013149-000059

1    have not alleged that defendants had actual access to any information that would have shown

2    any statements about MSR hedging to be false or untruthful.

3           Plaintiffs do offer a chart of "Statement[s]" and claim that it shows "Indicia of Access

4    and Knowledge." Br. 12:17-17:27. But the chart just recycles plaintiffs' empty assertions.

5    Having failed to manufacture scienter through the blanket allegation that the "above quoted

6    statements by Defendants" were "materially false and misleading when made" (¶ 60), the

7    chart argues that the very same statements standing alone prove the defendants had, but failed

8    to take advantage of, accurate information about interest rate behavior and appropriate

9    hedging strategies. The chart relies on the erroneous premise that if management spoke on a

10   topic, a court may infer that management had "actual access" to all information within the

11   company on that topic, including information contradicting management's statement. A close

12   look reveals the absurdity of this tautological argument, which (contrary to settled law) would

13   allow an inference of scienter whenever management made a false statement.

14          For example, on April 16, 2003, three months before the pipeline hedging loss,

15   Mr. Killinger gave introductory comments discussing WaMu's 31st consecutive increase in

16   the cash dividend: "[W]e continue to be very disciplined in managing the company, which

17   we believe will place us in a stronger position when the current environment changes."

18   Plaintiffs' chart truncates the statement, inserts the phrase "[interest rate]," and then contends

19   this statement shows Mr. Killinger's "access and knowledge" of WaMu's subsequent pipeline

20   hedging difficulties because it gave "personal assurance that WaMu was equipped to confront

21   interest-rate fluctuations." Br. 12:18-19. In fact, Mr. Killinger's general optimism following

22   a strong Q1 '03 provides no indication, other than plaintiffs' say-so, that Mr. Killinger had

23   actual access to facts concerning information flow problems, which became manifest under

24   pressure of an extreme interest rate movement and caused the pipeline hedging loss in Q3 '03.

25          Similarly, plaintiffs describe Mr. Casey's April 16, 2003, statement that WaMu was

26   focused on "balancing the demands of today" against "eventual change in interest rate

27   environment" as illustrating "personal involvement" and a sign of access and knowledge of

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 15
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1  future issues related to pipeline hedging.  Br. 12:20-26.  But if this were so, *every* statement

2  by a senior officer would satisfy the "actual access" test, simply because (by its very

3  existence) it would demonstrate management's personal knowledge of and access to

4  information pertaining to the subject matter of the statement.

5       Nor do plaintiffs allege facts suggesting Ms. Oppenheimer's actual access to

6  information contradicting her statements.  Ms. Oppenheimer assumed her mortgage banking

7  role (for which she is named as a defendant) months *after* disclosure of the pipeline hedging

8  losses, and she made only two statements during the class period.  The first, on December 9,

9  2003, acknowledged technology problems but made no reference to hedging.  ¶ 89.  The

10 second statement, five months later on May 18, 2004, mentioned hedging but did not refer to

11 technology problems.  ¶ 115.  Ms. Oppenheimer's May statement said only that WaMu was

12 managing its balance sheet in a "very sophisticated fashion, with a number of various hedges

13 and instruments."[3]  Br. 17:5-13.  Plaintiffs do not deny the truth of Ms. Oppenheimer's

14 statement but claim it shows her "personal understanding that systems technology metrics are

15 critical to hedging and risk management."  *Id*.  In fact, Ms. Oppenheimer's general statement

16 (which says nothing about "systems technology metrics," let alone link those metrics to

17 hedging) does not show her "detailed knowledge of the Company's hedging and risk

18 management activities," as plaintiffs claim.  *Id*.  Indeed, while plaintiffs say that Ms.

19 Oppenheimer "did not purport to rely on statements of intermediaries or reports by lower

20 level management," Br. 11:24-25, she expressly defers to a colleague who "can speak about

21 very specific numeric measures that we have in place."  ¶ 115.

22

23 ───────────────
   [3] Plaintiffs' brief also misstates the context of Ms. Oppenheimer's statement by stating (inaccurately) that it was
24 made at a Lehman Brothers Conference on May 12 at which Mr. Killinger spoke.  Br. 16-17.  But plaintiffs'
   Complaint does not allege that Ms. Oppenheimer attended that conference.  In any event, even if she had, the law
25 does not allow plaintiffs to impute to one defendant liability for a co-defendants' statements absent specific
   allegations (lacking here) that the defendant substantially participated in making those statements.  *See In re*
26 *Metawave Comm'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1088-89 (W.D. Wash 2003); *In re Cylink Sec.*
   *Litig.*, 178 F. Supp. 2d 1077, 1084-85 (N.D. Cal. 2001); *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1166
27 (W.D.Wash. 1998) (under Rule 9(b) and Reform Act, plaintiffs must "attribute the misleading statements upon
   which [their] claim is based to a particular defendant") (citation omitted).

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 16
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1    Plaintiffs' conclusory allegations of access to knowledge fall short even of allegations

2    that the Ninth Circuit has deemed insufficient.  In *Digimarc*, for example, even though

3    management "closely reviewed" accounting numbers and discussed inventory data in

4    meetings, plaintiffs could not allege facts showing that management was in a position to know

5    about the manipulation of the data from which the accounting numbers were derived.  552

6    F.3d at 1000-01.  In *Corinthian Colleges*, the defendants publicly stated (and confidential

7    witnesses corroborated) that senior management exercised "close oversight" and "closely

8    monitored" its operational data using a "sophisticated information management system and

9    database."  540 F.3d at 1058.  And in *Glazer*, the company entered into a settlement with the

10   federal government, admitting it had been "aware of the high probability that its foreign sales

11   agents" violated the FCPA.  549 F.3d at 748.  In each case, the Ninth Circuit held that these

12   allegations of actual access to facts contradicting defendants' public statements did not pass

13   muster.  This Court should reject plaintiffs' far less substantial allegations here.

14        **2.    Plaintiffs Do Not Plead Facts Making It Absurd to Suggest that
              Management Would Not Know of the Alleged Falsity.**

15        Plaintiffs make their "absurd to suggest" argument based on the proposition that

16   management ***must*** have known about "technological" and "pervasive risk management"

17   problems, which defendants promised to fix but did not.  Br. 23-24.  But this is misdirection.

18   The MSR hedging losses disclosed at the end of the proposed class period had nothing to do

19   with any "technological" or "pervasive risk management" problems.  The Complaint makes

20   this clear, for it concedes that pipeline hedging (the hedging affected by the technological

21   problems) performed as expected after Q3 '03 (¶ 120), and plaintiffs do not dispute that MSR

22   hedging did what it was supposed to do before Q2 '04.  *See, e.g.*, Caplow Decl., Ex. A at 36

23   (03 10K/A at 32-33); ¶¶ 104-06.  Neither the Complaint nor the brief cites any analyst,

24   financial commentator, or confidential witness who attributed the Q2 '04 MSR hedging

25   problems to the same issues that led to the Q3 '03 hiccup in pipeline hedging.  Rather, the Q2

26   '04 MSR hedging loss stemmed from an unusual tightening of basis spreads.  Plaintiffs do not

27

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 17
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200  ·  1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150  ·  Fax: (206) 757-7700

1   suggest the falsity of any statement pertaining to that topic, much less explain how the falsity

2   of that statement would have been "obvious" to each defendant.

3          The shortcomings in plaintiffs' argument can be readily diagnosed by comparison to

4   the one case where the Ninth Circuit inferred scienter based on the conclusion that it would be

5   "absurd to suggest" management's lack of knowledge.  In *Applied Signal*, the falsehood

6   related to stop-work orders from two customers that, taken together, comprised 80% of a

7   small company's business.  527 F.3d at 984.  By contrast, the Ninth Circuit declined to infer

8   scienter in *Corinthian Colleges*, even though the defendant received 82% of its revenue from

9   federal student loan funding, 540 F.3d at 1055 n.2, and the plaintiffs alleged that pervasive

10  admissions fraud meant that 50-60% of students were unqualified to receive that aid.  *Id.* at

11  1055.  Here, WaMu had 63,700 employees at year end 2003.  Plaintiffs' claims, however, are

12  specific to the hedging used to mitigate risk for two sub-segments (out of four) of the

13  mortgage banking segment, which comprises only one of three segments of the Consumer

14  Group (as distinct from the Commercial Group).  *See* Caplow Decl., Ex. A at 8-9 (03 10K/A

15  at 1-2).[4]  Plaintiffs' MSR claim relates only to the hedge for prepayment risk, which at year

16  end 2003 represented less than 2.4% of WaMu's assets.  *Id.* at 68, 80 (03 10K/A at 64, 74).

17         This case has nothing in common with *Applied Signal*.  It is hardly absurd to suggest

18  that defendants would rely on the professionals in WaMu's Treasury Department responsible

19  for the complex task of pipeline and MSR hedging, rather than directing management

20  attention to a function that from all appearances generally performed without any flaws.

21              **3.      Holistic Review Does Not Save the Complaint.**

22         Viewing the Complaint holistically does not give rise to a strong inference of scienter.

23  Indeed, the most compelling facts squarely negate plaintiffs' claims.  On June 29, 2004, the

24  day after the end of plaintiffs' proposed class period, WaMu's stock closed at $38.47, 5%

25  *higher* than at the beginning of the proposed class period.  During that proposed class period,

26
27  [4]  Plaintiffs' claim reaches only one aspect of WaMu's loan origination business:  plaintiffs do not allege any
    false statements about the risks associated with "purchase commitments" for mortgage loans bought though the
    correspondent channel, which resembles pipeline risk.  Caplow Decl., Ex. A at 92 ('03 10K/A at 89).

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 18
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

the Company declared record dividends every quarter. It never had to restate its financial statements or adjust its earnings reports. The events at issue were never the subject of government or internal investigations, and plaintiffs point to no earmarks that might hint at some concealed fraud. Instead, the case involves nothing more than two brief stock price drops following unusual economic events. The holistic analysis could end there.

Rather than engage in a holistic analysis, as the Supreme Court and the Ninth Circuit have directed, plaintiffs cherry-pick a few factors that courts have identified in reviewing scienter issues. But the factors on which courts traditionally have relied in assessing scienter (including some that plaintiffs chose to ignore) show that one cannot draw a strong inference of scienter from the circumstances of this case.

### a.    Self-disclosure and Remediation.

A court should not infer scienter when the defendant itself disclosed the matter at issue and "took steps" to make improvements "when it discovered those problems." *In re Watchguard Sec. Litig.*, 2006 WL 2927663, at *10 (W.D. Wash. Oct. 12, 2006). "If anything," identifying and remediating the hedging problems "counters an inference that the company was trying to keep the alleged accounting problems from view." *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 679 (D. Colo. 2007) (internal citation omitted). Even plaintiffs admit that defendants promptly disclosed both the pipeline hedging and MSR hedging issues. No one suggests that defendants "cooked the books" in any way.

### b.    Confidential Witnesses.

The Court has disposed of most of the confidential witness allegations. *South Ferry LP, No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1140 (W.D. Wash. 2005). As to the rest, none (a) references defendants or suggests that they had access to facts that would disprove their public statements; (b) states facts suggesting that defendants were on notice of either category of hedging problems prior to WaMu's disclosure of those problems; (c) suggests that the alleged technological problems had any impact on hedging operations after Q3 '03; or (d) links the alleged operational and technical problems that lie at the core of the complaint to the

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 19
DWT 12865842v3 0013149-000059

MSR hedging losses in Q2 '04.  *See In re Tibco Software, Inc. Sec. Litig*., 2006 WL 2844421,

at *1 (N.D. Cal. Sept. 29, 2006) (confidential witnesses did not establish that executives

overseeing system integration were aware of specific integration problems identified by

witnesses); *In re Zumiez Inc. Sec. Litig.*, 2009 WL 901934, at *9 (W.D. Wash. Mar. 30, 2009)

("statements hardly raise an inference that the alleged problems were widespread throughout

the Company"; "the witnesses provide little to no indication as to when these problems

occurred"); *Watchguard*, 2006 WL 2927663, at *3 (allegation that a CFO's "financial results

may not have been legitimately derived" did not give rise to strong inference of scienter).

### c.     Alleged GAAP Violations and Certifications.

The Court properly rejected plaintiffs' efforts to draw a strong inference of scienter

through allegations of GAAP violations.  *South Ferry*, 399 F. Supp. 2d at 1147.  Plaintiffs

have not offered any reason to re-visit that holding.  In particular, they have not alleged any

particular violation of GAAP that could give rise to a compelling inference that defendants

knew WaMu's financial statements were false, especially in the absence of any particularized

allegation that any defendant had access to information that would establish the falsity of a

public statement.  The same is true of plaintiffs' effort to draw an inference of scienter from

Sarbanes-Oxley certifications and SEC filings.  "Boilerplate language in a corporation's 10–K

form, or required certifications under Sarbanes-Oxley section 302(a) … add nothing

substantial to the scienter calculus."  *Digimarc*, 552 F.3d at 1003–04.

### d.     Stock Sales.

Plaintiffs persist in pointing to defendants' stock sales, suggesting that they show

scienter.  In *Corinthian Colleges*, however, the Ninth Circuit made clear that, even as part of a

holistic analysis, a court must assess officers' stock sales "as a whole," rather than on a

defendant-by-defendant basis, to see if a pattern emerges of insiders capitalizing on

knowledge of the alleged fraud.  540 F.3d at 1066-67.  Thus, the Ninth Circuit drew no

inference of scienter in *Corinthian Colleges*, even though one defendant sold 37% of his

holdings during the class period.  "We typically require larger sales amounts—and

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 20
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1   corroborative sales by other defendants—to allow insider trading to support scienter." *Id.* at

2   1067.  Here, as in *Corinthian Colleges*, plaintiffs' allegations concerning stock sales do not

3   suggest the sort of pattern that could give rise to a strong inference of scienter—whether

4   assessed individually or collectively.

5       ***Thomas Casey.***  Mr. "Casey is alleged to have 'sold' 752 shares during the Class

6   Period" to "pay a tax liability on vested shares." *South Ferry*, 399 F. Supp. 2d at 1145.  In

7   evaluating scienter, the timing and prior history of "allegedly improper stock transactions are

8   viewed as a whole." *Corinthian Colleges*, 540 F.3d at 1067.  When, as here, one of the

9   defendants essentially "sold nothing at all," it suggests that "there was no insider information

10  from which to benefit." *Id.*; *Andropolis*, 505 F. Supp. 2d at 678 (absence of stock sales "dulls

11  allegations of fraudulent motive" and is "inconsistent with an intent to defraud shareholders").

12      ***Kerry Killinger.***  Ignoring the Court's November 17, 2005, Order, plaintiffs reassert

13  rejected arguments that Mr. Killinger's "sale" of 231,587 shares of stock during the class

14  period was suspicious.  The Court found that 109,637.28 of those shares were not actually

15  sold but were transferred to a deferred compensation plan and that 30,588.02 shares were

16  withheld for payroll tax obligations on a stock award. *South Ferry*, 399 F. Supp. 2d at 1144.

17  These non-sale transfers do not support a strong inference of scienter. *Id.* at 1145.

18      Further, the Court has held that Mr. Killinger's only class period stock sale (91,361

19  shares on January 28, 2004) is suspicious in neither timing nor amount.  In terms of timing,

20  the sale was consistent with prior annual sales of stock in January 2002 and 2003. *Id.*  If

21  Mr. Killinger had been exploiting insider information, he could have sold shares in November

22  or December 2003, when the stock was trading at a higher price.  Instead, consistent with

23  prior patterns, he sold in January, after the price started to decline.  Perhaps the most

24  compelling evidence negating scienter is the fact that the transaction consisted entirely of

25  Mr. Killinger exercising 91,361 options ***that were set to expire within the next month*** and

26  selling the resulting shares.  As the Court previously found, the timing of Mr. Killinger's sale

27  could have been dictated, in part, by the imminent expiration of his options. *Id.*

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 21
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1    As to amount, Mr. Killinger's stock sale is not suspicious.  First, the Complaint uses

2 misleading figures to suggest scienter.  Plaintiffs allege that Mr. Killinger sold 10.22% of his

3 holdings on January 28, 2004, but they calculate that percentage based on Mr. Killinger's

4 stock and "exercised options."  ¶¶ 155-156.  The correct method of calculating percentage of

5 holdings sold is to include all stock and exercis*able* options.  *See Ronconi v. Larkin*, 253 F.3d

6 423, 435 n.25 (9th Cir. 2001).  Taking into account Mr. Killinger's exercisable options, the

7 sale represented a mere 2% of his total holdings.[5]  Selling such a small percentage of total

8 holdings is not suspicious.  *See Vantive*, 283 F.3d at 1094 (CEO's sale of only 13% of

9 holdings tended to negate inference of scienter); *Ronconi*, 253 F.3d at 435 (sales by the CEO

10 and CFO of 10% and 17%, respectively, were not suspicious in amount).  Further, the fact

11 that the January 2004 sale was larger than prior January sales has a non-culpable explanation:

12 the share price was significantly higher in January 2004 than it had been at the time of

13 Mr. Killinger's January sales in prior years.  *South Ferry*, 399 F. Supp. 2d at 1145.

14    ***Deanna Oppenheimer.***  The Court has found that Ms. Oppenheimer's April "sale" of

15 15,320.37 shares actually involved a withholding for payroll tax obligations on a stock award.

16 *South Ferry*, 399 F. Supp. 2d at 1146.  Moreover, as discussed in defendants' opening brief,

17 Ms. Oppenheimer's January trade involved only a small fraction of her holdings—less than

18 13%—not 52.52%, as alleged.  Ms. Oppenheimer exercised 123,859 options on January 28,

19 2004, out of a possible 978,828 shares and exercisable options.  *See* Caplow Decl., Ex. F at

20 217 (DEF 14A, Mar. 17, 2004, at 14) (showing Ms. Oppenheimer's holdings following the

21 January transaction).  As with Mr. Killinger, Ms. Oppenheimer's sales do not raise any

22 inference of scienter.  *See Vantive*, 283 F.3d at 1094; *Ronconi*, 253 F.3d at 435.

23    **e.    Participation in the Performance Share Program**

24    Plaintiffs claim that Mr. Killinger and Ms. Oppenheimer (but not Mr. Casey) were

25 "strongly motivated" to keep WaMu stock inflated through the end of 2003 due to their

26

27 ---
[5] As of February 27, 2004, Mr. Killinger held 725,058 shares and 4,280,251 exercisable options, for total holdings of 5,005,309 shares.  Caplow Decl., Ex. F at 217 (DEF 14A, Mar. 17, 2004, at 14).

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 22
DWT 12865842v3 0013149-000059

1 participation in the company's Performance Share Program. Br. 18; *see also* ¶ 164. This

2 amounts to a bare "motive and opportunity" allegation, which does not give rise to a strong

3 inference of scienter. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.

4 1999). Courts repeatedly have held that the mere motive to increase performance-based

5 compensation, like other routine business objectives, cannot give rise to the strong inference

6 of scienter required under the Reform Act. *See Glazer*, 549 F.3d at 748 (evidence of personal

7 profit motive in completing merger insufficient because present in almost every transaction);

8 *Constr. Laborers Pension Trust v. Neurocrine Biosciences, Inc.*, 2008 WL 2053733, at *7

9 (S.D. Cal. May 13, 2008) (motive to receive bonus compensation does not support scienter);

10 *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1087 (N.D. Cal. 2003) (motive to

11 increase pay is insufficient for a strong inference of scienter).

12      Further, other facts pled by plaintiffs contradict any inference of scienter based on an

13 alleged motive to prop up stock sales through the end of 2003. As plaintiffs allege, the

14 Company voluntarily announced in early December 2003 that it was experiencing shortfalls in

15 the face of rising interest rates. As a result, the Company's stock price dipped, and analysts

16 lowered earnings estimates for 2003 and 2004. ¶¶ 91-93. If defendants had been motivated to

17 support the stock price through the end of 2003, they would not have made candid

18 announcements against their interest in early December 2003.

19               **f.    Ms. Oppenheimer's Resignation.**

20      Ms. Oppenheimer's resignation more than six months after the end of the class period

21 provides no evidence of scienter. Br. 20:26-21:4. For a resignation to support an inference of

22 scienter, it must occur "slightly before or after" the relevant corrective statement, and the

23 plaintiff must "allege sufficient information to differentiate between a suspicious change in

24 personnel and a benign one." *Digimarc*, 552 F.3d at 1002. "Absent allegations that the

25 resignation at issue was . . . accompanied by suspicious circumstances, the inference that the

26 defendant corporation forced certain employees to resign because of its knowledge of the

27 employee's role in the fraudulent representations will never be as cogent or as compelling as

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 23
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1  the inference that the employees resigned or were terminated for unrelated personal or

2  business reasons." *Id*.

3        Here, plaintiffs allege no facts suggesting that Ms. Oppenheimer's decision to resign

4  was in any way "suspicious." Ms. Oppenheimer departed long after the relevant corrective

5  disclosure, her responsibilities never extended to hedging management, and the plaintiffs

6  suggest no reason to classify her resignation as anything other than "benign."

7                         **g.**    **Plausible Alternative Inferences.**

8        In holding that the district court correctly dismissed plaintiffs' amended complaint for

9  failure to allege facts giving rise to a strong inference of scienter, the Ninth Circuit in

10  *Digimarc* referred to the company's acknowledged accounting misstatements and observed:

11          It is more plausible that Digimarc's management was unable to control
            the accounting processes within the corporation during this integration

12          than that it was systematically using accounting manipulations to make
            the company seem slightly more financially successful.

13  552 F.3d at 1007. Here, the proposed class covers a period of significant company

14  expansion, steady stock appreciation, and record dividends. The two transient drops in share

15  price occurred in response to two discrete manifestations of unusual interest rate behavior.

16  No internal reports or confidential witnesses link the defendants to information suggesting

17  they were aware of the prospect of hedging losses before they occurred. Under these

18  circumstances, systematic fraud provides the least plausible explanation of events.

19                    **III.**    **CONCLUSION**

20        For the foregoing reasons, defendants request that the Court dismiss plaintiffs'

21  Complaint. Because plaintiffs have had repeated opportunities in this Court and in the Ninth

22  Circuit to explain how they could allege defendants' scienter, and they have failed to do so,

23  defendants respectfully request that the Court make its dismissal with prejudice.

24        RESPECTFULLY SUBMITTED this 12th day of June, 2009.

25                  **DAVIS WRIGHT TREMAINE LLP**
                    *Attorneys for Thomas Casey*

26

27                  By:  *s/ Stephen M. Rummage*
                    Stephen M. Rummage, WSBA #11168

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 24
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

**SIMPSON THACHER & BARTLETT LLP**
Barry R. Ostrager (*pro hac vice*)
Mary Kay Vyskocil (*pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Tel.:      (212) 455-2500
Fax:      (212) 455-2502
Email:    bostrager@stblaw.com
            mvyskocil@stblaw.com

Robert J. Pfister (*pro hac vice*)
Gabriel D. Miller (*pro hac vice*)
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067
Tel.:      (310) 407-7500
Fax:      (310) 407-7502
Email:    rpfister@stblaw.com

**DAVIS WRIGHT TREMAINE LLP**
Stephen M. Rummage, WSBA #11168
Steven P. Caplow, WSBA #19843
1201 Third Avenue, Suite 2200
Seattle, Washington 98101-3045
Tel.: (206) 757-8108
Fax: (206) 757-7136
Email: steverummage@dwt.com
Email: stevencaplow@dwt.com

*Attorneys for Thomas Casey*

**WILSON SONSINI GOODRICH & ROSATI, PC**
*Attorneys for Kerry Killinger*

By:  s/ Barry M. Kaplan
         Barry M. Kaplan, WSBA #8661
         Douglas W. Greene, WSBA #22844
         Professional Corporation
         701 Fifth Avenue, Suite 5100
         Seattle, WA  98104-7036
         Tel.:  (206) 883-2500
         Fax:  (206) 883-2699
         Email: bkaplan@wsgr.com
         Email: dgreene@wsgr.com

**MORVILLO ABRAMOWITZ GRAND
IASON & SILBERBERG, PC**
*Attorneys for Deanna Oppenheimer*

By:  s/  Cyrus Vance, Jr.
         Cyrus Vance, Jr., WSBA # 18615
         565 Fifth Avenue
         New York, New York 10017
         Tel.: 212-880-9490
         Fax: 212-856-9494
         Email: CVance@maglaw.com

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 25
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

CERTIFICATE OF SERVICE

     I hereby certify that on June 12, 2009, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record who receive CM/ECF notification, and that the remaining parties shall be served in accordance with the Federal Rules of Civil Procedure.

     DATED this 12th day of June, 2009.

          Davis Wright Tremaine LLP
          *Attorneys for Defendant Thomas W. Casey*

     By /s/ Stephen M. Rummage
        Stephen M. Rummage, WSBA #11168
        1201 Third Avenue, Suite 2200
        Seattle, Washington  98101-3045
        Telephone:  (206) 757-8136
        Direct Fax:  (206) 757-7136
        E-mail:     steverummage@dwt.com

INDIVIDUAL DEFENDANTS' JOINT RESPONSE BRIEF ON REMAND
Case No. C04-1599 JCC — 26
DWT 12865842v3 0013149-000059

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700